IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Alexander Gray, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *-vs-* | ) | No. 23-cv-1931 |
| | ) | |
| City of Evanston, Evanston Police | ) | |
| Officers Kubiak, Kane, Popp, | ) | |
| Rosenbaum, and Pogorzelski, | ) | *(Judge Seeger)* |
| | ) | |
| *Defendants.* | ) | |

## INDEX OF PAPER EXHIBITS TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

| Ex No. | Description | App. Page |
|---|---|---|
| 1 | Answer to Amended Complaint, ECF No. 11 | 1 |
| 2 | Police Incident Report | 8 |
| 3 | Frame Grabs of Video Evidence re Use of Force | 11 |
| 4 | Summary Table of Video Evidence re Use of Force | 41 |
| 5 | Frame Grabs re Use of Force | 43 |
| 6 | Summary Table of Video Evidence re Search | 59 |
| 7 | Kane Interrogatory Answers | 60 |
| 8 | Kubiak Interrogatory Answers | 69 |
| 9 | Pogorzelski Interrogatory Answers | 78 |
| 10 | Popp Interrogatory Answers | 86 |
| 11 | Rosenbaum Interrogatory Answers | 94 |
| 12 | Gray Deposition Excerpts | 103 |

| Ex No. | Description | App. Page |
|---|---|---|
| 13 | Kane Deposition | 117 |
| 14 | Kubiak Deposition | 163 |
| 15 | Popp Deposition | 203 |
| 16 | Rosenbaum Deposition | 244 |
| 17 | Use of Force Policy | 302 |
| 18 | Search and Seizure Policy | 316 |

### DIGITAL MEDIA TO BE UPLOADED THROUGH DIGITAL MEDIA SUBMISSION PROCEDURE

| # | File Name |
|---|---|
| V1 | MAN_WITH_A_GUN_(FOIA_23-14_Kubiak.mp4 |
| V2 | MAN_WITH_A_GUN_(FOIA_23-14_Kane).mp4 |
| V3 | MAN_WITH_A_GUN_(FOIA_23-14_Burgers).mp4 |
| V4 | MAN_WITH_A_GUN_(FOIA_23-14_Brown).mp4 |
| V5 | MAN_WITH_A_GUN_(FOIA_23-14_Conley) (1).mp4 |
| V6 | MAN_WITH_A_GUN_(FOIA_23-14_Conley_2) (2).mp4 |
| V7 | CrosbyArrest.mp4 |

Dated: January 26, 2024

/s/ Kenneth N. Flaxman

Kenneth N. Flaxman
ARDC No. 08830399
Joel A. Flaxman
200 South Michigan Ave Ste 201
Chicago, Illinois 60604
(312) 427-3200

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Alexander Gray | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| vs. | ) | No.  2023-cv-1931 |
| | ) | |
| City of Evanston, Evanston Police Officers | ) | |
| Kubiak, Kane, Popp, Rosenbaum, and | ) | |
| Pogorzelski, | ) | |
| | ) | |
| *Defendants.* | ) | |

## DEFENDANTS ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendants, City of Evanston, Evanston Police Officers Kubiak, Kane, Popp, Rosenbaum, and Pogorzelski (collectively "Defendants") by and through their attorney NICHOLAS E. CUMMINGS, Corporation Counsel, and through Alexandra Ruggie, Deputy City Attorney, submits the foregoing Answer and Affirmative Defenses to Plaintiff's Amended Complaint at Law, hereby state as follows:

1.      This is a civil action arising under 42 U.S.C. § 1983.  The jurisdiction of this Court is conferred by 28 U.S.C § 1343.

**ANSWER:**      **The Defendants admit that jurisdiction is proper as alleged in paragraph 1.**

2.      Plaintiff Alexander Gray is a middle-aged, law-abiding resident of the Northern District of Illinois.

**ANSWER:**      **The Defendants lack sufficient information or knowledge upon which to form a belief as to the truth of the allegations contained in paragraph 2.**

3.  Defendant City of Evanston is an Illinois municipal corporation.

**ANSWER:**      **The Defendants admit the allegations contained in paragraph 3.**

**Exhibit 1**
Page 1 of 7

4.      Defendants Kubiak, Kane, Popp, Rosenbaum, and Pogorzelski were at all relevant times acting under color of their authority as police officers of the City of Evanston.

**ANSWER:      The Defendants admit the allegations contained in paragraph 4.**

5.      On March 31, 2021, the Evanston police department informed its police officers by electronic means that an anonymous caller had reported "a white male, approximately 5 feet tall to 6 feet tall, in a dark coat and jeans" carrying a handgun north of the beach at 501 Sheridan Square in the City of Evanston.

**ANSWER:      The Defendants admit the allegations contained in paragraph 5.**

6.      Defendants Kubiak, Kane, Popp, Rosenbaum, Pogorzelski and other Evanston police officers responded to the report of the white male, approximately 5 feet tall to 6 feet tall, in a dark coat and jeans.

**ANSWER:      The Defendants admit the allegations contained in paragraph 6.**

7.  Defendant Kubiak was the first officer to arrive at the scene.

**ANSWER:      The Defendants admit the allegations contained in Paragraph 7.**

8.      Kubiak saw plaintiff, who is a non-white male, standing about 200 feet north of the beach at 501 Sheridan Square in the City of Evanston.

**ANSWER:      Defendants lack sufficient information and knowledge to form a belief as to the truth of the allegations contained in paragraph 8.**

9.      Kubiak did not see plaintiff violating any law or ordinance.

**ANSWER:      Defendants lack sufficient information or knowledge upon which to form a belief as to the truth of the allegations contained in Paragraph 9.**

10.      Kubiak unholstered his firearm and pointed it at plaintiff in the manner shown below:

**ANSWER:       Defendants admit the allegations contained in Paragraph 10.**

**Exhibit 1**
Page 2 of 7

*App. 2 of 326*

11.     As Kubiak pointed his firearm at plaintiff, he ordered plaintiff to "Put your hands up. Get on the ground." Plaintiff protested that he lived in the area; in response to Kubiak's question of "What do you have in your hands?" Plaintiff showed his empty hands to Kubiak as shown below:

**ANSWER:     Defendants deny the allegations contained in Paragraph 11.**

12.     Kubiak continued to point his firearm as he approached plaintiff and repeated his order to, "Get on the ground."

**ANSWER:      Defendants deny allegations contained in Paragraph 12.**

13.     Plaintiff was then in fear of his life.

**ANSWER:     Defendants lack sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 13.**

14.     Kubiak continued to point his firearm at plaintiff as plaintiff complied with Kubiak's orders to get on the ground.

**ANSWER:     Defendants admit the allegations contained in paragraph 14.**

15.     Kubiak then stated, "Do what we tell you to do and you won't get hurt" and ordered plaintiff to spread his hands "like Superman."

**ANSWER:     Defendants admit the statement "Do what we tell you to do and you won't get hurt" was made, but lack sufficient knowledge or information to form a belief as to the truth of the allegation that Kubiak made the statement.**

16.     Defendant Kubiak deprived plaintiff of rights secured by the Fourth Amendment in pointing his firearm at plaintiff in ordering plaintiff to get on the ground.

**ANSWER:     Defendants deny the allegations contained in paragraph 16.**

17.     Defendant Kane, who joined Kubiak, unholstered his firearm, and pointed it at plaintiff.

**ANSWER:     Defendants admit the allegations contained in paragraph 17.**

Exhibit 1
Page 3 of 7

*App. 3 of 326*

18.     Defendant Kane deprived plaintiff of rights secured by the Fourth Amendment in pointing his firearm at plaintiff.

**ANSWER:**     **Defendants deny the allegations contained in paragraph 18.**

19.     Other Evanston police officers, including defendant Popp, Rosenbaum, and Pogorzelski arrived at the scene, unholstered their firearms, and pointed their weapons at plaintiff.

**ANSWER:**     **Defendants admit that other Evanston police officers including Defendants Popp, Rosenbaum and Pogorselzki arrived at the scene and unholstered their firearms. Defendants deny that they pointed their weapons at plaintiff.**

20.     Two Evanston police officers, whose names are presently not known to plaintiff, then handcuffed and searched plaintiff while he remained on the ground and while defendant Rosenbaum point his assault rifle at plaintiff at point-blank range.

**ANSWER:**     **Defendants admit that two Evanston Police Officers handcuffed Plaintiff and conducted a search. Defendants deny that Defendant Rosenbaum pointed his assault rifle at plaintiff at point-blank range.**

21.     Defendant Rosenbaum did not have any lawful basis to point his assault rifle at plaintiff and thereby deprived plaintiff of right secured by the Fourth Amendment.

**ANSWER:**     **Defendants deny the allegations contained in paragraph 21.**

22.     The officers who handcuffed and searched plaintiff are depicted in the following image:

**ANSWER:**     **Defendants admit the allegations contained in paragraph 22.**

23.     The two Evanston police officers are depicted above who searched plaintiff did not have lawful basis to conduct that search and thereby deprived plaintiff of rights secured by the Fourth Amendment.

**ANSWER:**     **Defendants deny the allegations contained in paragraph 23.**

Exhibit 1
Page 4 of 7

*App. 4 of 326*

24.     All of the officers at the scene (aside from the defendant Rosenbaum) failed to intervene to stop Rosenbaum from pointing his assault rifle at plaintiff.

**ANSWER:     Defendants deny the allegations contained in paragraph 24.**

25.     All of the officers at the scene (aside from the two officers depicted above) failed to intervene to stop the two above depicted Evanston police officers from conducting an unreasonable and unconstitutional search.

**ANSWER:     Defendants deny the allegations contained in paragraph 25.**

26.     At all relevant times, an express policy of the City of Evanston authorized its police to point loaded firearms, including assault rifles, at a person without reasonable suspicion that the person was involved in criminal activity or that deadly force was reasonable.  This policy was a moving force of the unconstitutional conduct described above.

**ANSWER:     Defendants deny the allegations contained in paragraph 26.**

27.     At all relevant times, the City of Evanston has failed to instruct and train its police officers that an uncorroborated anonymous tip that a person is carrying a firearm does not permit a police officer to point a firearm at a person, order that person to lay on the ground, and order that person to comply with the police orders under penalty of death while officers searched that person.  This failure to train was moving force of the unconstitutional conduct as described above.

**ANSWER:     Defendants deny the allegations contained in paragraph 27.**

28.     As a result of the foregoing, plaintiff was deprived of rights secured by the Fourth and Fourteenth Amendments and incurred physical and other injuries.

**ANSWER:     Defendants deny the allegations contained in paragraph 28.**

29.     Plaintiff hereby demands trial by jury.

**ANSWER:      Defendants admit that Plaintiff is demanding a trial by jury.**

Exhibit 1
Page 5 of 7

*App. 5 of 326*

## AFFIRMATIVE DEFENSES

Defendants, City of Evanston ("City"), and Evanston Police Officers Kubiak, Kane, Popp, Rosenbaum and Pogorzelski (collectively "Defendants"), by and through their attorney, NICHOLAS E. CUMMINGS, Corporation Counsel, and through Alexander Ruggie, Deputy City Attorney assert the following affirmative defenses:

1.      Defendants Kubiak, Kane, Popp, Rosenbaum and Pogorzelski, conduct was at all times objectively reasonable and did not violate any of Plaintiff's clearly established Constitutional rights.    Accordingly, Defendants Kubiak, Kane, Popp, Rosenbaum and Pogorzelski are entitled to qualified immunity.

2.      Officers Kubiak, Kane, Popp, Rosenbaum and Pogorzelski cannot be held liable for Plaintiff's 42 U.S.C. § 1983 claims unless he or she individually caused or participated in an alleged constitutional deprivation because individual liability for damages under 42 U.S.C. § 1983 is predicated upon personal responsibility. See *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983).

3.      Plaintiff cannot recover punitive damages for claims against Defendants in their official capacity.  See *Holly v. City of Naperville*, 571 F. Supp. 668 (N.D. Ill. 1983).

4.      The City is not liable to Plaintiff for any federal claim for which its employees or agents are not liable to Plaintiff. See *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

5.      Under the Tort Immunity Act, the City is not required to pay punitive or exemplary damages in any action brought directly or indirectly against an employee by the injured party or a third party. 745 ILCS 10/2-102.

6.      To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that Plaintiff has a duty to mitigate, commensurate with the degree of failure to mitigate attributed to Plaintiff by the jury in this case.

**Exhibit 1**
Page 6 of 7

## JURY DEMAND

Defendants, City of Evanston, Kubiak, Kane, Popp, Rosenbaum and Pogorzelski, hereby

demand a jury trial for all issues so triable.

Dated: May 25, 2023                           NICHOLAS E. CUMMINGS
                                              Corporation Counsel
                                              City of Evanston


                                   By:    /s/ Alexandra Ruggie
                                          Deputy City Attorney

Nicholas E. Cummings, Corporation Counsel (ncummings@cityofevanston.org)
Alexandra B. Ruggie, Deputy City Attorney (aruggie@cityofevanston.org)
City of Evanston, Law Department
2100 Ridge Avenue, Suite 4400
Evanston, Illinois 60201
(847) 866-2937
law@cityofevanston.org

**Exhibit 1**
Page 7 of 7

*App. 7 of 326*

| Agency Name | INCIDENT/INVESTIGATION | Case# |
|---|---|---|

**Agency Name** *Evanston Police Department*

**INCIDENT/INVESTIGATION REPORT**

**Case#** *21-002580*

**ORI** *IL0163200*

**Date / Time Reported** *03/31/2021 14:34 Wed*

**Last Known Secure** *03/31/2021 14:28 Wed*

**At Found** *03/31/2021 14:34 Wed*

**INCIDENT DATA**

**Location of Incident** *501 SHERIDAN RD, Evanston IL 60201*

**Gang Relat** NO

**Premise Type** *Park/playground*

**Zone/Beat** EPD, 72

| | Crime Incident(s) | (Com) | Weapon / Tools | | | Activity |
|---|---|---|---|---|---|---|
| #1 | *Man With Gun* *7971* | | | | | |
| | | | Entry | Exit | Security | |
| #2 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |
| #3 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |

**MO**

**VICTIM**

| V1 | Victim/Business Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

**# of Victims** 0   **Type:**   **Injury:**

**Home Address**    **Home Phone**

**Employer Name/Address**    **Business Phone**   **Mobile Phone**

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|

**CODES:** V- Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)

**OTHERS INVOLVED**

**Type:** INDIVIDUAL    **Injury:**

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| RP | ███████████ | | ███ | ███ | ███ | | ███████ | |

**Home Address** ████████████████████    **Home Phone** ████████

**Employer Name/Address**    **Business Phone**   **Mobile Phone**

**Type:** INDIVIDUAL    **Injury:**

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB / Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| OP | GREY, ALEXANDER P | | 1973 / 47 | B | M | | Resident | |

**Home Address** ███ SHERIDAN SQ  EVANSTON, IL 60202    **Home Phone** 312-675-████

**Employer Name/Address**    **Business Phone**   **Mobile Phone**

**PROPERTY**

1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|

**Status**

**Officer/ID#** *BROWN, S. (PATR) (1719)*

**Invest ID#** *(0)*

**Supervisor** *DELEON, E. (PATR, *165) (1292)*

**Complainant Signature**   **Case Status** *Open*  *03/31/2021*   **Case Disposition:**   Page 1

# INCIDENT/INVESTIGATION REPORT

*Evanston Police Department*

Case # *21-002580*

| Status Codes | 1 = None | 2 = Burned | 3 = Counterfeit / Forged | 4 = Damaged / Vandalized | 5 = Recovered | 6 = Seized | 7 = Stolen | 8 = Unknown |
|---|---|---|---|---|---|---|---|---|

| | IBR | Status | Quantity | Type Measure | Suspected Type | |
|---|---|---|---|---|---|---|
| **D R U G S** | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

*KANE, M. (1695), POPP, K. (1682), ROSENBAUM, D. (1689), BASNER, N. (1525), POGORZELSKI, P. (1697)*

Suspect Hate / Bias Motivated:

### NARRATIVE

Officer(s) name and star number(s): Brown*142, Kane*209, Popp*116, Rosenbaum*161, Pogorzelski *255
Response address: 501 Sheridan Road
Response date and time: 3/31/21 at approximately 1434 hours
Nature of Call: Man with a Gun
Recorded on Body Worn Camera: Y

In Summary: on 3/31/21 at approximately 1434 hours, Officers Kane*209, Popp*116, Rosenbaum*161, Pogorzelski *255 and I, Ofc Brown*142 responded to 501 Sheridan Road to the report of a Man with a Gun.

While enroute dispatch advised that an unknown citizen, later identified as ███████████████ reported see a white male, approximately 5 feet tall to 6 feet tall, in a dark coat and jeans situated just north of the beach on the trail with a gun in his right hand.

Upon arriving on scene I observed Officer's Kane*209, Popp*116, Rosenbaum*161, Pogorzelski *255 with their weapons drawn on a man matching the aforementioned description who was later identified as Alexander Grey (10/27/93).

Grey was detained, cuffed (Double-locked, checked for tension within reasonability of the situation) and searched by Officers Kane and Rosenbaum under the cover of Officers Pogorzelski, Popp, and myself.

It should be noted that during his search/detainment Grey was explained the reason for the detention by Ofc. Pogorzelski and complied without incident.

A search of Grey and the surrounding area produced negative results for a hand gun.

It should be noted that Grey was carrying a pair of black over the head headphones in his right hand at the time of his detainment.

Grey was released with cuffs and provided an incident card complete with report number.

Speaking with ████████ via telephone on 3/31/21 at approximately 1520 hours ████████ stated that she was walking northbound on the east side of the 500 block of Sheridan square when she observed Grey ahead of her standing in the path (middle of the block, East side) facing westbound with what she believed to have been a gun in his right hand.

It should be noted that ████████ became unsure of whether she actually saw a gun when told that Grey had been found with a pair of black headphones in his right hand.

By CDELARO ██ 04/01/2021 ██ 0:42

**Exhibit 2**
Page 2 of 3

INCIDENT/INVESTIGATION REPORT

Narr. (cont.)  OCA: 21-002580                    *Evanston Police Department*

Nothing Further.

Exhibit 2
Page 3 of 3



**Exhibit 3**
Page 1 of 30

*App. 11 of 326*



**Exhibit 3**
Page 2 of 30



**Exhibit 3**
Page 3 of 30



**Exhibit 3**
**Page 4 of 30**

*App. 14 of 326*



**Exhibit 3**
**Page 5 of 30**

*App. 15 of 326*



2021-03-31 14:41:27 -0500
AXON BODY 3 X6030971X

**Exhibit 3**
Page 6 of 30

*App. 16 of 326*



Exhibit 3
Page 7 of 30

App. 17 of 326



**Exhibit 3**
**Page 8 of 30**

*App. 18 of 326*



**Exhibit 3**
**Page 9 of 30**

*App. 19 of 326*



**Exhibit 3**
**Page 10 of 30**

*App. 20 of 326*



**Exhibit 3**
**Page 11 of 30**

*App. 21 of 326*



**Exhibit 3**
**Page 12 of 30**

*App. 22 of 326*



**Exhibit 3**
**Page 13 of 30**



**Exhibit 3**
Page 14 of 30

*App. 24 of 326*



**Exhibit 3**
**Page 15 of 30**



**Exhibit 3**
Page 16 of 30



**Exhibit 3**
Page 17 of 30



**Exhibit 3**
Page 18 of 30



2021-03-31 14:41:57 -0500
AXON BODY 3 X6030971X

**Exhibit 3**
**Page 19 of 30**

*App. 29 of 326*



**Exhibit 3**
**Page 20 of 30**

*App. 30 of 326*



**Exhibit 3**
Page 21 of 30

*App. 31 of 326*



**Exhibit 3**
**Page 22 of 30**

*App. 32 of 326*



**Exhibit 3**
**Page 23 of 30**

*App. 33 of 326*



2021-03-31 14:42:07 -0500
AXON BODY 3 X6030971X

**Exhibit 3**
Page 24 of 30

*App. 34 of 326*



**Exhibit 3**
Page 25 of 30

*App. 35 of 326*



**Exhibit 3**
Page 26 of 30



**Exhibit 3**
**Page 27 of 30**

*App. 37 of 326*



**Exhibit 3**
**Page 28 of 30**

*App. 38 of 326*



**Exhibit 3**
**Page 29 of 30**

*App. 39 of 326*



**Exhibit 3**
Page 30 of 30

## SUMMARY TABLE 1:
## PLAINTIFF'S ROADMAP TO
## VIDEO EVIDENCE OF THE INITIAL SEIZURE

The "Time" is as shown on the body camera video.

"Video" is "V1" for Kubiak's BWC; V2 is Kane's BWC.

"Page" is the page number of Exhibit __, which consists of frame grabs of the image at the specific time in the BWC.

Event *in italics* is a description of the image. Dialog is an attempt to transcribe the words spoken on the BWC.

| Time | Video | Page | Event or Dialog |
|------|-------|------|-----------------|
| 14:41:10 | V1 | 1 | *Kubiak arrives on scene* |
| 14:41:15 | V2 | 2 | *Kane arrives on scene* |
| 14:41:22 | V1 | 3 | [Kane or Kubiak] … I got an eye on him |
| 14:41:23 | V1 | 4 | *Kubiak draws firearm and points at Gray* |
| 14:41:24 | V1 | 5 | [Kubiak] Pull your hands up. Pull yours hands out of the … |
| 14:41:27 | V1 | 6 | [Kubiak] OK. Get on the ground get on the ground |
| 14:41:28 | V1 | 7 | [Kubiak] Get on the ground. |
| 14:41:34 | V1 | 8 | [Kubiak] What do you have in your pockets? |
| 14:41:36 | V1 | 9 | [Gray] I was smoking a cigarette. |
| 14:41:38 | V1 | 10 | [Kubiak] What do you have in your pocket? |
| 14:41:39 | V2 | 11 | *Kane joins Kubiak* |
| 14:41:40 | V1 | 12 | [Gray] Nothing. |
| 14:41:41 | V1 | 13 | [Kubiak] Don't put your hands there. |
| 14:41:42 | V1 | 14 | [Gray] I live here. |
| 14:41:43 | V1 | 15 | [Kubiak] All right. Get on the ground. |
| 14:41:46 | V1 | 16 | [Kubiak] Okay get on the ground please |
| 14:41:48 | V1 | 17 | [Kubiak] Get on the ground. |
| 14:41:56 | V1 | 18 | [Kubiak] Ok get up, get … |
| 14:41:57 | V1 | 19 | [Gray] [Unintelligible] |
| 14:41:58 | V1 | 20 | [Kubiak] Ok. Ok. |
| 14:41:59 | V1 | 21 | [Gray] [unintelligible] |

(continued next page)

**Exhibit 4**
Page 1 of 2

| Time | Video | Page | Event or Dialog |
|------|-------|------|-----------------|
| 14:42:00 | V1 | 22 | [Kane] Do what we tell you and you won't get hurt, OK? Everything is going to be fine if you listen to what I say. |
| 14:42:03 | V2 | 23 | *Kane with unholstered firearm* |
| 14:42:07 | V1 | 24 | [Kane] You got any weapons on you? |
| 14:42:08 | V1 | 25 | [Gray] [unintelligible] |
| 14:42:09 | V1 | 26 | [Kane] No weapons on you? |
| 14:42:10 | V1 | 27 | [Gray] Unintelligible |
| 14:42:11 | V1 | 28 | [Kane] Put your hands farther, like Superman. |
| 14:42:14 | V1 | 29 | [Kane] There you go |
| 14:42:16 | V2 | 30 | *Kane and Kubiak approach Gray* |

**Exhibit 4**
Page 2 of 2

*App. 42 of 326*



**Exhibit 5**
Page 1 of 16

*App. 43 of 326*



**Exhibit 5**
Page 2 of 16



**Exhibit 5**
Page 3 of 16

*App. 45 of 326*



**Exhibit 5**
**Page 4 of 16**

*App. 46 of 326*



**Exhibit 5**
Page 5 of 16

*App. 47 of 326*



**Exhibit 5**
Page 6 of 16

*App. 48 of 326*



**Exhibit 5**
**Page 7 of 16**

*App. 49 of 326*



**Exhibit 5**
Page 8 of 16



**Exhibit 5**
Page 9 of 16

*App. 51 of 326*



**Exhibit 5**
Page 10 of 16

*App. 52 of 326*



**Exhibit 5**
Page 11 of 16

*App. 53 of 326*



**Exhibit 5**
Page 12 of 16

*App. 54 of 326*



**Exhibit 5**
Page 13 of 16

*App. 55 of 326*



**Exhibit 5**
Page 14 of 16

*App. 56 of 326*



**Exhibit 5**
Page 15 of 16

*App. 57 of 326*



**Exhibit 5**
Page 16 of 16

# SUMMARY TABLE 2:
## PLAINTIFF'S ROADMAP TO
## VIDEO EVIDENCE OF THE SEARCHES

The "Time" is as shown on the body camera video.

"Video" is V2 is Kane's BWC; V3 is BWC of Officer Burgers (not a defendant); V4 is BWC of Officer Brown (also not a defendant); V5 and V6 are Officer Conley (not a defendant, as produced by City of Evanston).

"Page" is the page number of Exhibit __, which consists of frame grabs of the image at the specific time in the BWC.

An event *in italics* is a description of the image.

| Time | Video | Page | Event |
|---|---|---|---|
| 14:42:20 | V4 | 1 | *Kubiak and Rosenbaum with firearms before handcuffing* |
| 14:42:25 | V4 | 2 | *Popp searching under Gray's jacket* |
| 14:42:33 | V2 | 3 | *Pat down search* |
| 14:42:34 | V2 | 4 | *Pat down search* |
| 14:42:35 | V2 | 5 | *Pat down search* |
| 14:42:36 | V4 | 6 | *Defendant Pogorzelski provides handcuffs to Defendant Popp; Defendant Rosenbaum holds his rifle at the ready close to plaintiff; Defendant Kane points his handgun at plaintiff* |
| 14:42:37 | V4 | 7 | *Popp takes handcuffs from Pogorzelski* |
| 14:42:39 | V5 | 8 | *Rosenbaum (with baseball cap) and rifle while Popp and Kane handcuff plaintiff* |
| 14:42:39 | V5 | 8 | *Long view of search (timestamp appears of out sync)* |
| 14:43:25 | V1 | 9 | *Popp searching Gray's jacket pocket* |
| 14:43:32 | V1 | 10 | *Popp searching jacket* |
| 14:43:49 | V1 | 11 | *Popp searching jacket* |
| 14:44:02 | V4 | 12 | *Popp searching jacket* |
| 14:44:04 | V6 | 13 | *Rosenbaum returns to scene of search* |
| 14:44:07 | V4 | 14 | *Popp searching jacket* |
| 14:44:16 | V3 | 15 | *Officer Burgers or Rosenbaum searching inside jacket pockets* |
| 14:44:17 | V3 | 16 | *continued search by Officer Burgers or Rosenbaum* |

**Exhibit 6**
Page 1 of 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALEXANDER GRAY, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 23-cv-1931 |
| | ) | |
| *v.* | ) | |
| | ) | |
| CITY OF EVANSTON, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |

**DEFENDANT KANE'S RESPONSE TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant Kane, by his undersigned attorneys, Leinenweber Baroni & Daffada, LLC, submits the following responses to Plaintiff's first set of interrogatories:

1.      State your full name, month and year of birth, and place of birth.

**ANSWER: Michael Francis Kane, October 1990, Hinsdale Illinois.**

2.      List each high school, college, university, graduate school, trade or technical school which you have attended and your dates of attendance in each and what degree or certificate, if any, you received from such institution.

**ANSWER:      Willowbrook High School (2005-2009) HS Diploma & Illinois State University (2009-2013) Bachelor's of Science in Criminal Justice, Minor in Sociology.**

3.      Did you ever serve in the military? If so, state:

    a)      Rank;
    b)      Serial number;
    c)      Branch of service;
    d)      Approximate dates of entry and discharge;
    e)      The type of discharge, whether honorable or otherwise, and if for medical reasons, state and describe the medical disability with reasonable specificity; and
    f)      Whether you were ever the subject of any disciplinary proceedings in the military service, and if so, describe the nature and state the outcome of such proceedings.

**ANSWER:      No.**

**Exhibit 7
Page 1 of 9**

4.     Identify each of your employers, in chronological order, starting with your graduation from high school and including all current and part- time employment. In your answer include the following:

        a)     The name and address of each employer;
        b)     The date you began each employment;
        c)     A general description of your job duties;
        d)     The date and reason for leaving each employment; and
        e)     A general description of your job duties at the time you left each position.

**ANSWER:**

1. **Paradise Bay Water Park**

   a. **437 E St. Charles Rd, Lombard, IL 60148**

   b. **June – August 2009**

   c. **Life Guard**

   d. **Left to start college.**

2. **West Chicago Community High School**

   a. **326 Joliet St, West Chicago, IL 60185**

   b. **Part time from November 2009 – December 2011**

   c. **Building & Grounds, maintenance, construction**

   d. **Worked here during summer and holidays**

   e. **Left to reside in Normal, IL for Rugby, work, and summer classes**

3. **Maggie Miley's Irish Pub**

   a. **126 E Beaufort St, Normal, IL 61761**

   b. **Part time May 2011 – May 2012**

   c. **Bar-back & Security**

   d. **Left to open up schedule for School and new job**

4. **Sami Apartments**

   a. **608 Kingsley St #A, Normal, IL 61761**

   b. **May 2012 – January 2013**

**Exhibit 7**
Page 2 of 9

*App. 61 of 326*

    c. **Property Management Company: assisted leasing agents, landscaping, moved furniture, conducted tours of properties for potential tennts/students, responsible for cleaning apartment pools.**

    d. **Left to start internship with Chicago Police Department**

5. **Hofbrauhas**

    a. **5500 Park Pl Rosement, IL 60018**

    b. **January 2013 – March 2014**

    c. **Bus Boy / Bar-back**

    d. **Worked part time while interning with CPD.**

6. **North Chicago Police Department**

    a. **1850 Lewis Ave, North Chicago, IL 60064**

    b. **March 2014 – November 2014**

    c. **Police Officer**

    d. **Transferred to Evanston PD**

7. **Evanston Police Department**

    a. **1454 Elmwood Ave, Evanston, IL 60064**

    b. **December 2014 – Current**

    c. **Police Officer**

5.    Have you ever been the subject of any citizen complaint concerning your actions or inactions as a police officer of the City of Evanston, and if so, state the disposition of each such complaint.

**ANSWER: Defendant objects to this interrogatory as vague, overly broad, and because it does not seek relevant information that is proportional to the needs of the case. Subject to and without waiving the objection, Defendant does not recall.**

6.    Have you ever been the subject of any disciplinary proceedings, including but not limited to citizen complaints to the Police Department of the City of Evanston, which resulted in the imposition of

**Exhibit 7**
**Page 3 of 9**

*App. 62 of 326*

any disciplinary action, including but not limited to a written or verbal warning, suspension, or reassignment?

**ANSWER: Defendant objects to this interrogatory as vague, overly broad, and because it does not seek relevant information that is proportional to the needs of the case. Subject to and without waiving the objection, Defendant was once suspended with options, for violation of EPD pursuit policy. Defendant does not recall any other disciplinary proceedings.**

7.      Describe any awards, recognitions, or commendations you have received in the course of your employment as an Evanston police officer.

**ANSWER:      Received Multiple awards, recognitions and commendations.**

8.      While serving as an Evanston police officer, have you ever applied for promotion to a higher paying position than your currently hold? Unless your response is a unqualified "no," provide details for each application made, including the position name, application date, and the outcome.

**ANSWER:      No.**

9.      Have you ever been a party, whether plaintiff or defendant, in any lawsuit? If so, state:

      a)      The court in which the case was filed;
      b)      The year of filing;
      c)      The title and case number; and
      d)      The final resolution of the case

**ANSWER:      No.**

10.     Have you ever been arrested, irrespective of whether the arrest has been expunged or sealed and irrespective of whether the arrest was made while you were a juvenile? Is so, please state for each such arrest:

      a)      The date and location of the arrest;
      b)      The arresting authority and names of officers involved;
      c)      If any criminal charges were filed in connection with the arrest, state the nature of the charges, the jurisdiction and disposition; and
      d)      Have the records of the arrest been expunged or sealed?

**Exhibit 7**
**Page 4 of 9**

**ANSWER:**

> **Summer 2006 Lombard, IL – underage drinking ticket from Lombard PD.**
> **Summer 2010 Twin Lakes, WI – underage drinking ticket from Twin Lakes PD.**
> **Summer 2012 Normal, IL – underage drinking ticket from Normal PD.**

11. Have you ever been interviewed, whether in person, by telephone, or any other method, by any law enforcement officer related to any alleged wrongdoing, whether on your part or on the part of another? If yes, for each instance, state:

   a) The date and location of the interview;
   b) The name of the interviewing authority and person or persons conducting the interview;
   c) The subject matter of the interview; and
   d) Whether you were informed about any constitutional or legal rights before or during the interview, and if so, what those rights were?

**ANSWER:** **Do not recall any instance.**

12. Did the plaintiff make any statements (written, oral, or otherwise) to you or to anyone else within earshot, other than those captured on your body cameras Officers Brown, Burgers, Conley, Kubiak, and Kane? If yes, state the words plaintiff spoke or, if you are unable to recall the exact words, describe the content as fully and accurately as you can.

**ANSWER:** **Defendant has no present recollection of plaintiff's words.**

13. Did you state "Do what we tell you to do and you won't get hurt" as alleged in paragraph 15 of the amended complaint?

**ANSWER:** **Defendant has no present recollection whether he made such statement.**

14. Do you contend that plaintiff was lawfully detained on March 31, 2021 at the time and place described in the amended complaint in this case?

**ANSWER:** **Yes.**

15. Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that plaintiff was lawfully detained March 31, 2021 at the time and place described in the amended complaint in this case.

**Exhibit 7**
Page 5 of 9

*App. 64 of 326*

**ANSWER:** **Defendant has no present recollection of all the facts of this incident and is thus unable to answer.**

16.     Do you contend that a reasonable police officer could have believed that it was lawful to detain plaintiff on March 31, 2021 at the time and place specified in the amended complaint in this case?

**ANSWER:** **Yes.**

17.     Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that a reasonable police officer could have believed that it was lawful to detain plaintiff on March 31, 2021 at the time and place specified in the amended complaint in this case.

**ANSWER:** **Subject was believed to be armed with a handgun in public near a beach on the walking path and park. Exigency for nearby pedestrians.**

18.     Why did you unholster your firearm and point it at plaintiff in the manner depicted in the image included as paragraph 17 of the amended complaint?

**ANSWER:** **There is no image included as paragraph 17 of the amended complaint.**

19.     Were you acting in accordance with any rule, regulation, or policy of the City of Evanston when you unholstered your firearm and pointed it at plaintiff in the manner depicted in the image included as paragraph 10 of the amended complaint?

**ANSWER:** **Defendant does not believe he is depicted in the image included as paragraph 10 of the amended complaint.**

20.     Unless the answer to the preceding interrogatory is an unqualified "no," identify any rule, regulation, or policy which authorized you to unholster your firearm and point it at plaintiff in the manner depicted in the image included as paragraph 10 of the amended complaint.

**ANSWER:** **Defendant does not believe he is depicted in the image included as paragraph 10 of the amended complaint.**

**Exhibit 7**
Page 6 of 9

*App. 65 of 326*

21.     Are you aware that you will be personally responsible for the payment of any award of punitive damages that may be made against you in this lawsuit?

**ANSWER:     Yes.**

22.     Do you own or hold any interest in real property? Unless your answer to is an unqualified "no," state the location of any such property, the names under which the title is held, and the extent of your ownership or interest.

**ANSWER:     Defendant objects to this interrogatory as premature and because the interrogatory seeks information of a private nature. Subject to and without waiving the foregoing objection, Defendant will answer said interrogatory upon the entry of a protective order limiting and or restricting the dissemination of such information.**

23.     Do you own any cash or checking or savings accounts? Unless your answer is an unqualified "no," state the total value of the items owned and state, for each checking or savings account:

    a)     The name of the financial institution the account is in;
    b)     The type of account; and
    c)     The present balance and the highest balance in the preceding 12-month period.

**ANSWER:     Defendant objects to this interrogatory as premature and because the interrogatory seeks information of a private nature. Subject to and without waiving the foregoing objection, Defendant will answer said interrogatory upon the entry of a protective order limiting and or restricting the dissemination of such information.**

24.     State your 10-year salary history.

**ANSWER:     Between $65,000 - $121,000.**

25.     Have you signed any financial statement or statements in the past ten years? Unless your answer is an unqualified "no," state for each financial statement:

    a)     Date prepared;
    b)     Entity to which the financial statement was submitted;

**Exhibit 7**
**Page 7 of 9**

*App. 66 of 326*

        c)      Reason for submission of the statement;

        d)      Whether you have access to a copy of such statement.

**ANSWER:**    **No.**

Dated: September 26, 2023            Respectfully Submitted,

          /s/ *Thomas M. Leinenweber*
          Thomas M. Leinenweber
          *One of the Attorneys for Defendant*

Thomas M. Leinenweber
James V. Daffada
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle St., Suite 2000
Chicago, Illinois 60602
Tel: (312) 217-8357

## CERTIFICATE OF SERVICE

      I, Thomas M. Leinenweber, an attorney, hereby certify that a true and correct copy of the foregoing was served upon the attorneys of record via Electronic Mail on September 26, 2023.

          /s/ *Thomas M. Leinenweber*

**Exhibit 7**
**Page 8 of 9**

*App. 67 of 326*

## VERIFICATION

I, Michael Kane, verify under penalty of perjury that I have reviewed the attached Responses to Plaintiff's First Set of Interrogatories, and I certify that the answers are true and correct to the best of my knowledge, information, and memory.

Date: ___10-25-23___

Michael Kane

**Exhibit 7**
**Page 9 of 9**

*App. 68 of 326*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALEXANDER GRAY, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 23-cv-1931 |
| | ) | |
| *v.* | ) | |
| | ) | |
| CITY OF EVANSTON, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |

**DEFENDANT KUBIAK'S RESPONSE TO**
**<u>PLAINTIFF'S FIRST SET OF INTERROGATORIES</u>**

Defendant Kubiak, by his undersigned attorneys, Leinenweber Baroni & Daffada, LLC, submits the following responses to Plaintiff's first set of interrogatories:

1.  State your full name, month and year of birth, and place of birth.

**ANSWER: Marcin Kubiak, February 14, 1968. Olsztyn, Warmian Masurian Voivodeship, Poland.**

2.  List each high school, college, university, graduate school, trade or technical school which you have attended and your dates of attendance in each and what degree or certificate, if any, you received from such institution.

**ANSWER:      High School, Olsztyn, Poland – High School Diploma (1982-1986), Academy of Physical Education in Warsaw, Poland, Faculty of Physical Therapy (1987-1988), Faculty of Physical Education (1988-1989), Wilbur Wright College, Chicago IL, Emergency Medical Technician – Ambulance Course (1994), Attained EMT-A License, Harry S. Truman College, Chicago IL, General Coursework (1995-1997), Cook County Police Academy, Triton College, Chicago IL (2001), University of Phoenix (2007-2009) Degree of Bachelor of Science in Business Management**

3.  Did you ever serve in the military? If so, state:

    a)      Rank;
    b)      Serial number;

**Exhibit 8**
Page 1 of 9

*App. 69 of 326*

      c)      Branch of service;

      d)      Approximate dates of entry and discharge;

      e)      The type of discharge, whether honorable or otherwise, and if for medical reasons, state and describe the medical disability with reasonable specificity; and

      f)      Whether you were ever the subject of any disciplinary proceedings in the military service, and if so, describe the nature and state the outcome of such proceedings.

**ANSWER:** **No.**

4.      Identify each of your employers, in chronological order, starting with your graduation from high school and including all current and part- time employment. In your answer include the following:

      a)      The name and address of each employer;

      b)      The date you began each employment;

      c)      A general description of your job duties;

      d)      The date and reason for leaving each employment; and

      e)      A general description of your job duties at the time you left each position.

**ANSWER:**

1.  **Brunon Dymowski Construction**

    **a.  N/a**
    **b.  1993 – 1994**
    **c.  General Construction**

2.  **Joseph W. Fell Antique Oriental Rugs**

    **a.  3221 N. Clark St, Chicago IL**
    **b.  1994 – 1997**
    **c.  Porter and assistant to the Owner**

3.  **Minasian Oriental Rugs**

    **a.  1244 Chicago Ave, Evanston IL**
    **b.  1997 – 1999**
    **c.  Porter**

4.  **Autobarn Chrysler and Jeep**

    **a.  1015 Chicago Ave, Evanston IL**
    **b.  1999**
    **c.  Sales Associate**

5.  **Minasian Oriental Rugs**

    **a.  1244 Chicago Ave, Evanston IL**
    **b.  1999 – 2001**
    **c.  Sales Associate**

**Exhibit 8**
Page 2 of 9

**6.  Evanston Police Department – 2001 – 2021**

        **a.  1454 Elmwood Ave, Evanston IL**
        **b.  2001 – 2021**
        **c.  Police officer and Detective**
        **d.  Retired 05/2021**

**7.  Adlai E. Stevenson High School**

        **a.  1 Stevenson Dr, Lincolnshire, IL 60069**
        **b.  05/2021 – Current**
        **c.  Support Staff and Security**

5.      Have you ever been the subject of any citizen complaint concerning your actions or inactions as a police officer of the City of Evanston, and if so, state the disposition of each such complaint.

**ANSWER:    Defendant objects to this interrogatory as vague, overly broad, and because it does not seek relevant information that is proportional to the needs of the case. Subject to and without waiving the objection, Defendant does not recall.**

6.      Have you ever been the subject of any disciplinary proceedings, including but not limited to citizen complaints to the Police Department of the City of Evanston, which resulted in the imposition of any disciplinary action, including but not limited to a written or verbal warning, suspension, or reassignment?

**ANSWER:    Defendant objects to this interrogatory as vague, overly broad, and because it does not seek relevant information that is proportional to the needs of the case. Subject to and without waiving the objection, Defendant received written warnings for avoidable auto accidents, court absences and tardiness. Defendant given one day suspension with pay for exceeding the amount of preventable car accidents. Defendant was never suspended or reassigned.**

7.      Describe any awards, recognitions, or commendations you have received in the course of your employment as an Evanston police officer.

**ANSWER:    Certificate of Recognition: 2003 Arrest of violent combative armed subject, 2004 Arrest of vehicular invasion and robbery subject, 2007 Bomb threat investigation resulting in**

**Exhibit 8**
Page 3 of 9

*App. 71 of 326*

**suspect's identification, arrest and charging, 2012 Home invasion investigation resulting in suspect's identification, arrest, charging and recovery of stolen art, 2012 Theft, unlawful use of a credit card, fraud investigation resulting in suspects identification, arrest and charging.**

8.      While serving as an Evanston police officer, have you ever applied for promotion to a higher paying position than your currently hold? Unless your response is a unqualified "no," provide details for each application made, including the position name, application date, and the outcome.

**ANSWER:      Passed Sergeant tests with scores in highly qualified category in 2013 and 2016. Never promoted.**

9.      Have you ever been a party, whether plaintiff or defendant, in any lawsuit? If so, state:

    a)      The court in which the case was filed;
    b)      The year of filing;
    c)      The title and case number; and
    d)      The final resolution of the case

**ANSWER:      No.**

10.      Have you ever been arrested, irrespective of whether the arrest has been expunged or sealed and irrespective of whether the arrest was made while you were a juvenile? Is so, please state for each such arrest:

    a)      The date and location of the arrest;
    b)      The arresting authority and names of officers involved;
    c)      If any criminal charges were filed in connection with the arrest, state the nature of the charges, the jurisdiction and disposition; and
    d)      Have the records of the arrest been expunged or sealed?

**ANSWER:      No.**

11.      Have you ever been interviewed, whether in person, by telephone, or any other method, by any law enforcement officer related to any alleged wrongdoing, whether on your part or on the part of another? If yes, for each instance, state:

    a)      The date and location of the interview;
    b)      The name of the interviewing authority and person or persons conducting the interview;
    c)      The subject matter of the interview; and

**Exhibit 8**
Page 4 of 9

*App. 72 of 326*

   d)  Whether you were informed about any constitutional or legal rights before or during the interview, and if so, what those rights were?

**ANSWER:**  **No.**

12.  Did the plaintiff make any statements (written, oral, or otherwise) to you or to anyone else within earshot, other than those captured on your body cameras Officers Brown, Burgers, Conley, Kubiak, and Kane? If yes, state the words plaintiff spoke or, if you are unable to recall the exact words, describe the content as fully and accurately as you can.

  **ANSWER:**  **Defendant does not recall Plaintiff making any statements other than those recorded by the body cam.**

13.  Did you state "Do what we tell you to do and you won't get hurt" as alleged in paragraph 15 of the amended complaint?

  **ANSWER:**  **Yes.**

14.  Do you contend that plaintiff was lawfully detained on March 31, 2021 at the time and place described in the amended complaint in this case?

  **ANSWER:**  **Yes.**

15.  Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that plaintiff was lawfully detained March 31, 2021 at the time and place described in the amended complaint in this case.

  **ANSWER:**  **A citizen called 911 EPD and reported observing a subject armed with a handgun in the close vicinity of the park. The caller provided a description of the subject and his location. Upon responding to the area, I observed a subject matching the description given by the caller, the subject was located in the area described by the caller. Believing that the subject (Plaintiff) was possibly armed with the handgun and having a duty to investigate this matter in a safe manner I did what was necessary to deal with this situation in a manner most safe to me, the Plaintiff and the public.**

**Exhibit 8**
**Page 5 of 9**

16.     Do you contend that a reasonable police officer could have believed that it was lawful to detain plaintiff on March 31, 2021 at the time and place specified in the amended complaint in this case?

**ANSWER:     Yes.**

17.     Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that a reasonable police officer could have believed that it was lawful to detain plaintiff on March 31, 2021 at the time and place specified in the amended complaint in this case.

**ANSWER:     Subject was believed to be armed with a handgun in public near a beach on the walking path and park.**

18.     Why did you unholster your firearm and point it at plaintiff in the manner depicted in the image included as paragraph 10 of the amended complaint?

**ANSWER:     Believing Plaintiff to be armed I had to investigate the matter in a manner most safe to me, the Plaintiff and the public.**

19.     Were you acting in accordance with any rule, regulation, or policy of the City of Evanston when you unholstered your firearm and pointed it at plaintiff in the manner depicted in the image included as paragraph 10 of the amended complaint?

**ANSWER:     Yes.**

20.     Unless the answer to the preceding interrogatory is an unqualified "no," identify any rule, regulation, or policy which authorized you to unholster your firearm and point it at plaintiff in the manner depicted in the image included as paragraph 10 of the amended complaint.

**ANSWER:     Defendant has no present recollection of the rule, regulation, or policy.**

21.     Are you aware that you will be personally responsible for the payment of any award of punitive damages that may be made against you in this lawsuit?

**Exhibit 8**
Page 6 of 9

*App. 74 of 326*

**ANSWER:     Yes.**

22.     Do you own or hold any interest in real property? Unless your answer to is an unqualified "no," state the location of any such property, the names under which the title is held, and the extent of your ownership or interest.

**ANSWER:     Defendant objects to this interrogatory as premature and because the interrogatory seeks information of a private nature. Subject to and without waiving the foregoing objection, Defendant will answer said interrogatory upon the entry of a protective order limiting and or restricting the dissemination of such information.**

23.     Do you own any cash or checking or savings accounts? Unless your answer is an unqualified "no," state the total value of the items owned and state, for each checking or savings account:

      a)     The name of the financial institution the account is in;
      b)     The type of account; and
      c)     The present balance and the highest balance in the preceding 12-month period.

**ANSWER:     Defendant objects to this interrogatory as premature and because the interrogatory seeks information of a private nature. Subject to and without waiving the foregoing objection, Defendant will answer said interrogatory upon the entry of a protective order limiting and or restricting the dissemination of such information.**

24.     State your 10-year salary history.

**ANSWER:     Between $85,000 - $103,000.**

25.     Have you signed any financial statement or statements in the past ten years? Unless your answer is an unqualified "no," state for each financial statement:

      a)     Date prepared;
      b)     Entity to which the financial statement was submitted;
      c)     Reason for submission of the statement;
      d)     Whether you have access to a copy of such statement.

**ANSWER:     No.**

**Exhibit 8**
Page 7 of 9

*App. 75 of 326*

Dated: September 26, 2023          Respectfully Submitted,

<div align="right">

/s/ *Thomas M. Leinenweber*
Thomas M. Leinenweber
*One of the Attorneys for Defendant*

</div>

Thomas M. Leinenweber
James V. Daffada
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle St., Suite 2000
Chicago, Illinois 60602
Tel: (312) 217-8357

## **<u>CERTIFICATE OF SERVICE</u>**

       I, Thomas M. Leinenweber, an attorney, hereby certify that a true and correct copy of the foregoing was served upon the attorneys of record via Electronic Mail on September 26, 2023.

<div align="right">

/s/ *Thomas M. Leinenweber*

</div>

**Exhibit 8**
**Page 8 of 9**

*App. 76 of 326*

## VERIFICATION

I, Marcin Kubiak, verify under penalty of perjury that I have reviewed the attached Responses to Plaintiff's First Set of Interrogatories, and I certify that the answers are true and correct to the best of my knowledge, information, and memory.

Date: 9/27/2023

Marcin Kubiak

**Exhibit 8**
Page 9 of 9

*App. 77 of 326*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALEXANDER GRAY, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 23-cv-1931 |
| | ) | |
| *v.* | ) | |
| | ) | |
| CITY OF EVANSTON, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |

**DEFENDANT POGORZELSKI'S RESPONSE TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant Pogorzelski, by his undersigned attorneys, Leinenweber Baroni & Daffada, LLC, submits the following responses to Plaintiff's first set of interrogatories:

1.      State your full name, month and year of birth, and place of birth.

**ANSWER:**     **Pauline Sophie Pogorzelski, December 1988, Park Ridge, IL.**

2.      List each high school, college, university, graduate school, trade or technical school which you have attended and your dates of attendance in each and what degree or certificate, if any, you received from such institution.

**ANSWER:**     **Guerin College Prep (2003-2007) High School Diploma, Wright Community College (2007-2008), Kankakee Community College (2008-2009) Associate's Degree, University of Illinois Springfield (2009-2011) Bachelor's Degree, Northwestern University (2013-2014).**

3.      Did you ever serve in the military? If so, state:

a)      Rank;
b)      Serial number;
c)      Branch of service;
d)      Approximate dates of entry and discharge;
e)      The type of discharge, whether honorable or otherwise, and if for medical reasons, state and describe the medical disability with reasonable specificity; and
f)      Whether you were ever the subject of any disciplinary proceedings in the military service, and if so, describe the nature and state the outcome of such proceedings.

**Exhibit 9**
**Page 1 of 8**

**ANSWER:** **No.**

4.     Identify each of your employers, in chronological order, starting with your graduation from high school and including all current and part- time employment. In your answer include the following:

      a)     The name and address of each employer;
      b)     The date you began each employment;
      c)     A general description of your job duties;
      d)     The date and reason for leaving each employment; and
      e)     A general description of your job duties at the time you left each position.

**ANSWER:**

1. **McDonald's**

   a. **4550 N. Cumberland Ave, Chicago IL, 60056**
   b. **June 2007 – May 2008**
   c. **Taking food orders and payments.**
   d. **Left for employment opportunity with Wyndham O'Hare.**

2. **Wyndham O'Hare**

   a. **6810 N. Mannheim Rd.**
   b. **May 2009 – August 2009**
   c. **Hotel Telephone operator**
   d. **Left for college.**

3. **Yorktown Shopping Center**

   a. **455 N. Westin Lombard, IL 60148**
   b. **May 2009 – August 2009**
   c. **Summer Internship**
   d. **Left for college.**

4. **Center for Public Safety & Justice**

   a. **Springfield, IL**
   b. **May 2010 – August 2010**
   c. **Summer Intern**
   d. **Returned to college**

5. **Rivers Casino**

   a. **300 S. River Rd. Des Plaines, IL 60018**
   b. **June 2011 – February 2012**
   c. **Security and revenue auditor**
   d. **Left for Job with Northwestern University**

6. **Northwestern University**

**Exhibit 9**
Page 2 of 8

*App. 79 of 326*

      a.  **633 Clark St., Evanston, IL 60208**
      b.  **February 2012 – July 2014**
      c.  **Community Service Officer**
      d.  **Left for job with Waukegan Police Department**

**7.  Waukegan Police Department**

      a.  **101 N. West St., Waukegan, IL 60085**
      b.  **Not sure.**
      c.  **Police Officer**
      d.  **Left for job with Evanston Police Department**

**8.  Evanston Police Department**

      a.  **1454 Elmwood Ave, Evanston, IL 60064**
      b.  **December 2014 – September 2021**
      c.  **Police Officer and Detective**

5.     Have you ever been the subject of any citizen complaint concerning your actions or inactions as a police officer of the City of Evanston, and if so, state the disposition of each such complaint.

**ANSWER:    Defendant objects to this interrogatory as vague, overly broad, and because it does not seek relevant information that is proportional to the needs of the case. Subject to and without waiving the objection, Defendant does not recall.**

6.     Have you ever been the subject of any disciplinary proceedings, including but not limited to citizen complaints to the Police Department of the City of Evanston, which resulted in the imposition of any disciplinary action, including but not limited to a written or verbal warning, suspension, or reassignment?

**ANSWER:    Defendant objects to this interrogatory as vague, overly broad, and because it does not seek relevant information that is proportional to the needs of the case. Subject to and without waiving the objection, Defendant does not recall any instance.**

7.     Describe any awards, recognitions, or commendations you have received in the course of your employment as an Evanston police officer.

**ANSWER:    2016 Officer of the Year, numerous other awards.**

**Exhibit 9**
**Page 3 of 8**

8.      While serving as an Evanston police officer, have you ever applied for promotion to a higher paying position than your currently hold? Unless your response is a unqualified "no," provide details for each application made, including the position name, application date, and the outcome.

**ANSWER:      No.**

9.      Have you ever been a party, whether plaintiff or defendant, in any lawsuit? If so, state:

      a)      The court in which the case was filed;
      b)      The year of filing;
      c)      The title and case number; and
      d)      The final resolution of the case

**ANSWER:**

  **1.   Hall v. City of Evanston, et. Al.**

      **a.   Northern District of IL**
      **b.   2019**
      **c.   2019-cv-00417**
      **d.   Settled and dismissed with prejudice.**

10.      Have you ever been arrested, irrespective of whether the arrest has been expunged or sealed and irrespective of whether the arrest was made while you were a juvenile? Is so, please state for each such arrest:

      a)      The date and location of the arrest;
      b)      The arresting authority and names of officers involved;
      c)      If any criminal charges were filed in connection with the arrest, state the nature of the charges, the jurisdiction and disposition; and
      d)      Have the records of the arrest been expunged or sealed?

**ANSWER:      No.**

11.      Have you ever been interviewed, whether in person, by telephone, or any other method, by any law enforcement officer related to any alleged wrongdoing, whether on your part or on the part of another? If yes, for each instance, state:

      a)      The date and location of the interview;
      b)      The name of the interviewing authority and person or persons conducting the interview;
      c)      The subject matter of the interview; and
      d)      Whether you were informed about any constitutional or legal rights before or during the interview, and if so, what those rights were?

**Exhibit 9**
Page 4 of 8

**ANSWER:      No.**

12.     Did the plaintiff make any statements (written, oral, or otherwise) to you or to anyone else within earshot, other than those captured on your body cameras Officers Brown, Burgers, Conley, Kubiak, and Kane? If yes, state the words plaintiff spoke or, if you are unable to recall the exact words, describe the content as fully and accurately as you can.

**ANSWER:      Defendant has no present recollection of plaintiff's words.**

13.     Were you wearing a body camera during the events alleged in the amended complaint in this case, and if so, was it recording?

**ANSWER:      Defendant has no present recollection and is thus unable to answer.**

14.     Please identify the officers depicted in the image included in paragraph 22 of the amended complaint.

**ANSWER:      Defendant is not able to accurately identify the officers.**

15.     Do you contend that plaintiff was lawfully detained on March 31, 2021 at the time and place described in the amended complaint in this case?

**ANSWER:      Defendant has no present recollection of all the facts of this incident and is thus unable to answer.**

16.     Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that plaintiff was lawfully detained March 31, 2021 at the time and place described in the amended complaint in this case.

**ANSWER:      Defendant has no present recollection of all the facts of this incident and is thus unable to answer.**

17.     Do you contend that a reasonable police officer could have believed that it was lawful to detain plaintiff on March 31, 2021 at the time and place described in the amended complaint in this case?

**Exhibit 9**
Page 5 of 8

*App. 82 of 326*

**ANSWER:** **Defendant has no present recollection of all the facts of this incident and is thus unable to answer.**

18. Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that a reasonable police officer could have believed that it was lawful to detain plaintiff on March 31, 2021 at the time and place described in the amended complaint in this case.

**ANSWER:** **Defendant has no present recollection of all the facts of this incident and is thus unable to answer.**

19. Do you contend that plaintiff was lawfully searched on March 31, 2021, at the time and place described in the amended complaint in this case?

**ANSWER:** **Defendant has no present recollection of all the facts of this incident and is thus unable to answer.**

20. Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that plaintiff was lawfully searched March 31, 2021 at the time and place described in the amended complaint in this case.

**ANSWER:** **Defendant has no present recollection of all the facts of this incident and is thus unable to answer.**

21. Do you contend that a reasonable police officer could have believed that it was lawful to search plaintiff on March 31, 2021, at the time and place described in the amended complaint in this case?

**ANSWER:** **Defendant has no present recollection of all the facts of this incident and is thus unable to answer.**

22. Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that a reasonable police officer could have believed that it was lawful to search plaintiff on March 31, 2021 at the time and place described in the amended complaint in this case.

**Exhibit 9**
Page 6 of 8

**ANSWER:** **Defendant has no present recollection of all the facts of this incident and is thus unable to answer.**

23. Did you unholster your firearm at any person at any time during the incident described in the amended complaint filed in this case?

**ANSWER:** **Defendant has no present recollection of all the facts of this incident and is thus unable to answer.**

24. Please summarize the acts, if any, you took in connection with the event described in the amended complaint.

**ANSWER: Defendant has no present recollection of all the facts of this incident and is thus unable to answer.**

Dated: September 26, 2023                                        Respectfully Submitted,

                                                                                    /s/ *Thomas M. Leinenweber*
                                                                                    Thomas M. Leinenweber
                                                                                    *One of the Attorneys for Defendant*

Thomas M. Leinenweber
James V. Daffada
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle St., Suite 2000
Chicago, Illinois 60602
Tel: (312) 217-8357

## CERTIFICATE OF SERVICE

I, Thomas M. Leinenweber, an attorney, hereby certify that a true and correct copy of the foregoing was served upon the attorneys of record via Electronic Mail on September 26, 2023.

                                                                    /s/ *Thomas M. Leinenweber*

**Exhibit 9**
**Page 7 of 8**

*App. 84 of 326*

## VERIFICATION

I, Pauline Pogorzelski, verify under penalty of perjury that I have reviewed the attached Responses to Plaintiff's First Set of Interrogatories, and I certify that the answers are true and correct to the best of my knowledge, information, and memory.

Date: **9-28-2023**

Pauline Pogorzelski

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALEXANDER GRAY, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 23-cv-1931 |
| | ) | |
| *v.* | ) | |
| | ) | |
| CITY OF EVANSTON, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |

**DEFENDANT POPP'S RESPONSE TO**
**<u>PLAINTIFF'S FIRST SET OF INTERROGATORIES</u>**

Defendant Popp, by his undersigned attorneys, Leinenweber Baroni & Daffada, LLC, submits the following responses to Plaintiff's first set of interrogatories:

1.     State your full name, month and year of birth, and place of birth.

**ANSWER: Kyle Alan Popp, April 1992, Hoffman Estates Illinois.**

2.     List each high school, college, university, graduate school, trade or technical school which you have attended and your dates of attendance in each and what degree or certificate, if any, you received from such institution.

**ANSWER:     Harry D. Jacobs High School (2006 -2008) & Hampshire High School (2008-2010) High School Diploma. University of Iowa (2010-2014) – Bachelors Degree, Sociology.**

3.     Did you ever serve in the military? If so, state:

    a)     Rank;
    b)     Serial number;
    c)     Branch of service;
    d)     Approximate dates of entry and discharge;
    e)     The type of discharge, whether honorable or otherwise, and if for medical reasons, state and describe the medical disability with reasonable specificity; and
    f)     Whether you were ever the subject of any disciplinary proceedings in the military service, and if so, describe the nature and state the outcome of such proceedings.

**ANSWER:     No.**

**Exhibit 10**
**Page 1 of 8**

*App. 86 of 326*

4.    Identify each of your employers, in chronological order, starting with your graduation from high school and including all current and part- time employment. In your answer include the following:

        a)      The name and address of each employer;
        b)      The date you began each employment;
        c)      A general description of your job duties;
        d)      The date and reason for leaving each employment; and
        e)      A general description of your job duties at the time you left each position.

**ANSWER:**

1) **Chemtech Plastics**

    a) **740 Church Rd., Elgin IL 60123**
    b) **2010-2011**

2) **University of Iowa Parking and Transportation**

    a) **155 W. Harrison St. Iowa City, IA 52242**
    b) **2013-2014**

3) **Evanston Police Department**

    a) **1454 Elmwood Ave, Evanston, IL 60201**
    b) **2014-2021**
    c) **Police Officer**

4) **St. Charles Police Department**

    a) **1515 W. Main St., St. Charles, IL 60174**
    b) **2021-Current**
    c) **Police Officer**

5.    Have you ever been the subject of any citizen complaint concerning your actions or inactions as a police officer of the City of Evanston, and if so, state the disposition of each such complaint.

**ANSWER:    Defendant objects to this interrogatory as vague, overly broad, and because it does not seek relevant information that is proportional to the needs of the case. Subject to and without waiving the objection, Defendant does not recall.**

6.    Have you ever been the subject of any disciplinary proceedings, including but not limited to citizen complaints to the Police Department of the City of Evanston, which resulted in the imposition of

**Exhibit 10**
Page 2 of 8

*App. 87 of 326*

any disciplinary action, including but not limited to a written or verbal warning, suspension, or reassignment?

**ANSWER:** **Defendant objects to this interrogatory as vague, overly broad, and because it does not seek relevant information that is proportional to the needs of the case. Subject to and without waiving the objection, Defendant does not recall.**

7. Describe any awards, recognitions, or commendations you have received in the course of your employment as an Evanston police officer.

**ANSWER:** **Defendant has no recollection of any specific awards, recognitions, or commendations, but has received numerous recognitions and commendations.**

8. While serving as an Evanston police officer, have you ever applied for promotion to a higher paying position than your currently hold? Unless your response is a unqualified "no," provide details for each application made, including the position name, application date, and the outcome.

**ANSWER:** **No.**

9. Have you ever been a party, whether plaintiff or defendant, in any lawsuit? If so, state:

    a) The court in which the case was filed;
    b) The year of filing;
    c) The title and case number; and
    d) The final resolution of the case

**ANSWER:** **Yes; however does not recall the details of the lawsuit or otherwise locate any record of the documentation. Investigation continues.**

10. Have you ever been arrested, irrespective of whether the arrest has been expunged or sealed and irrespective of whether the arrest was made while you were a juvenile? Is so, please state for each such arrest:

    a) The date and location of the arrest;
    b) The arresting authority and names of officers involved;
    c) If any criminal charges were filed in connection with the arrest, state the nature of the charges, the jurisdiction and disposition; and

**Exhibit 10**
Page 3 of 8

*App. 88 of 326*

        d)     Have the records of the arrest been expunged or sealed?

**ANSWER:**    **No.**

11.    Have you ever been interviewed, whether in person, by telephone, or any other method, by any law enforcement officer related to any alleged wrongdoing, whether on your part or on the part of another? If yes, for each instance, state:

    a)    The date and location of the interview;
    b)    The name of the interviewing authority and person or persons conducting the interview;
    c)    The subject matter of the interview; and
    d)    Whether you were informed about any constitutional or legal rights before or during the interview, and if so, what those rights were?

**ANSWER:**    **Defendant does not recall any instance.**

12.    Did the plaintiff make any statements (written, oral, or otherwise) to you or to anyone else within earshot, other than those captured on your body cameras Officers Brown, Burgers, Conley, Kubiak, and Kane? If yes, state the words plaintiff spoke or, if you are unable to recall the exact words, describe the content as fully and accurately as you can.

**ANSWER:**    **Defendant has no present recollection of plaintiff's words.**

13.    Were you wearing a body camera during the events alleged in the amended complaint in this case, and if so was it recording?

**ANSWER:**    **Yes, and Defendant believes that it was recording.**

14.    Do you contend that plaintiff was lawfully detained on March 31, 2021 at the time and place described in the amended complaint in this case?

**ANSWER:**    **Yes.**

15.    Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that plaintiff was lawfully detained March 31, 2021 at the time and place described in the amended complaint in this case.

**Exhibit 10**
Page 4 of 8

**ANSWER:** **Defendant has no present recollection of all the facts of this incident and is thus unable to answer.**

16.     Do you contend that a reasonable police officer could have believed that it was lawful to detain plaintiff on March 31, 2021 at the time and place specified in the amended complaint in this case?

**ANSWER:** **Yes.**

17.     Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that a reasonable police officer could have believed that it was lawful to detain plaintiff on March 31, 2021 at the time and place specified in the amended complaint in this case.

**ANSWER:** **Subject believed to be armed with a handgun in public near a beach on the walking path and park.**

18.     Did you unholster your firearm at any time during the incident described in the amended complaint filed in this case?

**ANSWER:** **Defendant does not recall if he unholstered his firearm during the incident and is thus unable to answer.**

19.     Unless your answer to the preceding interrogatory is an unqualified "no," were you acting in accordance with any rule, regulation, or policy of the City of Evanston when you unholstered your firearm?

**ANSWER:** **Defendant does not recall if he unholstered his firearm during the incident and is thus unable to answer.**

20.     Unless your answer to the preceding interrogatory is an unqualified "no," identify any rule, regulation, or policy which authorized you to unholster your firearm and point it at plaintiff in the manner depicted in the image included as paragraph 10 of the amended complaint?

**Exhibit 10**
Page 5 of 8

**ANSWER:** **Defendant does not believe he is depicted in the image included as paragraph 10 of the amended complaint.**

21.     Are you aware that you will be personally responsible for the payment of any award of punitive damages that may be made against you in this lawsuit?

**ANSWER:** **Yes.**

22.     Are you depicted in the image included in paragraph 22 of the amended complaint?

**ANSWER:** **Yes.**

23.     If your answer to the preceding interrogatory is an unqualified "no," please state the name of the persons depicted in the image included in paragraph 22 of the amended complaint.

**ANSWER:** **Defendant is unable to accurately identify the other officer depicted in said image. .**

24.     Please summarize the acts, if any, you took in connection with the event described in the amended complaint.

**ANSWER:** **Defendant does not have a present recollection of specific acts, except that he responded as an assisting unit to the call for service.**

25.     Have you signed any financial statement or statements in the past ten years? Unless your answer is an unqualified "no," state for each financial statement:

      a)      Date prepared;
      b)      Entity to which the financial statement was submitted;
      c)      Reason for submission of the statement;
      d)      Whether you have access to a copy of such statement.

**ANSWER:** **No.**

**Exhibit 10**
**Page 6 of 8**

*App. 91 of 326*

Dated: September 26, 2023                    Respectfully Submitted,

                                             /s/ *Thomas M. Leinenweber*
                                             Thomas M. Leinenweber
                                             *One of the Attorneys for Defendant*

Thomas M. Leinenweber
James V. Daffada
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle St., Suite 2000
Chicago, Illinois 60602
Tel: (312) 217-8357

## **CERTIFICATE OF SERVICE**

I, Thomas M. Leinenweber, an attorney, hereby certify that a true and correct copy of the foregoing was served upon the attorneys of record via Electronic Mail on September 26, 2023.

                                             /s/ *Thomas M. Leinenweber*

**Exhibit 10**
Page 7 of 8

*App. 92 of 326*

## VERIFICATION

I, Kyle Popp, verify under penalty of perjury that I have reviewed the attached Responses to Plaintiff's First Set of Interrogatories, and I certify that the answers are true and correct to the best of my knowledge, information, and memory.

Date:_____9/27/23_____

_____
Kyle Popp

**Exhibit 10**
Page 8 of 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ALEXANDER GRAY,                )
                                    )
         *Plaintiff,*          )       Case No. 23-cv-1931
                                    )
         *v.*                 )
                                    )
CITY OF EVANSTON, et al.       )
                                    )
        *Defendants.*      )

**DEFENDANT ROSENBAUM'S RESPONSE TO
<u>PLAINTIFF'S FIRST SET OF INTERROGATORIES</u>**

Defendant Rosenbaum, by his undersigned attorneys, Leinenweber Baroni & Daffada, LLC, submits the following responses to Plaintiff's first set of interrogatories:

1.      State your full name, month and year of birth, and place of birth.

    **ANSWER:    Daniel Faber Rosenbaum, July, 1990, Evanston Illinois.**

2.      List each high school, college, university, graduate school, trade or technical school which you have attended and your dates of attendance in each and what degree or certificate, if any, you received from such institution.

    **ANSWER:    New Trier Township High School (2004-2008), HS Diploma, The University of Chicago (2008-2012) B.A.**

3.      Did you ever serve in the military? If so, state:

    a)    Rank;
    b)    Serial number;
    c)    Branch of service;
    d)    Approximate dates of entry and discharge;
    e)    The type of discharge, whether honorable or otherwise, and if for medical reasons, state and describe the medical disability with reasonable specificity; and
    f)    Whether you were ever the subject of any disciplinary proceedings in the military service, and if so, describe the nature and state the outcome of such proceedings.

    **ANSWER:    No.**

**Exhibit 11
Page 1 of 9**

4.    Identify each of your employers, in chronological order, starting with your graduation from high school and including all current and part- time employment. In your answer include the following:

a)    The name and address of each employer;
b)    The date you began each employment;
c)    A general description of your job duties;
d)    The date and reason for leaving each employment; and
e)    A general description of your job duties at the time you left each position.

**ANSWER:**

**1) Pool Guardians**

   **a) 1 Riverway, Suite 2055, Houston, TX**
   **b) June - 2008**
   **c) Head Lifeguard**
   **d) September – 2009**

**2) Lake Shore Country Club**

   **a) 1255 Sheridan Rd. Glencoe, IL**
   **b) May – 2009**
   **c) Assistant Manager – Managed staff of over 50 individuals, maintaining safe and controlled aquatics environment.**
   **d) September – 2010**

**3) University of Chicago: Department of Neurobiology**

   **a) 924 E. 57th St. Chicago, IL**
   **b) June – 2010**
   **c) Research Assistant – Carried out experiments and independent research.**
   **d) May – 2011**

**4) University of Chicago: Biological Sciences Collegiate Div. -**

   **a) 924 E. 57th St. Chicago, IL**
   **b) January – 2011**
   **c) Teacher's Assistant – Pharmacological Perspectives in Cell and Molecular Biology.**
   **d) March – 2012**

**5) City of Chicago: Department of Police**

   **a) 5101 S. Wentworth, Chicago IL**
   **b) June – 2011**
   **c) Student Worker – Unit 610 Area 1 Detectives Division, observed and assisted law enforcement operations.**
   **d) September – 2011**

**6) University of Chicago Crime Lab**

Exhibit 11
Page 2 of 9

*App. 95 of 326*

      a) **33 N. LaSalle St. Suite 1600, Chicago IL**
      b) **August – 2012**
      c) **Research Specialist and Consultant**
      d) **September – 2014**

  7) **University of Chicago Crime Lab**

      a) **33 N. LaSalle St. Suite 1600, Chicago IL**
      b) **March – 2017**
      c) **Consultant – Implementation and "stand-up" of district level intelligence fusion centers across CPD.**
      d) **July – 2019**

  8) **Evanston Police Department, 1454 Elmwood, Evanston IL – 2014 – Present**

      a) **1454 Elmwood, Evanston IL**
      b) **September – 2014**
      c) **Police Officer – Assigned Bureau of Patrol, conducted police field operations.**
      d) **Current**
      e) **Assigned to Special Operations Group.**

5. Have you ever been the subject of any citizen complaint concerning your actions or inactions as a police officer of the City of Evanston, and if so, state the disposition of each such complaint.

**ANSWER: Defendant objects to this interrogatory as vague, overly broad, and because it does not seek relevant information that is proportional to the needs of the case. Subject to and without waiving the objection, Defendant does not recall.**

6. Have you ever been the subject of any disciplinary proceedings, including but not limited to citizen complaints to the Police Department of the City of Evanston, which resulted in the imposition of any disciplinary action, including but not limited to a written or verbal warning, suspension, or reassignment?

**ANSWER: Defendant objects to this interrogatory as vague, overly broad, and because it does not seek relevant information that is proportional to the needs of the case. Subject to and without waiving the objection, Defendant believes they have received 3 verbal warnings. Otherwise, Defendant does not recall.**

**Exhibit 11**
Page 3 of 9

*App. 96 of 326*

7.     Describe any awards, recognitions, or commendations you have received in the course of your employment as an Evanston police officer.

**ANSWER:     Valedictorian, Basic Recruit Training Class 14-4; 1 x Citation; 6 x Honorable Mentions; 3 x Certificates of Recognition; 4 x Letters of Appreciation; 1 x Citizen Commendation Award (Evanston Fire Dept.); Fitness Award; 2 x Unit Citations; 1 x Career Service Award. For full narratives of the above I can scan/provide copies of the award citations.**

8.     While serving as an Evanston police officer, have you ever applied for promotion to a higher paying position than your currently hold? Unless your response is a unqualified "no," provide details for each application made, including the position name, application date, and the outcome.

**ANSWER:     No.**

9.     Have you ever been a party, whether plaintiff or defendant, in any lawsuit? If so, state:

    a)     The court in which the case was filed;
    b)     The year of filing;
    c)     The title and case number; and
    d)     The final resolution of the case

**ANSWER:**

    **1.   Lark v. City of Evanston, et. Al.**

        **a.   Northern District of IL**
        **b.   2016**
        **c.   2016-cv-04630**
        **d.   Settled and dismissed with prejudice**

    **2.   Hall v. City of Evanston, et. Al.**

        **a.   Northern District of IL**
        **b.   2019**
        **c.   2019-cv-00417**
        **d.   Settled and dismissed with prejudice.**

10.     Have you ever been arrested, irrespective of whether the arrest has been expunged or sealed and irrespective of whether the arrest was made while you were a juvenile? Is so, please state for each such arrest:

    a)     The date and location of the arrest;

**Exhibit 11**
Page 4 of 9

*App. 97 of 326*

       b)     The arresting authority and names of officers involved;
       c)     If any criminal charges were filed in connection with the arrest, state the natureof the charges, the jurisdiction and disposition; and
       d)     Have the records of the arrest been expunged or sealed?

**ANSWER:**     **No.**

11.     Have you ever been interviewed, whether in person, by telephone, or any other method, by any law enforcement officer related to any alleged wrongdoing, whether on your part or on the part of another? If yes, for each instance, state:

       a)     The date and location of the interview;
       b)     The name of the interviewing authority and person or persons conducting the interview;
       c)     The subject matter of the interview; and
       d)     Whether you were informed about any constitutional or legal rights before or during the interview, and if so, what those rights were?

**ANSWER:**     **Defendant does not recall any instance.**

12.     Did the plaintiff make any statements (written, oral, or otherwise) to you or to anyone else within earshot, other than those captured on your body cameras Officers Brown, Burgers, Conley, Kubiak, and Kane? If yes, state the words plaintiff spoke or, if you are unable to recall the exact words, describe the content as fully and accurately as you can.

**ANSWER:**     **Defendant has no present recollection of plaintiff's words.**

13.     Were you wearing a body camera during the events alleged in the amended complaint in this case, and if so was it recording?

**ANSWER:**     **Yes, and yes.**

14.     Do you contend that plaintiff was lawfully detained on March 31, 2021 at the time and place described in the amended complaint in this case?

**ANSWER:**     **Yes.**

**Exhibit 11**
Page 5 of 9

*App. 98 of 326*

15.     Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that plaintiff was lawfully detained March 31, 2021 at the time and place described in the amended complaint in this case.

**ANSWER:     EPD responded to a call of a man with a gun in which the plaintiff matched the description of a man displaying a firearm while in the 500 block of South Blvd.**

16.     Do you contend that a reasonable police officer could have believed that it was lawful to detain plaintiff on March 31, 2021 at the time and place specified in the amended complaint in this case?

**ANSWER:     Yes.**

17.     Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that a reasonable police officer could have believed that it was lawful to detain plaintiff on March 31, 2021 at the time and place specified in the amended complaint in this case.

**ANSWER:     Subject was believed to be armed with a handgun in public near a beach on the walking path and park.**

18.     Do you contend that plaintiff was lawfully searched on March 31, 2021 at the time and place described in the amended complaint in this case?

**ANSWER:     Yes.**

19.     Unless your answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that plaintiff was lawfully searched March 31, 2021 at the time and place described in the amended complaint in this case.

**ANSWER:     A 911 caller provided information that an individual matching the plaintiff's description was displaying a firearm. Responding officers, suspecting that evidence of a firearm being possessed would be located on the plaintiff's person, conducted a search for said evidence.**

20.     Do you contend that a reasonable police officer could have believed that it was lawful to search plaintiff on March 31, 2021 at the time and place described in the amended complaint in this case?

**Exhibit 11**
Page 6 of 9

*App. 99 of 326*

**ANSWER:** **Yes.**

21.     Unless the answer to the preceding interrogatory is an unqualified "no," state the facts and circumstances that support your belief that a reasonable police officer could have believed that it was lawful to search plaintiff on March 31, 2021 at the time and place described in the amended complaint in this case.

**ANSWER:** **Subject believed to be armed with a handgun in public near a beach on the walking path and park.**

22.     Did you point your firearm at any person at any time during the incident described in the amended complaint filed in this case?

**ANSWER:** **My recollection is that I maintained my weapon in a "low ready" or "indexed down" position and did not "point" the rifle at the plaintiff.**

23.     Unless your answer to the preceding interrogatory is an unqualified "no," were you acting in accordance with any rule, regulation, or policy of the city of Evanston when you unholstered your firearm?

**ANSWER:** **Yes.**

24.     Unless your answer to the preceding interrogatory is an unqualified "no," identify any rule, regulation, or policy which authorized you to unholster your firearm and point it at plaintiff in the manner depicted in the image included as paragraph 10 of the amended complaint?

**ANSWER:** **EPD Policy Manual Policy 306. Specifically, Policy 306.3.3 regarding rifle deployment.**

25.     Please summarize the acts, if any, you took in connection with the event described in the amended complaint.

**Exhibit 11**
Page 7 of 9

*App. 100 of 326*

**ANSWER:**      **I arrived on scene, retrieved my patrol rifle, and assisted in safely detaining the plaintiff.  Once the scene was secure, I left.**

Dated: September 26, 2023                                         Respectfully Submitted,

                                                                                    /s/ *Thomas M. Leinenweber*
                                                                                    Thomas M. Leinenweber
                                                                                    *One of the Attorneys for Defendant*

Thomas M. Leinenweber
James V. Daffada
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle St., Suite 2000
Chicago, Illinois 60602
Tel: (312) 217-8357

<u>**CERTIFICATE OF SERVICE**</u>

      I, Thomas M. Leinenweber, an attorney, hereby certify that a true and correct copy of the foregoing was served upon the attorneys of record via Electronic Mail on September 26, 2023.

                                                                                    /s/ *Thomas M. Leinenweber*

**Exhibit 11**
Page 8 of 9

*App. 101 of 326*

**VERIFICATION**

    I, Daniel Rosenbaum, verify under penalty of perjury that I have reviewed the attached Responses to Plaintiff's First Set of Interrogatories, and I certify that the answers are true and correct to the best of my knowledge, information, and memory.


Date: 09/28/2023

_____
Daniel Rosenbaum

**Exhibit 11**
Page 9 of 9

*App. 102 of 326*

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALEXANDER GRAY,                    )
                                   )
              Plaintiff,           )
                                   )
         vs.                       ) No. 20-CV-1931
                                   )
CITY OF EVANSTON, ET AL.,          )
                                   )
              Defendants.          )


        The deposition of ALEXANDER GRAY taken via
videoconference before Melina Colak, Certified Shorthand
Reporter, taken pursuant to the provisions of the
Illinois Code of Civil Procedure and the Rules of the
Supreme Court thereof pertaining to the taking of
depositions for the purpose of discovery, commencing at
1:00 p.m. on the 8th day of December, 2023.

**Exhibit 12**
**Page 1 of 14**

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 2

1    APPEARANCES (via videoconference):

2        KENNETH N. FLAXMAN, P.C.
         MR. KENNETH N. FLAXMAN
3        200 South Michigan Avenue
         Suite 201
4        Chicago, Illinois 60604
         Phone:   312.427.3200
5        E-mail:  knf@kenlaw.com

6            On behalf of the Plaintiff;

7        LEINENWEBER DAFFADA & SANSONETTI LLC
         MR. JAMES V. DAFFADA
8        120 North LaSalle Street
         Suite 2000
9        Chicago, Illinois 60602
         Phone:   312.380.6635
10       E-mail:  jim@ilesq.com

11           On behalf of the Defendants.

12
                 *    *    *    *    *    *
13

14

15

16

17

18

19

20

21

22

23

24

Royal Reporting Services, Inc.
312.361.8851

Exhibit 12
Page 2 of 14

App. 104 of 326

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 3

1                    I N D E X

2    WITNESS                                      PAGE

3    ALEXANDER GRAY

4

5       Examination by Mr. Daffada.................  4

6

7

8                    (NO EXHIBITS MARKED)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Exhibit 12
Page 3 of 14

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 4

1                      (Witness sworn.)

2    WHEREUPON:

3                      ALEXANDER GRAY,

4    called as a witness herein, having been first duly

5    sworn, was examined and testified via videoconference as

6    follows:

7                      EXAMINATION

8    BY MR. DAFFADA:

9        Q.    Good morning, Mr. Gray.  My name is James

10   Daffada.  I represent the City of Evanston and the

11   officers that are defendants in this case.

12           Could you please state your full name and

13   spell your last name, please?

14       A.    It's Alexander Peter Gray.  Last name,

15   G-R-A-Y.

16       Q.    And your date of birth?

17       A.    _____-73.

18       Q.    Mr. Gray, have you given a deposition before?

19       A.    No, I have not.

20       Q.    Okay.  During this deposition, I'm going to be

21   asking you questions and asking you to give me answers.

22           Are you on any medication or any other reason

23   that would preclude you from being able to give me

24   truthful, responsive answers?

**Exhibit 12**
Page 4 of 14

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 5

1     A.   No.

2     Q.   Okay.  When I ask you a question, you may not

3 hear it because we're on video.  And I may give you a

4 bad question -- you know, you don't understand it.  If

5 that happens, will you let me know?

6     A.   Yes.

7     Q.   Okay.  Do you understand that you can take a

8 break at any time as long as there's not a question

9 pending at the time?

10       In other words, I have a question and you have

11 not answered it.  You need to answer it before taking a

12 break.  Do you understand that?

13     A.   I do.

14     Q.   All right.  Great.

15       One final rule -- we call them rules, but

16 they're not rules.  Your answers to my questions have to

17 be audible.  Oftentimes, I'll ask a question that might

18 be a yes or no.  And by force of habit, sometimes we

19 just shake our heads or say uh-huh.

20       In order to get a good record, will you give

21 full answers and try to avoid those?

22     A.   Yes.

23     Q.   Thank you.  Prior to this deposition, can

24 you -- Did you review any materials?

**Exhibit 12**
Page 5 of 14

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 6

1     A.   Yes, I did.

2     **Q.   What were those materials?**

3     A.   The interrogatories; the body cam footage; and

4  the depositions by the Evanston Police Department

5  officers.

6     **Q.   With respect to the body cam footage, did you**

7  **review selected videos or all of them or...**

8     A.   I reviewed bits and pieces of them from what I

9  felt I could handle.

10     **Q.   Okay.  With respect to your interrogatories,**

11  **is there anything in there after your review that you**

12  **feel is not accurate?**

13     A.   No.

14     **Q.   Is there anything you would like to change or**

15  **add to those interrogatories?**

16     A.   No.

17     **Q.   In your interrogatories, you indicated that**

18  **your fiancee is named Jeanette Hudon.**

19     A.   Yeah.  Hudon.

20     **Q.   Hudon.  Okay.  And that she called the police**

21  **department to get a copy of the police report.  Did she**

22  **do that on your behalf?**

23     A.   She did.

24     **Q.   Okay.  And do you know who she spoke to at the**

**Exhibit 12**
Page 6 of 14

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 7

1    police department?

2         A.   I don't know.

3         Q.   Did she receive a copy of the police report?

4         A.   She did.

5         Q.   And she provided it to you?

6         A.   She did.

7         Q.   And you also indicate she called your

8    alderman, Melissa Wynne.  How do you know that?

9         A.   She -- I was there when she did it.

10        Q.   What did she tell -- If you were there --

11   What -- Were you on the phone?

12        A.   No.  I was just in the room.

13        Q.   Do you recall what Ms. Hudon said to

14   Ms. Wynn?

15        A.   She explained what had happened.  So she told

16   them the story of what happened.

17        Q.   And did she ask her for anything?

18        A.   She did not.  I'm sorry.  Did who ask who?

19        Q.   Did Ms. Hudon ask Ms. Wynn any questions?

20        A.   She -- I don't remember.  I don't recall if

21   she did.

22        Q.   Do you know the purpose of calling Ms. -- the

23   alderman -- Wynn for -- Ms. Hudon calling Ms. Wynn?

24        A.   I think she wanted to just make sure that she

Exhibit 12
Page 7 of 14

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 8

1    was aware of what happened in her district.

2        A.    Okay.

3        Q.    **With respect -- Did Ms. Hudon submit a Freedom**

4    **of Information Act request to the City of Evanston?**

5        A.    On my behalf, she did.

6        Q.    **She did.  Okay.  And that is the source of the**

7    **videos that you watched prior to this deposition; is**

8    **that right?**

9        A.    Correct, yes.

10       Q.    **Taking you back to March 31, 2021, just**

11   **immediately prior to the incident.  Can you, generally,**

12   **tell me what you were doing at the time?  Not the whole**

13   **day.  I'm just talking about 10, 15, 20 minutes before.**

14       A.    Sure.  Yeah.  I just finished up with a bunch

15   of conference calls for work.  And at that time, I was a

16   smoker, so I decided to finally take a break and go

17   smoke a cigarette.  So I smoked a cigarette and made a

18   couple calls to some friends and then decided to have

19   one more cigarette.  And that's when this began.  So...

20       Q.    **And do you recall when an officer initially**

21   **approached you?**

22       A.    Yes, I do.

23       Q.    **And when you first noticed the officer, were**

24   **you on the phone at the time?**

Royal Reporting Services, Inc.
312.361.8851

**Exhibit 12**
Page 8 of 14

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 9

1      A.   No, I don't believe so.  It's hard to

2  remember.  I don't think I was, actually.

3      **Q.   And did you have a cellphone in your hands?**

4      A.   Probably.  Probably.  Yes.

5      **Q.   I'm going to show you -- In your answers to**

6  **interrogatory, you indicated that you felt pain when you**

7  **were -- I'm going to quote:**

8          **"I felt pain when I was forced to lay on the**

9  **ground and when the officers forced me to stand up while**

10  **I remained handcuffed."**

11          **Do you still have pain from that incident?**

12      A.   I have recurring, like, hip and knee pain.

13  Just minor, yes, but I do.

14      **Q.   Is there anything that -- Is it constant or**

15  **does it come at different times?**

16      A.   Comes at different times.

17      **Q.   Is there anything that triggers it that you're**

18  **aware of?**

19      A.   Sometimes stairs; walking for extended periods

20  of time.

21      **Q.   Have you consulted with any medical**

22  **professionals about this condition?**

23      A.   I have not.

24      **Q.   Has it gotten -- Since the incident, has it**

Royal Reporting Services, Inc.
312.361.8851

**Exhibit 12**
Page 9 of 14

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023



Page 14

1

24        Q.    In your complaint -- your amended complaint

Exhibit 12
Page 10 of 14

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 15

1  that you filed in this case -- one of the allegations is

2  that one of the officers -- in particular, Defendant

3  Rosenbaum -- pointed his assault rifle at you at

4  point-blank range; is that correct?

5      A.   Yes.

6      Q.   Okay.  In your review of the videos, did you

7  see him -- Is that -- Is there a depiction of Officer

8  Rosenbaum pointing his assault rifle at you at

9  pointblank range?

10     A.   Yes.

11     Q.   And whose video did you believe that you saw

12  it in?

13     A.   I don't recall.

14     Q.   Did you see it on one occasion or just

15  multiple?

16     A.   I remember it on one occasion.

17     Q.   And the word "point-blank", what does that --

18  Can you tell me what that means to you?

19     A.   I mean, to me, it means the gun was pointed

20  directly at me.

21     Q.   The barrel of the gun?

22     A.   Yes.

23     Q.   And pointblank, is that -- How far away from

24  you?

Exhibit 12
Page 11 of 14

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 16

1    A.    A few feet, maybe less.

2    **Q.    And prior to seeing the videos -- Was this**

3    **while you were on the ground that you believe -- or you**

4    **say he pointed a gun?**

5    A.    Yeah.   That's when I saw it.   During the

6    incident, I was on the ground.   I did not even know that

7    there was other cops until I was on the ground, to be

8    honest with you.

9    **Q.    So the first officer -- I should take that**

10   **back.   Strike that.**

11          **When did you first know that there was an**

12   **assault rifle pointed at you?   Is that from the video or**

13   **was it --**

14   A.    Yes.

15   **Q.    Okay.**

16   THE COURT REPORTER:   I'm sorry.   I'm just going to

17   interrupt real quick.   If we could just speak one at a

18   time.   It makes my job a whole lot easier if you just

19   wait for him to finish his question before you answer.

20   Thank you so much.

21   MR. DAFFADA:   I should have told you this before we

22   started.   You know how I told you the rules?

23   THE WITNESS:   Yeah, yeah.

24   MR. DAFFADA:   One of them is we're not supposed to

Exhibit 12
Page 12 of 14

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 17

1    talk over each other.  It's my habit.  Bad habits.  I

2    apologize.  You try not to do that, and I'll try not to

3    do that.

4        MR. FLAXMAN:  Could we redo that question and

5    answer?

6        MR. DAFFADA:  Can you read back that question and

7    answer?

8        THE COURT REPORTER:  Sure.

9                (Record read as requested.)

10   BY MR. DAFFADA:

11       Q.   How long would you say the entire incident

12   lasted?

13       A.   Seemed to last around maybe 10, 15 minutes.

14       Q.   And there were multiple officers at the scene;

15   is that right?

16       A.   Yes.

17       Q.   Were the officers -- Do you believe the

18   officers were disrespectful to you at all?

19       A.   Not disrespectful, no.

20       Q.   Did they explain the reason why they asked you

21   to lay on the ground and had to search you?

22       A.   Not while -- not asked me to lay on the

23   ground, no.  They just told me to get on the ground.  It

24   wasn't until I got up, I believe -- if I recall -- that

Royal Reporting Services, Inc.
312.361.8851

Exhibit 12
Page 13 of 14

Alexander Gray v. City of Evanston; et al.
Deposition of Alexander Gray - Taken 12/8/2023

Page 18

1    they told me.

2         MR. DAFFADA:  I don't have any other questions,

3    Ken.  That's about the fastest deposition I've ever had

4    to do.

5         THE WITNESS:  You're welcome.

6         MR. FLAXMAN:  I have no questions.  We'll waive

7    signature.  And if you would --

8         MR. DAFFADA:  Pleasure to meet you, sir.  I hope I

9    run into you in Evanston.  Ken and I both live in

10   Evanston.  I just found that out.

11        THE WITNESS:  We all live in Evanston then.

12        MR. DAFFADA:  Best of luck.

13        THE WITNESS:  All right.

14        MR. DAFFADA:  Thank you, Ken.

15        MR. FLAXMAN:  Are you ordering?

16        MR. DAFFADA:  Yes, I am.

17        MR. FLAXMAN:  I would like a copy, please.  Just a

18   PDF or e-tran.

19                    (Deposition concluded at 1:26 p.m.)

20

21

22

23

24

Royal Reporting Services, Inc.
312.361.8851

**Exhibit 12**
Page 14 of 14

```
1              IN THE UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF ILLINOIS

3                        EASTERN DIVISION

4   ALEXANDER GRAY,              )

5                 Plaintiff,     )

6     vs.                        )   No. 23-cv-1931

7   CITY OF EVANSTON, et al.,  )

8                 Defendants.    )

9          The deposition of DETECTIVE MICHAEL F.

10  KANE called for examination pursuant to the

11  Rules of Civil Procedure for the United States

12  District Courts pertaining to the taking of

13  depositions, taken remotely before Johnetta

14  Stafford Taylor, a Registered Professional

15  Reporter within and for the State of Illinois,

16  on October 31, 2023, at the hour of 2:21 p.m.

17  via Zoom videoconferencing.

18

19

20

21

22

23  Johnetta Stafford Taylor

24  License No. 084-001583
```

Exhibit 13
Page 1 of 46

```
 1   APPEARANCES:

 2        KENNETH FLAXMAN LAW OFFICES

 3        BY:  MR. KENNETH N. FLAXMAN

 4        200 South Michigan Avenue

 5        Suite 201

 6        Chicago, Illinois  60604

 7        (312) 427-3200

 8        knf@kenlaw.com

 9             Representing the Plaintiff;

10

11        LEINENWEBER, BARONI & DAFFADA

12        BY:  MR. JAMES DAFFADA

13        120 North LaSalle Street

14        Suite 2000

15        Chicago, Illinois  60602

16        (866) 786-3705

17        jim@ilesq.com

18             Representing the Defendants.

19

20             *******

21

22

23

24
```

Exhibit 13
Page 2 of 46

Detective Michael F. Kane 10/31/2023

```
 1                 I N D E X

 2   WITNESS                         EXAMINATION

 3   DETECTIVE MICHAEL F. KANE

 4     By Mr. Flaxman                      4

 5

 6

 7

 8

 9

10

11               E X H I B I T S

12   NUMBER                        MARKED FOR ID

13

14        (Exhibits previously marked and

15        retained by Mr. Flaxman.)

16

17

18

19

20

21

22

23

24
```

**Exhibit 13**
**Page 3 of 46**

Detective Michael F. Kane 10/31/2023

```
 1          THE COURT REPORTER:  On the record.
 2              This deposition is being taken by means
 3      of Zoom audio/videoconference, and the oath will
 4      be administered remotely by the court reporter
 5      pursuant to Executive Order 2020-14 and by
 6      agreement of counsel.
 7              Will all counsel present please state
 8      your name and agreement with this procedure.
 9          MR. FLAXMAN:  I'm Kenneth Flaxman, attorney
10      for the Plaintiff.  We agree.
11          MR. DAFFADA:  James Daffada, attorney for all
12      Defendants in this case.  We agree.
13                      (Whereupon, the witness was
14                      duly sworn.)
15          MR. FLAXMAN:  Good afternoon, sir.
16              DETECTIVE MICHAEL F. KANE,
17      called as a witness herein, was examined and
18      testified as follows:
19                      EXAMINATION
20      BY MR. FLAXMAN:
21          Q.   Could you state your name and spell
22      your last name for us, please.
23          A.   Yes.  Michael Kane, K-A-N-E.
24          Q.   And what's your business or occupation,
```

Exhibit 13
Page 4 of 46

Detective Michael F. Kane 10/31/2023

1    sir?

2        A.   I'm a detective with the Evanston

3    Police Department.

4        Q.   And for how long have you worked for

5    the Evanston Police Department?

6        A.   Approximately 8 1/2 years.

7        Q.   How did you come to -- when you

8    started, was your position when you started

9    detective?

10       A.   No.

11       Q.   What was your position when you

12   started?

13       A.   I was a patrolman.

14       Q.   How did you come to be a detective?

15       A.   I applied for the position six months

16   ago.

17       Q.   Was there an increase in pay to become

18   a detective?

19       A.   No.

20       Q.   Was there a change in working hours

21   when you became a detective?

22       A.   Yes.

23       Q.   And what were your hours as a police

24   officer and what are they as a detective?

1    A.    I worked a 12-hour shift as a

2  patrolman.  Now, I work an 8-hour shift as

3  detective.

4    Q.    Do you work 40 hours a week?

5    A.    Yes.

6    Q.    As a patrol officer working 12-hour

7  shifts, how many hours a week did you work?

8    A.    I would work one 60-hour workweek, and

9  then I would work one 12-hour workweek the

10  following week.

11    Q.    Back on March 31 of 2021, am I correct

12  that you were a patrol officer?

13    A.    Yes.

14    Q.    Did you look at any documents or images

15  or videos to prepare for this deposition?

16    A.    I did.

17    Q.    Could you tell us what you looked at?

18    A.    I looked at body camera from the

19  incident, the police report.  And that's all.

20    Q.    When you say police reports, is there

21  more than one police report?

22    A.    To the best of my recollection, I read

23  the report written by Officer Shannell Brown.

24    Q.    And let's -- let me put it on the

Detective Michael F. Kane 10/31/2023

```
 1    screen and ask you if it's the same one that's

 2    been marked as, I think -- as an exhibit, which

 3    I'll...

 4                    (Whereupon, Exhibit No. 10

 5                    was previously marked for

 6                    identification.)

 7    BY MR. FLAXMAN:

 8        Q.   Do you see what's been marked at the

 9    bottom as Exhibit 10 on your screen?

10        A.   I do.

11        Q.   This is a 3-page report; is that right?

12        A.   Can you scroll up, sir?

13        Q.   Sure.

14                    (Short pause.)

15        THE WITNESS:  Yes.  I reviewed this report a

16    few weeks ago.

17    BY MR. FLAXMAN:

18        Q.   Is this the report you reviewed in

19    preparation for this deposition?

20        A.   Yes.

21        Q.   Did you look at any other reports?

22        A.   No.

23        Q.   When you looked at this report, did you

24    see anything that did not -- that was not in
```

Detective Michael F. Kane 10/31/2023

1    accord with your recollection of the incident of

2    March 31, 2021?

3        A.    I don't recall the incident from my

4    memory from that date.

5        Q.    Well, did looking at the report refresh

6    your recollection?

7        A.    No.

8        Q.    Did you look at any videos to prepare

9    for the deposition?

10       A.    I did.

11       Q.    And how many videos did you look at?

12       A.    I don't know.

13       Q.    Did you look at your body camera video?

14       A.    Yes.

15       Q.    Did you conduct a search of a suspect

16   on March 31, 2021?

17       A.    Based on the video, I did conduct a

18   search.

19       Q.    Could you tell us why you conducted

20   that search?

21       A.    Based on the video, I believed the

22   subject I searched was armed with a handgun.

23       MR. FLAXMAN:  I'm sorry.  I missed the last

24   words.

1           Could we have it read back, please?

2       THE WITNESS:  I'll repeat myself.

3           Based on the video and the best of my

4   recollection, I searched the subject in the

5   video because I believed he was armed with a

6   handgun.

7   BY MR. FLAXMAN:

8       Q.   And could you tell us why you believed

9   he was armed with a handgun?

10      A.   Due to the call of service from

11  dispatch.

12      Q.   And do you remember what was -- what

13  information about that call for service was

14  relayed to you?

15      A.   Based on the video, I heard dispatch

16  state there was a man with a gun on the public

17  way in the 500-block of Sheridan Square with a

18  gun in his right hand.

19      Q.   Is there anything that the dispatcher

20  communicated about the race of the suspect?

21      A.   Yes.

22      Q.   And what was that?

23      A.   It was white.

24      Q.   And was there anything that was

Exhibit 13
Page 9 of 46

```
1   communicated to you by the dispatcher about the
2   height of the suspect?
3       A.   Yes.  Based on the video and the best
4   of my recollection, I believe it was 5 to 6 feet
5   tall.
6       Q.   And was the man that you searched
7   between 5 and 6 feet tall?
8       A.   I don't know.
9       Q.   Was the man that you searched a white
10  male?
11      A.   I don't know.
12      Q.   Okay.  Before you searched that man,
13  had you seen him hold a handgun?
14      A.   I don't recall.
15      Q.   Before you searched that man, had he
16  told you that he had a handgun?
17      A.   I don't know.
18      Q.   When you searched that man, did you
19  find a handgun?
20      A.   Based on the video, I did not.
21      Q.   Well, if you'd found a handgun, would
22  you have written a report?
23      A.   I don't know.
24      Q.   If you found a handgun, would some
```

1    police officer on the scene have written a

2    report documenting that you found a handgun?

3         A.   Yes, of course.

4         Q.   Okay.  When you reviewed the video, was

5    that your body camera video or somebody else's

6    body camera video?

7         A.   I don't know.

8         Q.   Did you review a body camera video?

9         A.   I did.

10        Q.   How was the information from the

11   dispatch communicated to you when you were

12   en route to the scene on March 31 of 2021?

13        A.   Based on the video that was sent to me

14   via radio.

15        Q.   And were you in a vehicle when you

16   heard that radio message?

17        A.   I don't know.

18        Q.   Was anybody -- were you in the presence

19   of other police officers when you heard that

20   radio message?

21        A.   I don't recall.

22        Q.   Let me -- are you familiar with the

23   search and seizure policy of the City of

24   Evanston?

Detective Michael F. Kane 10/31/2023

1    A.   I've read it, but I don't recall
2  specifics on it.
3    Q.   Do you recall anything in the search
4  and seizure policy of the City of Evanston as it
5  was in effect on March 31 of 2021 that required
6  that any search be documented?
7    A.   I don't know.
8    Q.   Have you seen any documentation of the
9  search that you conducted on March 31 of 2021?
10    A.   I don't know.
11    Q.   When you say you don't know, does that
12  mean you don't recall or you never learned that?
13  What do you mean when you say I don't know?
14    A.   I don't recall any report of my search.
15    Q.   Okay.  Do you recall whether you
16  prepared a report?
17    A.   I did not prepare a report.
18    Q.   Have you ever given a deposition
19  before?
20    A.   No.
21    Q.   Have you ever been sued before?
22    A.   No.
23    Q.   Did you ever work for the City of North
24  Chicago?

Detective Michael F. Kane 10/31/2023

1      A.    I did.

2      Q.    When did you work there?

3      A.    I was employed with the City of North

4  Chicago in 2014.

5      Q.    And why did you leave?

6      A.    I left North Chicago to become a police

7  officer in Evanston.

8      Q.    Had you attended a police academy at

9  North Chicago?

10     A.    Yes.

11     Q.    Which police academy did you attend?

12     A.    Cook County Sheriff's Police Academy.

13     Q.    Did you have to test at the City of

14  Evanston to start work there as a police

15  officer?

16     A.    Yes.

17     Q.    Had you tested at Evanston before you

18  started the job at North Chicago?

19     A.    Sorry.  Can you rephrase that question?

20     Q.    Well, had you tested -- let me start

21  over.

22          Had you started the testing procedure

23  at Evanston before you started the job at North

24  Chicago?

Detective Michael F. Kane  10/31/2023

```
 1        A.    Yes.

 2        Q.    Do you recall -- let me go back.

 3              On March 31, 2021 when you were

 4   responding to this call that we've been talking

 5   about, did you have a weapon with you?

 6        A.    Yes.

 7        Q.    Did you have a handgun?

 8        A.    Yes.

 9        Q.    Did you have a Taser?

10        A.    I don't recall at that time.

11        Q.    Do you recall unholstering that handgun

12   at any time during the incident of March 31,

13   2021?

14        A.    I do not recall.

15        Q.    Did you see your unholstered handgun in

16   your hand on the video that you watched about

17   the incident?

18        A.    Yes.  Based on the video, I did see my

19   weapon unholstered.

20        Q.    Well, do you recall why it was that you

21   unholstered your firearm?

22        A.    Based on the video, I was responding to

23   a call of an armed subject.

24        Q.    And did you see an armed subject before
```

1   you unholstered your handgun?

2       A.   No.

3       Q.   Did you see a white male at the

4   location referred to in the dispatch about the

5   suspect?

6       A.   I don't know.

7       Q.   What do you mean by you don't know?

8       A.   I don't recall.

9       Q.   Well, did you see a male in the

10  approximate location referred to in the

11  dispatch?

12      A.   Based on the video, I observed a male

13  in the parkway.

14      Q.   And as you sit here today, do you

15  recall whether that male you saw was black or

16  white?

17      A.   Based on the video, I don't know his

18  race.

19      Q.   When you unholstered your handgun, did

20  you point it at that suspect?

21      A.   Based on the video, I did not point my

22  handgun at the subject.

23      MR. FLAXMAN:  Let's go to the tape -- let's

24  go to the video.  I'm about to show you what's

1  previously been marked and I believe shared with

2  your counsel -- nothing is popping up.

3          As 17, Kane 032016 to 043522.  And let

4  me see if I can get that on the screen.

5          That's not what I want to do.

6          All right.  I think -- is it on your

7  screen?  Is there a video on your screen?

8      THE WITNESS:  Yes, sir.

9                  (Whereupon, a video was shown

10                  with audio.)

11  BY MR. FLAXMAN:

12      Q.   Can you tell us, in the top right-hand

13  corner, it says -- or in the top near the right,

14  it says 14:41:13-0500.

15          Do you see that?

16      A.   I do.

17      Q.   Are you familiar with the scene that's

18  depicted in this frame?

19      A.   I am.

20      Q.   Can you tell us what it is?

21      A.   This is the 500 block of Sheridan

22  Square.

23      Q.   Okay.  Is this the north end or the

24  south end?

Exhibit 13
Page 16 of 46

Detective Michael F. Kane 10/31/2023

```
 1        A.   This is the north end.

 2        MR. FLAXMAN:  Okay.  Let me play a little

 3   bit.

 4                   (Whereupon, a video was shown

 5                    with audio.)

 6   BY MR. FLAXMAN:

 7        Q.   Was that your voice we just heard?

 8        A.   I did not hear that.  I don't know.

 9        Q.   Is the audio playing on your end or --

10        MR. DAFFADA:  It's pretty light.  Try it

11   again.

12                   (Whereupon, a video was shown

13                    with audio.)

14   BY MR. FLAXMAN:

15        Q.   Were you able to make out any of those

16   words?

17        A.   No, sir.

18        Q.   Okay.  Were you able to make out words

19   on the video when you reviewed it before the

20   deposition?

21        A.   Yeah.  I had heard words, but I don't

22   recall the words.

23        MR. FLAXMAN:  Okay.  Let's keep playing.

24
```

Detective Michael F. Kane 10/31/2023

```
 1                    (Whereupon, a video was shown
 2                   with audio.)
 3   BY MR. FLAXMAN:
 4       Q.   Were you able to make out any of the
 5   words we just heard?
 6       A.   No.
 7       Q.   Okay.  And does the number in the right
 8   top say 14:41:40?
 9       A.   It does.
10       Q.   Do you know the name of the police
11   officer whose back we're looking at?
12       A.   Based on prior video, it appears to be
13   Officer Kubiak.
14       Q.   And it looks like there's no handgun in
15   his holster; is that correct?
16       A.   Yes.
17       Q.   Could you make out any of the words he
18   said?
19       MR. DAFFADA:  Objection.  Foundation.
20           You can answer.
21       THE WITNESS:  No.
22       MR. FLAXMAN:  All right.  Let's play some
23   more.
24
```

Exhibit 13
Page 18 of 46

```
 1                    (Whereupon, a video was shown
 2                  with audio.)
 3   BY MR. FLAXMAN:
 4        Q.   Did you hear Officer Kubiak say 'Get on
 5   the ground, please'?
 6        A.   Yes.
 7        Q.   Is that a standard instruction given by
 8   Evanston police officers?
 9        MR. DAFFADA:  Objection.  Form.
10            You can answer.
11        THE WITNESS:  I don't know.
12   BY MR. FLAXMAN:
13        Q.   Have you ever instructed a suspect to
14   'Get on the ground, please'?
15        A.   I don't recall.
16        Q.   Were you surprised -- or do you
17   remember hearing Officer Kubiak say 'Get on the
18   ground, please'?
19        A.   I do not.
20        Q.   Okay.  Could you -- from this video,
21   could you tell whether we're looking at a
22   suspect who was a white male or a black male?
23        A.   I could not.
24        MR. FLAXMAN:  Let's play some more.
```

Detective Michael F. Kane 10/31/2023

```
 1                    (Whereupon, a video was shown
 2                     with audio.)
 3   BY MR. FLAXMAN:
 4       Q.   Did you hear Officer Kubiak say 'Get on
 5   the ground'?
 6       A.   Yes.
 7       Q.   Do you remember hearing him say that on
 8   March 31, 2021?
 9       A.   I do not.
10       MR. FLAXMAN:  Let's play some more.
11                    (Whereupon, a video was shown
12                     with audio.)
13   BY MR. FLAXMAN:
14       Q.   Now, is that your hand on his vest?
15       A.   Yes.
16       Q.   Do you remember putting your hand on
17   his vest?
18       A.   Based on my memory, I do not.
19       Q.   And why would you have placed your hand
20   on his vest in that situation?
21       MR. DAFFADA:  Objection.  Form.
22           You can answer.
23       THE WITNESS:  I don't know.
24
```

Detective Michael F. Kane 10/31/2023

1   BY MR. FLAXMAN:

2       Q.   Now, we're looking at the suspect who

3   is now -- has complied with the order to get on

4   the ground; is that right?

5       A.   Yes.

6       Q.   And he's holding his hands out apart

7   from his body; is that right?

8       A.   Yes.

9       MR. FLAXMAN:  Okay.  Let's play some more.

10                  (Whereupon, a video was shown

11                   with audio.)

12  BY MR. FLAXMAN:

13      Q.   Did you hear Officer Kubiak say

14  something and you won't get hurt?

15      A.   I did not hear that.

16      Q.   Okay.

17                  (Whereupon, a video was shown

18                   with audio.)

19  BY MR. FLAXMAN:

20      Q.   And we're hearing a tone every several

21  seconds.

22           Do you know what that tone is?

23      A.   I do.

24      Q.   What is it?

Detective Michael F. Kane 10/31/2023

```
 1        A.    That's an emergency tone.

 2        Q.    And do you know how it's generated?

 3        A.    During any type of emergency, it deters

 4   other officers from getting on the radio.

 5        MR. FLAXMAN:  Let's play some more.

 6                      (Whereupon, a video was shown

 7                       with audio.)

 8   BY MR. FLAXMAN:

 9        Q.    Did you hear that voice say 'Do you got

10   any weapons on you'?

11        A.    I did.

12        Q.    Was that your voice?

13        A.    I don't know.

14        Q.    Was it Officer Kubiak's voice?

15        A.    I do not know.

16        Q.    Okay.  We're now -- the number at the

17   top right is 14:42.07; is that correct?

18        A.    Yes.

19        MR. FLAXMAN:  Let's play some more.

20                      (Whereupon, a video was shown

21                       with audio.)

22   BY MR. FLAXMAN:

23        Q.    Did you hear that word 'no weapons on

24   you'?
```

Detective Michael F. Kane  10/31/2023

```
 1        A.   I just heard weapons.

 2        MR. FLAXMAN:  Let's play some more.

 3                  (Whereupon, a video was shown

 4                   with audio.)

 5   BY MR. FLAXMAN:

 6        Q.   Now, did you hear 'like Superman'?

 7        A.   Yes.

 8        Q.   Have you ever instructed a suspect to

 9   hold their hands apart like Superman?

10        A.   I don't recall.

11        Q.   Have you ever heard any Evanston police

12   officer other than on March 31 give that

13   instruction to hold your hands apart like

14   Superman?

15        A.   I don't recall.

16        MR. FLAXMAN:  All right.  Let's play some

17   more.

18                  (Whereupon, a video was shown

19                   with audio.)

20        MR. FLAXMAN:  Well, we reached the end of

21   that snippet.

22   BY MR. FLAXMAN:

23        Q.   Do you remember as you got closer to

24   the suspect on March 31 of 2021, were you able
```

Detective Michael F. Kane  10/31/2023

```
 1   to see whether he was a black man or a white

 2   man?

 3       A.   I don't recall.

 4       Q.   Were you able to see that he had

 5   headphones in front of him on the ground?

 6       A.   I don't recall.

 7       Q.   Do you know why it was that the man was

 8   on the ground?

 9       A.   He was instructed to get on the ground

10   by Officer Kubiak.

11       Q.   And do you know why Evanston police

12   officers instruct suspects to get on the ground?

13       A.   I don't --

14       MR. DAFFADA:  Objection.  Form.

15       THE WITNESS:  -- know.

16   BY MR. FLAXMAN:

17       Q.   Now up to the end of that video, the

18   snippets that we just watched, did you see the

19   suspect do anything that caused you to believe

20   that he was in possession of a firearm?

21       A.   I don't know.

22       Q.   Before the snippet that we just watched

23   concluded or when you were on the scene on

24   March 31 of 2021, did you hear the suspect say
```

**Exhibit 13**
**Page 24 of 46**

Detective Michael F. Kane  10/31/2023

```
1   anything that caused you to believe he had a

2   firearm?

3        MR. DAFFADA:  Can you repeat the question

4   again?  I'm sorry.

5        MR. FLAXMAN:  Can we have it read back,

6   please.

7                      (Whereupon, the record was read

8                       as requested.)

9        THE WITNESS:  I don't know.

10  BY MR. FLAXMAN:

11       Q.   Does that mean -- when you say I don't

12  know, what do you mean by that?

13       A.   Based on the video, I did not hear

14  anything from the said subject eliciting that he

15  would have a firearm.

16       Q.   Based on the video, did you agree that

17  Officer Kubiak was following the rules and

18  regulations of the Evanston Police Department in

19  his interaction with the suspect?

20       A.   Based on the video, I would agree with

21  his actions.

22       Q.   Now, when you worked at Evanston, did

23  you receive training on search and seizure?

24       A.   I have.
```

**Exhibit 13**
Page 25 of 46

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

25
*App. 141 of 326*

Detective Michael F. Kane  10/31/2023

1    Q.   And did you receive training about
2  complaints from anonymous callers?
3    A.   I don't recall.
4    Q.   Back on March 31 of 2021, was it your
5  understanding that the caller who complained
6  about the man with the gun did not leave his or
7  her name?
8    A.   Based on the video and dispatch, I have
9  no knowledge of this.
10   Q.   Well, if we go back to that report --
11   MR. DAFFADA:  Incident report?
12   MR. FLAXMAN:  Which is Exhibit 10, which I
13 now put on the screen I think.
14        Is it sharing or not?
15   THE WITNESS:  It's not.
16   MR. FLAXMAN:  All right.  We'll make it
17 share.
18             (Short pause.)
19   MR. FLAXMAN:  Is it now sharing?
20   THE WITNESS:  Yes, sir.  I see the report.
21   MR. FLAXMAN:  Let's look at Page 2 of
22 Exhibit 10.
23 BY MR. FLAXMAN:
24   Q.   Do you see where it says -- and I'll

1    make it a little bigger if I can.

2          While en route, dispatch advised that

3    an unknown citizen.

4          Do you see that?

5    A.   I do.

6    Q.   Do you remember hearing that on

7    March 31 of 2021 when you were en route to the

8    scene?

9    A.   I do not.

10   Q.   Okay.  Does an unknown citizen mean

11   that it's an anonymous person?

12   A.   I don't know.

13   Q.   Did you ever receive any instruction in

14   the course of your employment for the City of

15   Evanston that reports from unknown citizens are

16   not reliable?

17   A.   I did not.

18              (Short pause.)

19   MR. FLAXMAN:  All right.  That's not a good

20   one.

21              (Whereupon, Exhibit No. 2

22              was previously marked for

23              identification.)

24   MR. FLAXMAN:  All right.  All right.  We're

Detective Michael F. Kane 10/31/2023

1    looking at Exhibit 2.

2    BY MR. FLAXMAN:

3        Q.   Are you able to see that?

4        A.   Yes.

5        Q.   Are you the police officer where the

6    cursor is, the one who is not wearing a mask?

7        A.   Yes.  That is me.

8        Q.   Okay.  What were you doing -- do you

9    recall what you were doing at the time shown on

10   this image?

11       A.   I do not recall.

12       Q.   Having looked at Exhibit 2, do you have

13   any recollection about whether the suspect --

14   let me go back.

15            Is the suspect shown in Exhibit 2?

16       A.   Based on the video, yes.

17       Q.   And having looked at this image from

18   the video, is the suspect black or white?

19       A.   I do not know his actual race.

20       Q.   Okay.  Do you know whether he appeared

21   to you to be a white male back on March 31 of

22   2021?

23       A.   I do not recall.

24       Q.   Okay.  Do you know who the officer is

Detective Michael F. Kane 10/31/2023

1    who has the I-C-E on his jacket?

2        A.    Based on the video, I believe that to

3    be Detective Rosenbaum.

4        Q.    Did you arrive on the scene with

5    Detective Rosenbaum?

6        A.    I do not recall.

7                       (Whereupon, Exhibit No. 4

8                       was previously marked for

9                       identification.)

10       Q.    Could you tell us what Exhibit 4 --

11   what area is shown in Exhibit 4?

12       MR. DAFFADA:  I didn't hear the question,

13   Ken.

14   BY MR. FLAXMAN:

15       Q.    Could you tell us what area is shown in

16   Exhibit 4?

17       A.    Exhibit 4 is showing the 500 block of

18   Sheridan Square.

19       Q.    And you were present when this image

20   was created; is that right?

21       A.    Based on the video, yes.

22       Q.    Do you recall how many officers who

23   were present had unholstered firearms?

24       A.    I do not recall.

Detective Michael F. Kane 10/31/2023

```
 1                      (Whereupon, Exhibit No. 5

 2                      was previously marked for

 3                      identification.)

 4       MR. FLAXMAN:  Now, Exhibit 5 is the same

 5   image.

 6   BY MR. FLAXMAN:

 7       Q.   Is that you where my cursor is, if

 8   you're able to make that out?

 9       A.   That is not me.

10       Q.   Okay.

11       A.   To the best of my recollection, that is

12   not me, sir.

13       Q.   Okay.  And this is the same area of the

14   park as the other preceding images; is that

15   right?

16       A.   Yes.

17       Q.   And is this you where my cursor is?

18       A.   Yes.

19       Q.   Okay.  Do you know what you're doing in

20   this image?

21       A.   I do not know in this image.

22                      (Whereupon, Exhibit No. 11

23                      was previously marked for

24                      identification.)
```

Exhibit 13
Page 30 of 46

Detective Michael F. Kane 10/31/2023

```
 1        MR. FLAXMAN:  I really don't care about this.
 2            I'm showing you Exhibit 11.
 3   BY MR. FLAXMAN:
 4       Q.   Have you ever seen an event report of
 5   this nature?
 6       A.   I do not recall seeing a -- actually,
 7   this is a CADS ticket.  I've seen these before.
 8       Q.   Well, have you ever -- my specific
 9   question is:  Have you ever seen this type of a
10   report?
11       A.   Yes.
12       Q.   And how did you have occasion to see
13   it?
14       A.   In the past, I've seen these printed
15   out after incidents to show when officers have
16   responded to calls, dispatched to calls, arrived
17   at calls.
18       Q.   Do you know how these forms are
19   created?
20       A.   I do not.
21       Q.   Are officers when they're dispatched to
22   a call supposed to communicate that they've
23   arrived at the scene?
24       A.   Yes.
```

Detective Michael F. Kane  10/31/2023

```
 1                    (Whereupon, Exhibit No. 12

 2                     was previously marked for

 3                     identification.)

 4       MR. FLAXMAN:  Okay.  This Exhibit 12.

 5   BY MR. FLAXMAN:

 6       Q.   Is that you standing up?

 7       A.   Yes.  That's me.

 8       Q.   Do you recall what you were looking at?

 9       A.   I do not recall.

10       Q.   Can you tell what your right hand is

11   doing?

12       A.   It appears to be near my back pocket.

13   I do not know what I'm doing now, sir.

14                    (Whereupon, Exhibit No. 13

15                     was previously marked for

16                     identification.)

17   BY MR. FLAXMAN:

18       Q.   Are you depicted in this image,

19   Exhibit 13?

20       A.   Yes.

21       Q.   Can you tell us what you're doing?

22       A.   Based on Exhibit 13, it appears that I

23   am handcuffing the subject.

24       Q.   And could you tell us why you
```

Detective Michael F. Kane 10/31/2023

 1    handcuffed the subject?

 2        A.   Yes.  Based on the video, the subject

 3    is believed to be armed at this time.

 4        Q.   And at the time you were handcuffing

 5    the suspect, had you seen him with a gun?

 6        A.   I don't recall.

 7        Q.   At the time you were handcuffing the

 8    subject, had you felt a hard object in his

 9    clothing?

10        A.   I do not recall.

11        Q.   At the time you were handcuffing the

12    subject, had the subject or the suspect told you

13    that he had a gun?

14        A.   I do not recall.

15        Q.   Do you remember the subject saying that

16    he lived across the street and he was just

17    outside getting a smoke?

18        A.   I do not recall.

19                     (Whereupon, Exhibit No. 14

20                     was previously marked for

21                     identification.)

22    MR. FLAXMAN:  This is Exhibit 14.

23        We'll skip.

24

Exhibit 13
Page 33 of 46

McCorkle Litigation Services, Inc.              33
Chicago, Illinois   (312) 263-0052       *App. 149 of 326*

Detective Michael F. Kane  10/31/2023

```
 1                    (Whereupon, Exhibit No. 15
 2                    was previously marked for
 3                    identification.)
 4        MR. FLAXMAN:  Exhibit 15.
 5            We'll skip.
 6                    (Whereupon, Exhibit No. 16
 7                    was previously marked for
 8                    identification.)
 9        MR. FLAXMAN:  Exhibit 16.
10            We'll skip.
11            Let's watch another video, which will
12   take some -- stop share.
13                    (Whereupon, Exhibit No. 18
14                    was previously marked for
15                    identification.)
16        MR. FLAXMAN:  This is video Exhibit 18.  It's
17   from the complete video, Kane 6 starting at
18   6 minutes, 26 seconds and 13 frames.  And I'll
19   try to get it going.
20                    (Short pause.)
21   BY MR. FLAXMAN:
22        Q.   Are you able to see an image on your
23   screen?
24        A.   Yes.
```

Exhibit 13
Page 34 of 46

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

Detective Michael F. Kane 10/31/2023

```
 1        Q.    And that police officer who has his
 2   hands touching the suspect is not you; is that
 3   correct?
 4        A.    Yes.
 5        Q.    Who is it, if you know?
 6        A.    That is Officer Burgers.
 7        MR. FLAXMAN:  Okay.  Let's play a little bit.
 8                  (Whereupon, a video was shown
 9                   with audio.)
10   BY MR. FLAXMAN:
11        Q.    Do you see Officer Burgers searching
12   through the jacket of the suspect?
13        A.    I do.
14        Q.    Do you recall searching through the
15   jacket of the suspect?
16        A.    Based on the video, I recall searching
17   parts of his jacket.
18        Q.    And why did you search parts of his
19   jacket?
20        A.    I believed the subject to be armed with
21   a firearm.
22        Q.    Did you have a search warrant to search
23   his jacket?
24        A.    I did not.
```

Detective Michael F. Kane 10/31/2023

1      Q.   Had you seen him with a handgun before

2   you searched his jacket?

3      A.   I did not.

4      Q.   Had any person on the scene told you

5   that they had seen the suspect with a handgun?

6      A.   Based on the video and dispatch, our

7   caller stated they saw the subject with a

8   handgun?

9      Q.   Was the caller at the scene?

10      A.   I do not recall.

11      Q.   Did the suspect or subject tell you

12   that he had a handgun?

13      A.   I don't know.

14      MR. FLAXMAN:  Okay.  Let's play a little

15   more.

16                  (Whereupon, a video was shown

17                   with audio.)

18   BY MR. FLAXMAN:

19      Q.   Now, we see someone's hands and gloves.

20          Are those your hands and your gloves?

21      A.   I do not know.

22      Q.   Okay.  And we're looking in the top

23   right hand, the number is 14:44:22; is that

24   correct?

Detective Michael F. Kane 10/31/2023

1    A.   Yes.

2    MR. FLAXMAN:  Let's play a little more.

3                 (Whereupon, a video was shown

4                  with audio.)

5  BY MR. FLAXMAN:

6    Q.   And after watching that snippet, do you

7  have -- has your recollection been refreshed as

8  to whether the subject you were -- that was

9  being questioned in that video was black or

10 white?

11   A.   No.

12   MR. FLAXMAN:  Okay.  Let's take a five-minute

13 break, and I think we're going to be done.

14   MR. DAFFADA:  Okay.

15                (Whereupon, a short break was

16                 taken.)

17   MR. FLAXMAN:  I'm going to show you some more

18 video.  The first one I'm going to show you is

19 Exhibit 19.  It's Kubiak from 4:27:04 to 05:09.

20                (Whereupon, Exhibit No. 19

21                 was previously marked for

22                 identification.)

23   MR. DAFFADA:  It's still not on the screen.

24

Detective Michael F. Kane 10/31/2023

```
 1                    (Whereupon, a video was shown

 2                     with audio.)

 3        MR. FLAXMAN:  All right.

 4   BY MR. FLAXMAN:

 5        Q.   Do you see this video at the top

 6   right-hand corner, it says 14:43:16?

 7        A.   I do.

 8        Q.   Do we see you in this image that we're

 9   starting with?

10        A.   Based on the video, I believe -- I

11   can't see my face there.

12        MR. FLAXMAN:  All right.  Let's play a little

13   bit.

14                    (Whereupon, a video was shown

15                     with audio.)

16   BY MR. FLAXMAN:

17        Q.   Is that you turning the suspect over?

18        A.   Yes.

19        Q.   Are you searching him as you turn him

20   over?

21        A.   Based on the video, it appears so.

22        Q.   After having seen this snippet of the

23   video, do you have a refreshed recollection as

24   to whether the man who is the suspect was a
```

**black male or a white male?**

A. I do not.

MR. FLAXMAN: All right. Let's play some more.

(Whereupon, a video was shown with audio.)

BY MR. FLAXMAN:

**Q. Could you tell us what you're doing at the last -- at this point in the video?**

A. At this point in the video, it appears that I'm searching the subject's coat.

**Q. And why were you searching him?**

A. Based on the video, the suspect is believed to be armed with a handgun.

(Whereupon, a video was shown with audio.)

BY MR. FLAXMAN:

**Q. Were you searching the suspect's clothing in this snippet that we just saw?**

A. Based on the video, it appears so.

**Q. Did you find any weapons when you searched him?**

A. I did not.

**Q. Did you find any contraband when you**

Detective Michael F. Kane 10/31/2023

 1    searched him?

 2        A.   I did not.

 3        Q.   Do you recall finding cigarettes?

 4        A.   I do not recall.

 5        MR. FLAXMAN:  Okay.  Let's watch some more.

 6                    (Whereupon, a video was shown

 7                     with audio.)

 8    BY MR. FLAXMAN:

 9        Q.   Were there any supervisors or

10    supervisor at the scene on March 31, 2021?

11        A.   I do not know.

12        Q.   Do the supervisors in Evanston wear

13    different colored uniforms or shirts than patrol

14    officers?

15        A.   Supervisors can wear the same colored

16    shirt and they can wear a white shirt mostly on

17    special events.

18        MR. FLAXMAN:  Okay.  Let's continue with the

19    video.

20                    (Whereupon, a video was shown

21                     with audio.)

22    BY MR. FLAXMAN:

23        Q.   Did that show you continuing to search

24    the suspect?

Detective Michael F. Kane 10/31/2023

```
 1        A.    Yes.

 2        Q.    And we just saw three officers help the

 3   suspect to his feet; is that correct?

 4        A.    Yes.

 5        Q.    Could you tell us who those officers

 6   are?

 7        A.    I believe it to be Officer Burgers,

 8   Detective Popp, and myself.

 9        Q.    Okay.  And after having seen this

10   snippet, do you have any refreshed recollection

11   as to whether or not the suspect was a male

12   black or a male white person?

13        A.    I do not.

14        MR. FLAXMAN:  Let's play some more.

15                    (Whereupon, a video was shown

16                     with audio.)

17                    (Whereupon, Exhibit No. 20

18                     was previously marked for

19                     identification.)

20        MR. FLAXMAN:  All right.  We're now going to

21   look at Exhibit 20, which is Brown from 4

22   minutes, 32 seconds and 15 frames to 5 minutes,

23   27 seconds and 9 frames.

24
```

Detective Michael F. Kane 10/31/2023

```
 1                    (Whereupon, a video was shown
 2                     with audio.)
 3   BY MR. FLAXMAN:
 4       Q.   Did you hear somebody say nothing?
 5       A.   I did not.
 6       Q.   Do you remember the suspect telling you
 7   that he didn't have anything that was unlawful
 8   in his possession?
 9       A.   I don't recall.
10       Q.   Is this another angle of the video at
11   14:42:25 showing you searching the suspect?
12       A.   Yes.
13       MR. FLAXMAN:  Okay.  Let's play some more.
14                    (Whereupon, a video was shown
15                     with audio.)
16   BY MR. FLAXMAN:
17       Q.   Okay.  After having seen this snippet,
18   has your recollection now been refreshed as to
19   whether or not the suspect was a white male or a
20   black male?
21       A.   No.
22       MR. FLAXMAN:  Let's play some more.
23                    (Whereupon, a video was shown
24                     with audio.)
```

Detective Michael F. Kane  10/31/2023

```
 1   BY MR. FLAXMAN:
 2       Q.   In this video that you just saw, the
 3   suspect is on the ground; is that right?
 4       A.   Yes.
 5       Q.   Is that a dignified way of treating a
 6   citizen?
 7       A.   Yes.
 8       MR. FLAXMAN:  Let's watch one more.
 9                    (Whereupon, a video was shown
10                     with audio.)
11       MR. DAFFADA:  On the video, just so you know,
12   the sound quality was not the same as if it's
13   not on Zoom, on the original.
14       MR. FLAXMAN:  I hope that when we get to
15   seeing each other in person, we can get better
16   sound.
17            I have nothing further.
18       MR. DAFFADA:  Okay.  Thanks, Ken.
19            Ken, we can off the record.  I wanted
20   to ask you about the rest of the deps just real
21   quick.
22       MR. FLAXMAN:  Let's just close it.
23            Do you waive signature again?
24       MR. DAFFADA:  Yes, sir.
```

Detective Michael F. Kane 10/31/2023

1    MR. FLAXMAN:  We'll be ordering the original.

2    MR. DAFFADA:  And we'll take a copy.

3         FURTHER DEPONENT SAITH NOT.

4         (Deposition concluded at 3:16 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   STATE OF ILLINOIS      )

 2                          )   SS:

 3   COUNTY OF C O O K      )

 4         I, Johnetta Stafford Taylor, a Certified

 5   Shorthand Reporter within and for the County of

 6   Cook County and State of Illinois, do hereby

 7   certify that heretofore, to-wit, on October 31,

 8   2023, remotely appeared before me via Zoom

 9   videoconferencing, DETECTIVE MICHAEL F. KANE, in

10   a cause now pending and undetermined in the U.S.

11   District Court for the Northern District of

12   Illinois, Eastern Division, Illinois, wherein

13   ALEXANDER GRAY is the Plaintiff, and CITY OF

14   EVANSTON, et al. are the Defendants.

15         I further certify that the said DETECTIVE

16   MICHAEL F. KANE was first duly sworn to testify

17   the truth, the whole truth and nothing but the

18   truth in the cause aforesaid; that the testimony

19   then given by said witness was reported

20   stenographically by me in the presence of the

21   said witness, and afterwards reduced to

22   typewriting by Computer-Aided Transcription, and

23   the foregoing is a true and correct transcript

24   of the testimony so given by said witness as
```

Exhibit 13
Page 45 of 46

Detective Michael F. Kane 10/31/2023

1    aforesaid.

2         I further certify that the signature to

3    the foregoing deposition was waived by counsel

4    for the respective parties.

5         I further certify that the taking of this

6    deposition was pursuant to notice and that there

7    were present at the deposition the attorneys

8    hereinbefore mentioned.

9         I further certify that I am not counsel

10   for nor in any way related to the parties to

11   this suit, nor am I in any way interested in the

12   outcome thereof.

13        IN TESTIMONY WHEREOF:  I have hereunto

14   set my verified digital signature this 6th day

15   of November 2023.

16

17

18

19

20   _____

21   COOK COUNTY, ILLINOIS

22   LIC. NO. 084-001583

23

24

Exhibit 13
Page 46 of 46

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF ILLINOIS

 3                       EASTERN DIVISION

 4    ALEXANDER GRAY,              )

 5              Plaintiff,    )

 6      vs.                       )   No. 23-cv-1931

 7    CITY OF EVANSTON, et al.,   )

 8              Defendants.    )

 9          The deposition of MARCHIN KUBIAK called

10    for examination pursuant to the Rules of Civil

11    Procedure for the United States District Courts

12    pertaining to the taking of depositions, taken

13    remotely before Mary Ellyn D'Andrea, CSR,

14    on November 1, 2023, at the hour of 11:00 a.m.

15    Via Zoom videoconferencing.

16

17

18

19

20

21

22

23    REPORTED BY:  MARY ELLYN D'ANDREA, CSR.

24    LICENSE NO.  084-002317
```

**Exhibit 14**
Page 1 of 40

```
1    APPEARANCES:

2         KENNETH FLAXMAN LAW OFFICES

3         BY:  MR. KENNETH N. FLAXMAN

4         200 South Michigan Avenue

5         Suite 201

6         Chicago, Illinois  60604

7         (312) 427-3200

8         Knf@kenlaw.com

9              Representing the Plaintiff;

10

11        LEINENWEBER, BARONI & DAFFADA

12        BY:  MR. JAMES DAFFADA

13        120 North LaSalle Street

14        Suite 2000

15        Chicago, Illinois  60602

16        (866) 786-3705

17        Jim@ilesq.com

18             Representing the Defendants.

19

20

21

22

23

24
```

Marchin Kubiak 11/01/2023

```
 1                    I N D E X

 2   WITNESS                        EXAMINATION

 3   MARCHIN KUBIAK

 4     BY MR. FLAXMAN                    4

 5

 6

 7

 8

 9

10             E X H I B I T S

11   NUMBER                        MARKED FOR ID

12   KUBIAK Deposition Exhibit

13             (NO EXHIBITS MARKED)

14

15

16

17

18

19

20

21

22

23

24
```

Exhibit 14
Page 3 of 40

```
 1                    MARCHIN KUBIAK,

 2   having been first duly sworn, was examined and

 3   testified as follows:

 4                    EXAMINATION

 5   BY MR. FLAXMAN:

 6        Q.   Good morning, sir.  Could you state

 7   your name, and spell your last name for us,

 8   please?

 9        A.   Good morning, it's Marchin Kubiak,

10   K-u-b-i-a-k.

11        Q.   Could you spell your first name, too?

12        A.   M-a-r-c-h-i-n.

13        Q.   And what's your business or occupation?

14        A.   Currently I'm employed as a support

15   staff security personnel at Stevenson High

16   School in Lincolnshire.

17        Q.   How long have you worked there?

18        A.   Since May of 2021.

19        Q.   Before starting at Stevenson, where

20   were you employed?

21        A.   I was employed as a police officer in

22   Evanston.

23        Q.   And when did you stop working in

24   Evanston?
```

Marchin Kubiak 11/01/2023

1      A.   Beginning of May 2021.

2      Q.   And why did you stop working at

3  Evanston?

4      A.   I retired.

5      Q.   Do you receive a pension when you

6  retired?

7      A.   Yes, sir.

8      Q.   Were you maxed out in your retirement

9  funding when you retired?

10     A.   If I understand correctly your

11 question, no.

12     Q.   Okay.  And what do you do at Stevenson?

13     A.   I work as a security officer -- not

14 officer, I'm sorry, it's the wrong word,

15 security personnel.

16     Q.   And do you carry a firearm?

17     A.   No.

18     Q.   Did you look at anything to prepare for

19 this deposition?

20     A.   I did.

21     Q.   Can you tell us what you looked at?

22     A.   I looked at a field general which is

23 another word for a report, I've seen footage of

24 the body camera that I was wearing at the time.

Marchin Kubiak 11/01/2023

1      Q.   Did you look at any other body cameras

2  other than the one you were wearing?

3      A.   I looked at a fragment of footage

4  recorded by another officer, one other officer,

5  yes.

6      Q.   And do you recall which other officer

7  that was, whose body camera video you briefly

8  reviewed part of?

9      A.   It was Officer Kane.

10     Q.   When you said you looked at the report,

11 was that the incident slash investigation report

12 of this incident that occurred on March 31st,

13 2021?

14     A.   Yes, it was.

15     Q.   And did you see anything in that report

16 that was different than the way you remembered

17 the incident of March 31st, 2021?

18     A.   No, sir.

19     Q.   Okay.  Do you recall responding to a

20 dispatch in the vicinity of 501 Sheridan Road of

21 a report of a man with a gun?

22     A.   Yes, sir.

23     Q.   And while you were in route to that 501

24 Sheridan Road, were you advised by the

Exhibit 14
Page 6 of 40

1    dispatcher that an unknown citizen had reported

2    seeing a white male approximately 5 feet tall to

3    6 feet tall in a dark coat and jeans situated

4    just north of the beach of the trail with a gun

5    in his right hand?

6         A.   Truthfully, I don't recall.  I -- now I

7    recall after seeing the video, yes.

8         Q.   Okay.  Well, did the video include an

9    audio of the dispatched message about the

10   identification of the suspect with the firearm?

11        A.   I believe so, yes.

12        Q.   And which video is that?

13        A.   My body camera, my camera.

14        Q.   At what point -- what's the first thing

15   that you recall seeing on the body camera video

16   that you reviewed?

17        A.   The steering wheel of my squad car.

18        Q.   Let me show you -- let me share the

19   screen and show you that video.

20             MR. DAFFADA:  Is there an exhibit

21   number to it?

22             MR. FLAXMAN:  Yeah, I need to find it.

23             MR. DAFFADA:  No problem.

24                  (Video playing)

```
 1   BY MR. FLAXMAN:
 2       Q.   Okay.  What I'm showing you is what
 3   we've marked as 19 underscore Kubiak 042704-05
 4   underscore 09 MP4.
 5           Is this part of your body camera video
 6   that you saw preparing for this deposition?
 7       A.   I believe so, yes.
 8       Q.   And when you watched the body camera
 9   video, did it start at the point that we're
10   seeing on this shared screen now?
11       A.   No, sir, it started earlier.
12           MR. FLAXMAN:  Let me ask your
13   Counsel -- did I mess something up, or do you
14   have a different video than I do?
15           MR. DAFFADA:  Ken, what -- I used the
16   video -- the only videos I received until
17   yesterday was -- or two days ago, is the ones
18   you gave me.
19           They are -- the one he reviewed is the
20   one you produced for me.  I can look up the name
21   here if you give me a second, and I will tell
22   you what video it's under.
23           MR. FLAXMAN:  Well, I will get that up.
24   I have those originals.
```

Marchin Kubiak 11/01/2023

 1          MR. DAFFADA:  Okay.

 2   BY MR. FLAXMAN:

 3      Q.   Okay.  We have on the screen an

 4   unmarked exhibit which is -- there's numbers at

 5   the top right, and I think the identifying

 6   number is X6030971X; do you see that?

 7      A.   I do.

 8      Q.   Okay.  Let me -- do you recognize your

 9   hands in this video?

10      A.   Yes, sir.

11      Q.   Okay.  I'm going to start playing it,

12   and when you hear what the dispatcher said,

13   would you speak up, and I'll stop, and we'll

14   indicate where in the video that is, and if you

15   can't hear the dispatcher say that, you can tell

16   me that too.

17          Let's start.  We have now watched and

18   listened to one minute of the video.  At the

19   beginning the video did not have audio.

20          Do you know why that is?

21      A.   I believe that's how the system was set

22   up.

23      Q.   All right.  We're now 1 minute into the

24   video.  We're now 1 minute 30 seconds in the

Marchin Kubiak 11/01/2023

1    video.

2         Did you hear the message from the

3    dispatcher that we referred to before?

4         A.   Yeah, that's just what the dispatcher

5    said, I believe.

6         Q.   Were you able to make out the words of

7    what the dispatcher said?

8         A.   I don't recall -- the --

9              MR. DAFFADA:  -- that's not clear --

10             THE WITNESS:  -- the audio on this

11   video, it's pretty bad, so I didn't.

12             MR. DAFFADA:  1.20, Ken, I think that's

13   where it starts, 1 minute 20 seconds, because

14   it's very clear in my -- the video you produced.

15   BY MR. FLAXMAN:

16        Q.   We just listened to five seconds

17   listened -- listened and watched five seconds

18   of the video from 1.20 to 1.25.

19             Is the description in that five second

20   clip we just heard?

21        A.   I believe so, but this audio is broken

22   up.

23        Q.   Is the audio better when you listened

24   to it preparing for the deposition?

Marchin Kubiak 11/01/2023

```
 1        A.   Yes, sir.
 2        Q.   Would you like --
 3             MR. FLAXMAN:  Did you play those 1.20
 4   to 1.30 on a local machine, Jim.
 5             MR. DAFFADA:  I did, yeah, on my
 6   computer, and I played it, and it's pretty
 7   clear.
 8             MR. FLAXMAN:  Could you play it now, or
 9   that's not possible?
10             Could you play it now?
11             MR. DAFFADA:  I'm going to try.
12             MR. FLAXMAN:  All right.
13             MR. DAFFADA:  Did you want to take a
14   break?
15             MR. FLAXMAN:  We'll take a one minute
16   break.
17             MR. DAFFADA:  I'm not that fast, Ken.
18             MR. FLAXMAN:  All right.  We'll take a
19   five minute break then.
20             MR. DAFFADA:  Okay.
21                  (Whereupon, a short recess was
22                   taken.)
23             MR. FLAXMAN:  Back on the record.
24
```

Marchin Kubiak 11/01/2023

```
1    BY MR. FLAXMAN:
2        Q.   Have you had a chance to listen to the
3    -- to that excerpt from your body camera?
4        A.   Yes, sir.
5        Q.   Were you able to make out any of the
6    words?
7        A.   Yes, sir.
8        Q.   Could you -- do you recall the first
9    words that you heard spoken in the message from
10   the dispatcher?
11       A.   I believe the dispatcher said white
12   male.
13       Q.   And did you hear anything from the
14   dispatcher about the height of the suspect?
15       A.   I believe she said about 6 feet tall.
16       Q.   Okay.  Now, when you responded to the
17   scene, did you see a man in the location of
18   where the man with the gun had been reported?
19       A.   Yes, sir.
20       Q.   Did you ever -- about how far away from
21   that man were you when you first saw him?
22       A.   I don't know, sir.
23       Q.   Well, is it more than 10 feet?
24       A.   I believe that it was more than 10
```

Marchin Kubiak 11/01/2023

1    feet, yes.

2        Q.   Were you far enough from the man to

3    estimate his height?

4        A.   I don't -- I don't recall.

5        Q.   Okay.  When you first -- when you first

6    saw the man, were you able to determine whether

7    he was white or black?

8        A.   No, sir.

9        Q.   What did you -- were you outside of

10   your vehicle when you first saw the man?

11       A.   I don't recall.

12       Q.   Do you recall what you did when you

13   first saw the man?

14       A.   I believe I parked the car and exited

15   it.

16       Q.   When you exited it, was your -- did you

17   have a firearm with you that day?

18       A.   I did.

19       Q.   Did you at any time that day un-holster

20   your firearm?

21       A.   I did.

22       Q.   Do you recall when you first

23   un-holstered your firearm?

24       A.   Not specifically.  I can only -- I mean

Marcin Kubiak 11/01/2023

1    after seeing the video.

2        Q.   After seeing the video, do you have a

3    present recollection of when you first

4    un-holstered your firearm on March 31st, 2021?

5        A.   Shortly after I exited the car; that's

6    the best answer that I can give you.

7        Q.   And why did you un-holster your

8    firearm?

9        A.   I believed that the subject Plaintiff

10   was standing right where the dispatcher

11   described that location, and I believe that he

12   was holding something in his hand.

13       Q.   Did you at any time during the incident

14   we've been talking about point your firearm at

15   that man?

16       A.   I did.

17       Q.   Why?

18       A.   I believed he was armed.

19       Q.   Had you seen a firearm in his hand,

20   either of his hands?

21       A.   I had seen a black object in his hand.

22       Q.   Could you describe the black object

23   that you saw?

24       A.   No.

Marchin Kubiak 11/01/2023

1     Q.   Did you believe that the black object

2  you saw was not a cell phone?

3          MR. DAFFADA:  Objection, form of the

4  question.  You can answer.

5          THE WITNESS:  I saw a black object in

6  his hand.

7  BY MR. FLAXMAN:

8     Q.   Was the black object pointed at another

9  person?

10    A.   I don't believe so, no.

11    Q.   Was the black object in his hand being

12 held to his ear, one of his ears?

13    A.   I don't recall.

14    Q.   Well, do you recall what the suspect

15 was doing with that black object when you first

16 saw him?

17    A.   I don't recall.  Based on the video,

18 he's just standing there.

19    Q.   Did you speak any verbal commands when

20 you saw the suspect with the black object

21 standing there in his hand?

22    A.   Again, I'm -- I don't recall; based on

23 the video, yeah, I said commands to him, yes.

24    Q.   What was the first command you gave to

1    him?

2        A.   I would have to watch the video again.

3        Q.   Well, let me see if we can go back and

4    do that again.

5            We're going to go back to the complete

6    video, the man with the gun FOIA, and we will

7    start at 1.25 in the video.

8                    (Video playing)

9            MR. DAFFADA:  Ken, before you ask your

10   next question, I just want to put an objection

11   on the record, just more as a note that the

12   video here we can't hear the audio well on it,

13   so I just want to make sure that the record

14   reflects that we agree that the original that we

15   have is the appropriate exhibit.

16           MR. FLAXMAN:  I think we agree to that.

17   I'm showing the video primarily to see if it

18   refreshes the witness' recollection, and I

19   didn't know that when you do screen sharing, you

20   don't screen share audio.  There is something

21   about zoom that I don't know.  I'm sure there is

22   something about zoom that I don't know, but it's

23   interesting.

24           MR. DAFFADA:  It's here, but you just

Marchin Kubiak 11/01/2023

```
 1    can't understand that.

 2            MR. FLAXMAN:  No, I understand that,

 3    and it would be -- it might be a zoom problem,

 4    or it might be my problem, but next time we do

 5    this I'll have it figured it out maybe.

 6            MR. DAFFADA:  Yeah.

 7    BY MR. FLAXMAN:

 8        Q.  Let's go back.  We're now at 2 minutes

 9    11 seconds in the video, and you're still

10    sitting in the car, is that correct, sir?

11        A.  Yes, sir.

12        Q.  All right.  Let's keep playing.

13            Now, did you hear your voice speak the

14    words I've got an eye on him?

15        A.  No, sir, I didn't.

16        Q.  All right.  Do you recall saying that

17    as you got out of the car?

18        A.  Yes.

19        Q.  Who was in the car with you, if you

20    recall?

21        A.  I was by myself.

22        Q.  Okay.  When you say I've got an eye on

23    him, did you un-holster your handgun?

24        A.  I don't recall.
```

1    Q.   All right.  Let's start up at 2.34.

2         Were you able to hear your voice saying

3    put your hands up, or something of that nature?

4    A.   I didn't hear it now.  The audio is

5    gone, but I probably said that, yes.

6    Q.   All right.  We're at 2.35.

7         Now, I heard your voice saying get on

8    the ground, get on the ground.

9         Were you able to hear that?

10   A.   Yes, I did.

11   Q.   Did you speak those words?

12   A.   Yes.

13   Q.   Do you have any recollection of how far

14   away you were from the suspect at this point in

15   the video 2 minutes and 40 seconds?

16   A.   I can guesstimate based on what I'm

17   seeing.

18   Q.   Well, how far does that appear to be?

19   A.   25 yards, I don't know, I don't know,

20   sir.

21   Q.   All right.  Why did you tell the

22   suspect to get on the ground?

23   A.   Based on the information that I

24   received from the dispatch, I believed that he

1    was armed.

2        Q.   And why did you want him on the ground

3    rather than standing with his hands in the air?

4        A.   I believed that position of a possible

5    armed suspect or subject on the ground is the

6    safest for him and me.

7        Q.   Is that something you were taught at

8    the Evanston Police Department?

9        A.   I believe so, yes.

10       Q.   Is that something that you've -- that

11   you consistently did with suspected armed

12   persons in your work at the Evanston Police

13   Department?

14           MR. DAFFADA:  Objection, foundation.

15   You can answer.

16           THE WITNESS:  Yes.

17   BY MR. FLAXMAN:

18       Q.   All right.  We're now at 2.40, and

19   we'll keep playing.

20           Did you hear another voice at that

21   point?

22       A.   I heard something, I don't know what it

23   was.

24       Q.   All right.  We're at 2.44.

Marchin Kubiak 11/01/2023

```
1              Do you remember saying what do you have
2    in your pocket?
3        A.   I believe so, I said something like
4    that at that point, yes.
5              MR. DAFFADA:  Just so you know, we
6    can't hear -- he's doing this based on memory.
7    We don't hear the video.
8              MR. FLAXMAN:  That's -- this is -- you
9    know, that's fine.
10             MR. DAFFADA:  Okay.
11   BY MR. FLAXMAN:
12       Q.   Do you remember the suspect saying I'm
13   smoking a cigarette in response to your question
14   what do you have in your pocket?
15       A.   Possibly, yes.
16       Q.   And was the suspect standing up when
17   you asked that question what do you have in your
18   pocket?
19       A.   Yes, sir.
20       Q.   Did the suspect ever tell you that he
21   had a firearm in his pocket?
22       A.   No, sir.
23       Q.   We are 2.37 in the video.
24             Did you -- do you remember telling the
```

1    suspect don't put your hands in?

2        A.   I probably said something like that,

3    yes.

4        Q.   What did you want the suspect to do

5    with his hands?

6        A.   I believe that I wanted him to keep his

7    hands out of his pockets.

8        Q.   Okay.  Let's play, we're at 2.53.

9            Do you remember telling the suspect

10   more than once to get on the ground?

11       A.   Yes.

12       Q.   Do you remember telling the suspect do

13   what we tell you, and you won't get hurt, okay?

14           MR. DAFFADA:  If you're quoting, I

15   mean, Ken, I understand you're not doing

16   anything improper here, but since he can't hear

17   the audio, it's hard for him to quote anything.

18           I mean, can we just figure that he said

19   those things, you know --

20           MR. FLAXMAN:  -- well, I'm testing his

21   recollection about did he say those things.

22           MR. DAFFADA:  Okay.  Then he's going to

23   say he doesn't recall unless he hears it.

24           If based on the video if he recalls,

Marchin Kubiak 11/01/2023

```
 1   it's fine.
 2   BY MR. FLAXMAN:
 3       Q.   Do you recall telling the suspect more
 4   than one time that do what we tell you, and you
 5   won't get hurt, okay, or words to that effect?
 6       A.   Yes, based on the video, yes.
 7            Before I saw the video, I really had no
 8   recollection of this incident.
 9       Q.   Well, do you remember answering
10   interrogatories in this case?
11       A.   Yes, sir.
12       Q.   And was your recollection better when
13   you answered the Answers to Interrogatories than
14   it is today?
15            MR. DAFFADA:  Objection, argumentative.
16            You can answer.
17            THE WITNESS:  I've seen the video
18   before I received interrogatories.
19   BY MR. FLAXMAN:
20       Q.   Okay.  And when you saw the video, were
21   you able to hear -- before you answered the
22   interrogatories, were you able to hear the video
23   more clearly than you could hear it today?
24       A.   Yes, sir.
```

Marchin Kubiak 11/01/2023

1     Q.    Thank you.

2           And when you answered the

3     interrogatories, were you being as correct

4     as you -- accurate and correct as you could be

5     that day?

6     A.    Yes, sir.

7     Q.    Okay.  Let me show you what has been

8     marked as Exhibit No. 23.

9           Do you see Exhibit 23 on your screen?

10    A.    Yes, sir.

11    Q.    And I'll go to the last page.  Is that

12    your signature on Page 9?

13    A.    Yes, sir.

14    Q.    All right.  Let's go back to Question

15    11 was, do what we tell you to do, and you won't

16    get hurt, and the question was did you state

17    that as alleged in Paragraph 15 of the Amended

18    Complaint, and your answer was yes.

19          Was that your answer then when you

20    signed the interrogatory answers?

21    A.    Yes, sir.

22    Q.    And is that your answer today that you

23    told the suspect do what we tell you to do, and

24    you won't get hurt?

```
 1        A.   Yes, sir.
 2        Q.   Could you tell us, as best you can,
 3   what you would have done to hurt the suspect if
 4   he didn't do what you told him to do?
 5             MR. DAFFADA:  Objection, form, calls
 6   for speculation.
 7             THE WITNESS:  I'm -- I don't know how
 8   to answer that, I'm sorry.
 9   BY MR. FLAXMAN:
10        Q.   Well --
11        A.   -- can you rephrase it?
12        Q.   Yeah.  When you said do what we tell
13   you to do, and you won't get hurt, what did you
14   mean?
15        A.   I meant I wanted him to follow my
16   directions.
17        Q.   And what were you going to do if he
18   didn't follow your directions?
19             MR. DAFFADA:  Object to form, calls for
20   speculation.
21   BY MR. FLAXMAN:
22        Q.   Can you answer the question?
23        A.   I don't know, sir.
24             MR. DAFFADA:  You know what, he's
```

 1  thinking about his answer.

 2        MR. FLAXMAN:  I'm sorry.

 3  BY MR. FLAXMAN:

 4     Q.   If you need more time to think, go

 5  right ahead.  I didn't mean to interrupt you.

 6     A.   I don't know, sir.

 7     Q.   Let's go back to the video.  We are at

 8  3 minutes in.

 9        Now, the video -- let's just watch five

10  seconds of the video.

11        Does that video show you holding your

12  firearm with two hands?

13     A.   Yes, sir.

14     Q.   And as you were doing that in the five

15  seconds snip that we saw, were you walking

16  towards the suspect?

17     A.   I believe so, yes.

18     Q.   At this point in the video when you

19  were walking towards the suspect, were you able

20  to determine whether he was a white male or a

21  black male?

22     A.   I don't believe so, no.

23     Q.   Okay.  We are at 3.05.

24        Did you tell him -- how many times did

Marchin Kubiak 11/01/2023

1    you tell him do what we tell you to do, and you

2    won't get hurt, or words to that effect?

3        A.   I don't recall.

4        Q.   Was it more than once?

5        A.   Possibly, it's on the video.

6        Q.   Okay.  We're at 3.13.

7             Do you remember telling the suspect

8    everything will be fine if you do what I say?

9        A.   If it's on the video, sir; if I said

10   that on the video, I said that.

11       Q.   Well, as you sit here today, do you

12   have a recollection of having said that?

13       A.   Not really.

14       Q.   Okay.  Do you remember telling the

15   suspect to put your hands out like superman?

16       A.   No, sir.

17       Q.   Have you ever told a suspect to put

18   your hands out like superman?

19       A.   Sir, I believe that is another officer

20   who says that.

21       Q.   Okay.  Do you know which officer that

22   was?

23       A.   I think Officer Kane.

24       Q.   Thank you.

Marchin Kubiak 11/01/2023

1           Now, we're at 3.26.  Is the image on

2    the screen right now you holding your handgun

3    with two hands?

4        A.   Yes, sir.

5        Q.   Do you know who the officer is to the

6    right of the screen?

7        A.   I believe it's Officer Kane.

8        Q.   And why were you pointing your handgun

9    at the suspect?

10       A.   I believed that he was possibly armed.

11       Q.   And were you close enough at this point

12   in the video to see whether or not he had

13   anything in his hands?

14       A.   Yes.

15       Q.   Did he have anything in either of his

16   hands?

17       A.   I don't believe so.

18       Q.   Were you able to see what that object

19   was directly in front of him at this point in

20   the video, 3.26?

21       A.   Knowing what I know now, I know that

22   those are headphones.

23           I don't believe I knew it at the time.

24       Q.   Well, did you suspect that what you now

 1   know to be headphones were a firearm?

 2           MR. DAFFADA:  Objection to form.

 3   BY MR. FLAXMAN:

 4      Q.   I'll rephrase the question.

 5           Back on March 31st of 2021 when you're

 6   at the point shown in the video at 3 minutes 26

 7   seconds, did you believe that the object in

 8   front of the suspect was a firearm?

 9      A.   I don't recall, sir.

10      Q.   Okay.  As you look at the video now, is

11   there anything you see in the video that could

12   have caused you to believe that what you now

13   know to have been headphones were a firearm?

14           MR. DAFFADA:  Objection, form.

15           THE WITNESS:  What I know today in

16   looking at this particular screenshot, I know

17   that those are headphones.

18   BY MR. FLAXMAN:

19      Q.   Well, back when -- on March 31st of

20   2021 when this image was captured by your body

21   camera, did you see anything that caused you to

22   believe that what you now know to be headphones

23   was, in fact, a firearm?

24      A.   I don't recall.

Exhibit 14
Page 28 of 40

Marchin Kubiak 11/01/2023

1    Q.   Is there anything you could look at

2   that would refresh your recollection?

3    A.   I don't know how to answer that.

4    Q.   Well, is there any other videos that

5   might refresh your recollection?

6    A.   I don't know.

7    Q.   Are there any reports you could look at

8   that might refresh your recollection?

9    A.   I don't think so, no.

10    Q.   Did you prepare any report about your

11   encounter with the suspect on March 31st of

12   2021?

13    A.   No, sir.

14    Q.   Let's continue playing at 3.26.

15         Now, did you continue walking until you

16   were closer to the suspect?

17    A.   Yes, sir.

18    Q.   And did you keep your firearm pointed

19   at the suspect?

20         MR. DAFFADA:  Objection, form.

21         You can answer, if you can.

22         THE WITNESS:  Yes, sir.

23   BY MR. FLAXMAN:

24    Q.   When did you stop pointing your firearm

Marchin Kubiak 11/01/2023

1    at the suspect?

2        A.   I don't recall specifically.

3        Q.   We're at 3.30 in the video.  All right.

4    We're at 3.50 in the video.

5            Are you still pointing your handgun at

6    the subject or suspect?

7        A.   I'm -- I don't know, not from that

8    shot, I don't know.

9        Q.   Okay.

10       A.   Possibly.

11       Q.   Let's play more.  We started at 3.50.

12           All right.  Do you recall -- we're now

13   at 4.28 in the video.

14           Do you recall whether or not your

15   handgun remained un-holstered at this point in

16   the video?

17       A.   I don't recall.

18       Q.   Did you see Officer Rosenbaum at the

19   scene on March 31st, 2021?

20       A.   I don't recall.  Based on the video, I

21   had to, yes.

22       Q.   Did you see any officers with rifles on

23   the scene?

24       A.   I do.

Marchin Kubiak 11/01/2023

1    Q.    Do you recall who -- their names?

2    A.    I recall Officer Rosenbaum.  I don't

3    remember the other officer's name.

4    Q.    Okay.  Did you see any officer pointing

5    a rifle at the suspect?

6    A.    No.

7    Q.    We're at 4.40 in the video.

8          I'm going to turn the audio off,

9    because it's distracting, and nobody can hear it

10   anyway.

11         Did you see other officers search the

12   suspect?

13   A.    I don't recall specifically.  Based on

14   the video, I had to, yes.

15   Q.    And we're at 4.48 now, that's where we

16   started.

17         We just saw an officer come on scene

18   wearing sunglasses.  It's one where my curser

19   is.  Do you know who that is?

20   A.    Yes, sir.

21   Q.    Who is that; what's his or her name?

22   A.    Her name is Fensen (phonetic).

23   Q.    And there's an officer to the left of

24   her; do you know who that is?

Marchin Kubiak 11/01/2023

1        A.   I don't recall his name.

2        Q.   Okay.  We're at 4.57, and we'll play

3    some more.

4             You didn't search the suspect, did you?

5        A.   I don't believe so, no.  Based on the

6    video, I did not.

7        Q.   Did you ever hear someone tell the

8    suspect, or use the word, the phrase traumatic

9    experience in speaking with the suspect on March

10   31st, 2021?

11       A.   Yes, sir, based on the video, it was my

12   voice.

13       Q.   And what was the suspect doing when you

14   said that?

15       A.   I don't recall specifically, standing

16   up and --

17       Q.   -- why did you use that phrase

18   traumatic experience?

19       A.   I don't know, sir.

20       Q.   Well, can you explain to us what the

21   word, the phrase traumatic experience means to

22   you?

23       A.   Something bad, something scary, I

24   mean --

Marchin Kubiak 11/01/2023

1    Q.   -- now, when you were in route to the

2   scene, and you heard more information from the

3   dispatcher about the description of the suspect,

4   do you remember -- do you recall hearing that

5   the suspect, that the complaint came from an

6   anonymous person, a person who did not leave his

7   or her name?

8          MR. DAFFADA:  Objection, foundation.

9          THE WITNESS:  I don't recall, sir.

10  BY MR. FLAXMAN:

11   Q.   In your work at the City of Evanston as

12  a police officer, did you receive any training

13  about anonymous complainants?

14   A.   I don't believe so.

15   Q.   Did you receive any training about when

16  it is or is not permissible to point a firearm

17  at a person?

18   A.   I believe so.

19   Q.   And were your actions on March 31st of

20  2021 consistent with your training about when

21  it's appropriate to point a firearm at a person?

22   A.   I believe so.

23   Q.   Did you discuss the facts of this case

24  with any Evanston police officer or supervisor

1    after the incident on March 31st, 2021?

2         A.   I don't believe so.

3         Q.   How many preventable car accidents have

4    you been -- did you have while you worked with

5    the City of Evanston?

6         A.   Several; I don't recall a specific

7    number.

8         Q.   Did you agree that they were all

9    preventable?

10        A.   I don't recall.

11        Q.   How many times have you been deposed

12   before today?

13        A.   This is the third time.

14        Q.   What were the other two occasions?

15        A.   The first one was a car accident that

16   happened in the City of Evanston, and the second

17   one was a worksite accident that happened at

18   Northwestern University.

19        Q.   Other than what you've told us today,

20   did you see or hear anything on March 31st, 2021

21   that caused you to believe that the suspect was

22   in possession of a firearm?

23        A.   Anything other than we hear today?

24        Q.   Right.

**Exhibit 14**
**Page 34 of 40**

1    A.   No.

2         MR. DAFFADA:  Do you want him to repeat

3    the question?

4         THE WITNESS:  No.

5    BY MR. FLAXMAN:

6    Q.   Okay.  Other than what we've talked

7    about today, was there anything that you saw or

8    heard on March 31st of 2021 that caused you to

9    believe that the suspect had committed a crime?

10        MR. DAFFADA:  Can you repeat the

11   question?

12        MR. FLAXMAN:  Let's have the court

13   reporter read it back.

14             (Whereupon, the record was read

15              as requested.)

16        THE WITNESS:  I was told that the

17   subject was armed with a firearm in the park.

18   BY MR. FLAXMAN:

19   Q.   Anything else that caused you to

20   believe the subjected committed a crime.

21   A.   I don't believe so.

22   Q.   Okay.  Did you have any information

23   that the subject had pointed a firearm in the

24   direction of another person?

Marchin Kubiak 11/01/2023

1      A.   I don't believe so.

2      Q.   Okay.  Did you have any information

3   that the subject, or the suspect was not -- did

4   not have a concealed carry permit?

5      A.   I don't recall anything of that nature,

6   no.

7      Q.   Back on March 31st of 2021, was it

8   lawful for a person who had a concealed carry

9   permit to carry a firearm in the City of

10  Evanston?

11          MR. DAFFADA:  Objection, form.  You can

12  answer.

13          THE WITNESS:  I don't believe so, sir.

14  BY MR. FLAXMAN:

15     Q.   And why is that?

16     A.   As far as my knowledge of concealed

17  carry goes, you can't carry it in a park.

18     Q.   How did you learn that?

19     A.   I don't know, sir.  I can't give you a

20  specific answer, sorry.

21     Q.   Just so we are clear about our terms,

22  when you say your understanding was you could

23  not carry a firearm in the park if you had a

24  concealed carry permit, are you referring to

Marchin Kubiak 11/01/2023

```
 1    carrying the firearm in a way it could be seen

 2    by someone, or just carrying a firearm in a

 3    pocket?

 4        A.   To the best of my knowledge, concealed

 5    carry permit implies that you need to carry it

 6    concealed.

 7        Q.   Okay.  And was it -- was your

 8    understanding in 2021 that if you had a

 9    concealed carry permit, it would be unlawful to

10    carry a concealed firearm in a park?

11        A.   Yes, sir, I believe so.

12        Q.   Okay.  And did you receive training at

13    the City of Evanston about the Concealed Carry

14    Statute?

15            MR. DAFFADA:  Objection.

16            THE WITNESS:  I don't believe so.

17    BY MR. FLAXMAN:

18        Q.   All right.  Are you planning on leaving

19    the Chicago area in the next year or two?

20        A.   I'm not planning, no.

21        Q.   All right.  I have nothing further.

22            MR. DAFFADA:  No questions.  We will

23    waive signature.

24            MR. FLAXMAN:  I will order the original
```

```
 1   transcript.  Thank you.

 2             THE COURT REPORTER:  Counsel, copy?

 3             MR. DAFFADA:  Yes, copy.  Thank you.

 4         (Deposition concluded at 12:00 p.m.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Exhibit 14
Page 38 of 40

```
 1   STATE OF ILLINOIS      )

 2                          )    SS:

 3   COUNTY OF C O O K      )

 4        I, MARY ELLYN D'ANDREA, a notary public

 5   within and for the County of Cook County and

 6   State of Illinois, do hereby certify that

 7   heretofore, to-wit, on November 1, 2023,

 8   personally appeared before me via

 9   videoconference, MANCHIN KUBIAK, in a cause now

10   pending and undetermined in the United States

11   District Court for the Northern District of

12   Illinois, Eastern Division, wherein ALEXANDER

13   GRAY is the Plaintiff, and THE CITY OF EVANSTON

14   is the Defendant.

15        I further certify that the said MANCHIN

16   KUBIAK was first duly sworn to testify the

17   truth, the whole truth and nothing but the truth

18   in the cause aforesaid; that the testimony then

19   given by said witness was reported

20   stenographically by me in the presence of the

21   said witness, and afterwards reduced to

22   typewriting by Computer-Aided Transcription, and

23   the foregoing is a true and correct transcript

24   of the testimony so given by said witness as
```

Marchin Kubiak 11/01/2023

1    aforesaid.

2         I further certify that the signature to

3    the foregoing deposition was waived by counsel

4    for the respective parties.

5         I further certify that the taking of this

6    deposition was pursuant to notice and that there

7    were present at the deposition the attorneys

8    hereinbefore mentioned.

9         I further certify that I am not counsel

10   for nor in any way related to the parties to

11   this suit, nor am I in any way interested in the

12   outcome thereof.

13        IN TESTIMONY WHEREOF:  I have hereunto

14   set my hand and affixed my notarial seal this

15   13th day of November, 2023.

16

17

18

19

20   _____

21        MARY ELLYN D'ANDREA

22

23

24

1              IN THE UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF ILLINOIS

3                       EASTERN DIVISION

4    ALEXANDER GRAY,            )

5               Plaintiff,      )

6      vs.                      )  No. 23-cv-1931

7    CITY OF EVANSTON, et al.,  )

8               Defendants.     )

9          The deposition of OFFICER KYLE POPP,

10   called for examination pursuant to the Rules of

11   Civil Procedure for the United States District

12   Courts pertaining to the taking of depositions,

13   taken remotely before Johnetta Stafford Taylor,

14   a Registered Professional Reporter within and for

15   the State of Illinois, on October 31, 2023, at

16   the hour of 11:00 a.m. via Zoom videoconferencing.

17

18

19

20

21

22

23   Johnetta Stafford Taylor

24   License No. 084-001583

```
 1    APPEARANCES:

 2        KENNETH FLAXMAN LAW OFFICES

 3        BY:  MR. KENNETH N. FLAXMAN

 4        200 South Michigan Avenue

 5        Suite 201

 6        Chicago, Illinois  60604

 7        (312) 427-3200

 8        knf@kenlaw.com

 9            Representing the Plaintiff;

10

11        LEINENWEBER, BARONI & DAFFADA

12        BY:  MR. JAMES DAFFADA

13        120 North LaSalle Street

14        Suite 2000

15        Chicago, Illinois  60602

16        (866) 786-3705

17        jim@ilesq.com

18            Representing the Defendants.

19

20                *******

21

22

23

24
```

Exhibit 15
Page 2 of 41

```
 1                    I N D E X

 2   WITNESS                        EXAMINATION

 3   OFFICER KYLE POPP

 4     By Mr. Flaxman                      4

 5

 6

 7

 8

 9

10               E X H I B I T S

11   NUMBER                        MARKED FOR ID

12

13        (Exhibits previously marked and

14        retained by Mr. Flaxman.)

15

16

17

18

19

20

21

22

23

24
```

1      THE COURT REPORTER:  On the record.

2           This deposition is being taken by means

3    of Zoom audio/videoconference, and the oath will

4    be administered remotely by the court reporter

5    pursuant to Executive Order 2020-14 and by

6    agreement of counsel.

7           Will all counsel present please state

8    your name and agreement with this procedure.

9      MR. FLAXMAN:  I am Kenneth Flaxman for the

10   Plaintiff.  Agreed.

11     MR. DAFFADA:  James Daffada for all

12   Defendants.  Agreed.

13                  (Whereupon, the witness was

14                  duly sworn.)

15     MR. FLAXMAN:  Good morning, sir.

16              OFFICER KYLE POPP,

17   called as a witness herein, was examined and

18   testified as follows:

19              EXAMINATION

20   BY MR. FLAXMAN:

21     Q.   Could you state your name and spell

22   your last name for us, please.

23     A.   Kyle Popp, P-O-P-P.

24     Q.   And where are you presently employed?

1    A.   I'm presently employed by the City of

2    St. Charles.

3    Q.   In what capacity?

4    A.   Police officer.

5    Q.   Were you previously employed by the

6    City of Evanston?

7    A.   Yes.

8    Q.   When did you start and when did you end

9    at the City of Evanston?

10    A.   I was hired in July of 2014, and I left

11    in August of 2021.

12    Q.   Were you a police officer at the City

13    of Evanston?

14    A.   Yes.

15    Q.   Why did you leave?

16    A.   No specific reason.  My wife works

17    farther out west, and the opportunity came up to

18    go to St. Charles.

19    Q.   Okay.  What kind of work does your wife

20    do?

21    A.   She's a nurse.

22    Q.   When you worked at Evanston, were you

23    ever the subject of any citizen complaints?

24    A.   Not that I recall.

Exhibit 15
Page 5 of 41

Officer Kyle Popp 10/31/2023

1    Q.   And you told us in your interrogatory

2  answers that you were disciplined for violation

3  of the EPD pursuit policy; is that right?

4    A.   (No audible response.)

5    Q.   Or maybe -- do I have the wrong guy?  I

6  think I have the wrong guy.

7         Were you ever disciplined for violation

8  of the pursuit policy while you worked at

9  Evanston?

10   A.   (No response.)

11   Q.   It could be my mistake.  I'm not trying

12  to trick you.  I just screwed up apparently?

13   A.   I don't believe I was disciplined for

14  that.

15   Q.   Okay.  Were you involved in a pursuit

16  that ended in a car crash of some sort?

17   A.   Yes.

18   Q.   Was there a lawsuit about that?

19   A.   Yes.

20   Q.   Were you disciplined for your

21  involvement in that incident, as best you can

22  recall as you sit here today?

23   A.   No.  Not that I can recall.

24   Q.   Okay.  As you sit here today -- well,

Exhibit 15
Page 6 of 41

1    were you the driver of the car or passenger of

2    the car?

3        A.    I was a passenger.

4        Q.    Was that a car chase of a vehicle that

5    had been stopped for a traffic violation?

6        A.    I don't recall.

7        Q.    In your interrogatories, I think you

8    told us that you received multiple awards.

9            Do you recall what you've received

10   awards for?

11       A.    All I remember is in general just for

12   like self-initiated arrests for unlawful use of

13   weapon, possession of stolen vehicle, different

14   narcotic arrests.

15       Q.    Did you receive any commendations while

16   you worked for the City of Evanston as a police

17   officer?

18       A.    I don't recall.  It may have been part

19   of those awards.

20       Q.    Were you wearing a -- well, we're here

21   about an incident that occurred in 2021.  I

22   think March 31 of 2021.

23            Do you have any recollection of the

24   incident that gives rise to this lawsuit?

Officer Kyle Popp 10/31/2023

1      A.   No.

2      Q.   Did you look at anything to prepare for

3   this deposition?

4      A.   Yes.

5      Q.   What did you look at?

6      A.   I looked at a video and the police

7   report.

8      Q.   Did you look at any still images?

9      A.   Yes, I did.

10     Q.   After looking at those still images, do

11  you have a recollection of being involved in the

12  handcuffing and initial search of a suspect on

13  March 31, 2021?

14     A.    In relation to a specific image?

15     Q.   Well, any image.  The question was do

16  you have a recollection.

17          After looking at any of those images,

18  of the video, do you now recall any involvement

19  in that incident?

20     A.    Only as to what I saw in the video or

21  on any image.

22     Q.   Okay.  Did you look at the Complaint

23  before preparing for this deposition?

24     A.   Yes.

Officer Kyle Popp  10/31/2023

 1      Q.   And there's an image in Paragraph 22 of

 2   the Complaint which shows two officers.

 3           Are you one of those officers?

 4      A.   (No audible response.)

 5      MR. DAFFADA:  We don't have the Complaint in

 6   front of us, Ken.

 7      MR. FLAXMAN:  Well, do you have it in front

 8   of you or should I put it on the screen?

 9      MR. DAFFADA:  If you can put it on the

10   screen, it would be easier.

11           Sorry to do that to you, but we didn't

12   have that out.

13      MR. FLAXMAN:  I had...

14                (Short pause.)

15      MR. FLAXMAN:  That's not working.  Let me...

16                (Short pause.)

17   BY MR. FLAXMAN:

18      Q.   All right.  I'm now showing you the

19   Complaint in this case, and there's an image at

20   the top of the Complaint.

21           Have you seen that before?

22      A.   Yes.

23      Q.   And there's -- are you in that image?

24      MR. DAFFADA:  Can you blow it up a little

```
 1    bit, Ken?

 2         MR. FLAXMAN:  Sure.

 3         MR. DAFFADA:  Thank you.

 4         THE WITNESS:  Yes.  I believe so.

 5    BY MR. FLAXMAN:

 6         Q.   And which of those -- there are two

 7    officers who are -- neither of them are standing

 8    straight up.

 9              Which one are you?

10         A.   I believe to the left.

11         Q.   Is that the officer wearing a hat?

12         A.   Correct.

13         Q.   And are you able to identify the other

14    officer shown in the picture?

15         A.   Yes.

16         Q.   And who is that?

17         A.   Officer Kane.

18         Q.   Were you working alone or with other

19    officers on March 31 of 2021?

20         A.   I don't recall.

21         Q.   Did you customarily work alone or with

22    other officers?

23         A.   It would depend on the day.

24         Q.   Do you remember what brought you to the
```

Officer Kyle Popp 10/31/2023

1    scene that's depicted in the image as part of

2    Paragraph 22 of the Complaint?

3         A.   A call for service.

4         Q.   Do you remember what that call for

5    service was?

6         A.   It was a call for a man with a gun

7    along the lakefront beach area.

8         Q.   Did the call identify the man as black

9    or white?

10        A.   I don't recall.

11        Q.   Did the call identify the height of the

12   man with the gun?

13        A.   I don't recall.

14        MR. FLAXMAN:  Okay.  Let me show you what's

15   previously been marked as Exhibit 2.

16                   (Whereupon, Exhibit No. 2 was

17                    previously marked for

18                    identification.)

19   BY MR. FLAXMAN:

20        Q.   Are you the officer at the bottom left

21   of Exhibit 2?

22        A.   Yes.

23        Q.   And I'll use the cursor to your left.

24             Would that be Officer Kane?

Officer Kyle Popp 10/31/2023

```
 1        A.   Yes.

 2        Q.   Can you tell us what you two appear to

 3   be doing?

 4        A.   At this point, it looks like detaining

 5   the subject on the ground.

 6        Q.   Okay.  Had you seen the suspect commit

 7   an offense before he was on the ground?

 8        A.   I --

 9        Q.   Let me rephrase that.

10             At the time depicted in Exhibit 2, had

11   you seen the suspect commit an offense?

12        A.   I don't recall.

13        Q.   When you were -- how close were you to

14   the suspect at the time when Exhibit 2 was

15   created?

16        MR. DAFFADA:  Objection.  Form.

17             You can answer.

18        MR. FLAXMAN:  Let me rephrase that question.

19   BY MR. FLAXMAN:

20        Q.   At the time of the incident depicted in

21   Exhibit 2, how close was your face from the head

22   of the suspect?

23        MR. DAFFADA:  Objection.  Form.

24             You can answer.
```

Officer Kyle Popp 10/31/2023

```
 1        THE WITNESS:  I don't know.
 2   BY MR. FLAXMAN:
 3        Q.   And were you able to tell whether or
 4   not the suspect was a black male or a white
 5   male?
 6        A.   I don't recall.
 7        Q.   Okay.  There's an officer standing up
 8   with a mask on.  My cursor is above her, behind
 9   Officer Kane.
10             Do you know who that is?
11        A.   I can't tell from this picture.
12        Q.   Okay.  Do you know how it was that the
13   suspect came to be on the ground?
14        A.   I don't recall.
15        Q.   Had you ordered him to the ground?
16        A.   No.
17        Q.   Did you hear anyone order him to the
18   ground?
19        A.   I don't recall.
20        MR. FLAXMAN:  Let's look at Exhibit 4.
21                  (Whereupon, Exhibit No. 4 was
22                   previously marked for
23                   identification.)
24
```

Officer Kyle Popp  10/31/2023

 1   BY MR. FLAXMAN:

 2       Q.   Are you familiar with the area that is

 3   depicted in Exhibit 4?

 4       A.   Yes.

 5       Q.   And could you tell us what that area

 6   is?

 7       A.   It's like a park along the lakefront of

 8   the beach area.

 9       Q.   And is that in the City of Evanston?

10       A.   Yes.

11       MR. FLAXMAN:  Okay.  Let's look at Exhibit 5.

12                    (Whereupon, Exhibit No. 5 was

13                     previously marked for

14                     identification.)

15   BY MR. FLAXMAN:

16       Q.   Are you able to make out yourself in

17   Exhibit 5?

18       A.   Only based on the previous images.

19       MR. FLAXMAN:  All right.  Let's look at

20   Exhibit 7.

21                    (Whereupon, Exhibit No. 7 was

22                     previously marked for

23                     identification.)

24

Officer Kyle Popp  10/31/2023

1    BY MR. FLAXMAN:

2         Q.   Can you see yourself in Exhibit 7?

3         A.   Yes.

4         Q.   And are you the officer who is sitting

5    to the right -- the suspect's right or crouching

6    down to the suspect's right?

7         A.   Yes.

8         MR. FLAXMAN:  Let me ask you to look at

9    Exhibit 12.

10                    (Whereupon, Exhibit No. 12 was

11                     previously marked for

12                     identification.)

13   BY MR. FLAXMAN:

14        Q.   Is this another picture of you kneeling

15   down and Officer Kane standing up?

16        A.   Yes.

17        Q.   Were you wearing a mask on March 31 of

18   2021?

19        A.   It appears in this picture I am.

20        Q.   All right.  And do you recall the

21   suspect being handcuffed on March 31, 2021?

22        A.   Yes.

23        MR. FLAXMAN:  And let me ask you to look at

24   Exhibit 13.

Exhibit 15
Page 15 of 41

Officer Kyle Popp 10/31/2023

```
1                         (Whereupon, Exhibit No. 13 was
2                          previously marked for
3                          identification.)
4     BY MR. FLAXMAN:
5         Q.   Is that when handcuffs are being placed
6     on the suspect?
7         A.   Yes.
8         Q.   Were you involved in handcuffing the
9     suspect?
10        A.   Yes.
11        Q.   Why did you handcuff the suspect?
12        A.   He was being detained as the subject of
13    a man with a gun call.
14        Q.   Was that the standard procedure of the
15    Evanston Police Department to handcuff suspects
16    who are being detained on a man with a gun call?
17        MR. DAFFADA:  Objection.  Form.
18             You can answer if you can.
19        THE WITNESS:  I don't recall.
20    BY MR. FLAXMAN:
21        Q.   Well, at the time you were involved in
22    handcuffing the suspect, had you seen the
23    suspect with a gun?
24        A.   NO.
```

Officer Kyle Popp 10/31/2023

1      Q.   Had anyone told you that they had seen
2   the suspect with a gun?
3      A.   Yes.
4      Q.   And who told you that they had seen the
5   suspect with a gun?
6      A.   It was our dispatch through the radio
7   call.
8      Q.   Do you recall as best you can what it
9   was the dispatch message consisted of?  What
10  words it consisted of?
11     A.   The best that I can recall was a man
12  with a gun along like the trail area by the
13  beach with a gun in his hand.
14     Q.   And this image, Exhibit 13, was taken
15  on the trail area by the beach; is that right?
16     A.   Correct.
17     Q.   And when you were handcuffing the
18  suspect, did he have a gun in his hand?
19     A.   No.
20     Q.   Did he tell you he had a gun in his
21  hand?
22     A.   I don't recall.
23     Q.   Did anybody tell you that this
24  particular person, this suspect, was the person

Officer Kyle Popp 10/31/2023

```
 1    who had been seen with the gun in their hand?
 2         MR. DAFFADA:  Objection.  Form.
 3         THE WITNESS:  I don't recall.
 4    BY MR. FLAXMAN:
 5         Q.   Did the dispatcher tell you that the
 6    report of a man with a gun was by an anonymous
 7    complainant?
 8         A.   I don't recall.
 9         MR. FLAXMAN:  Exhibit 14 is called Policy 312
10    of the Evanston Police Department.
11                      (Whereupon, Exhibit No. 14
12                       was previously marked for
13                       identification.)
14    BY MR. FLAXMAN:
15         Q.   Have you ever seen Policy 312 of the
16    Evanston Police Department?
17         MR. DAFFADA:  Objection.  Form and
18    foundation.
19             You can answer.
20         THE WITNESS:  I don't recall.
21    BY MR. FLAXMAN:
22         Q.   Do you know whether or not the Evanston
23    Police Department had a written policy directed
24    to search and seizure?
```

**Exhibit 15**
**Page 18 of 41**

1     MR. DAFFADA:  Objection.  Foundation.

2          You can answer.

3     THE WITNESS:  I don't recall.

4   BY MR. FLAXMAN:

5     Q.   Well, were you ever trained in any of

6   the policies, written policies of the Evanston

7   Police Department?

8     MR. DAFFADA:  Objection.  Foundation.

9          You can answer.

10    THE WITNESS:  I don't recall.

11  BY MR. FLAXMAN:

12    Q.   Did you go to a police academy before

13  working on the street in the City of Evanston as

14  a police officer?

15    A.   Yes.

16    Q.   Which academy did you go to?

17    A.   Cook County Sheriff's Police Academy.

18    Q.   Okay.  Now, when you were with the

19  suspect on March 31 of 2021 and handcuffing him,

20  did you hear the suspect consent to being

21  handcuffed?

22    MR. DAFFADA:  Objection.  Form.

23    THE WITNESS:  I don't recall.

24

Officer Kyle Popp 10/31/2023

1    BY MR. FLAXMAN:

2        Q.   Was the suspect being placed under

3    arrest at the time he was being handcuffed?

4        A.   I don't recall.

5        Q.   Are you familiar with the phrase

6    community caretaking interests?

7        A.   No.  Not particularly.

8        Q.   Are you familiar with the phrase

9    exigent circumstances?

10       A.   Yes.

11       Q.   Were there any exigent circumstances

12   present on March 31, 2021 when the suspect was

13   handcuffed?

14       A.   That he was believed to be armed with a

15   handgun.  Yes.

16       Q.   And did anybody pat down the suspect on

17   March 31 of 2021?

18       A.   Yes.

19       Q.   And could you explain to us what you

20   mean by a pat-down?

21       A.   Physically patting down like somebody's

22   person.

23       Q.   Is that -- does a pat-down go

24   underneath the outer clothing of the suspect?

Officer Kyle Popp 10/31/2023

```
 1        A.   It depends on the -- you know, it
 2   depends.
 3        Q.   And did you pat down the suspect?
 4        A.   I don't recall.
 5        Q.   Do you recall who, if anyone, patted
 6   down the suspect on March 31, 2021?
 7        A.   I don't recall.
 8        Q.   When you came upon the suspect, was he
 9   on the ground?
10        A.   I don't recall.
11        Q.   What was he doing when you came upon
12   the suspect?
13        A.   I'm sorry.  I don't under -- can you
14   repeat the question?
15        Q.   Well, was he walking when you came upon
16   the suspect?
17        A.   I don't recall.
18        Q.   Was he running when you came upon the
19   suspect?
20        A.   I don't recall.
21        Q.   Was he laying on the ground with his
22   hands outstretched in a Superman position when
23   you came upon the suspect on March 31 of 2021?
24        A.   I don't recall.
```

Officer Kyle Popp 10/31/2023

1    Q.   Is there a policy of the Evanston

2  Police Department that you are aware of when you

3  worked there about treating civilians with

4  dignity?

5    A.   I don't recall.

6    Q.   Do you know the phrase low ready with

7  respect to a handgun?

8    A.   Yes.

9    Q.   Could you tell us what that phrase

10  means?

11    A.   Yes.

12    Q.   Would you tell us what that phrase

13  means?

14    A.   Yes.  It means you have your firearm

15  unholstered up in front of you pointed down

16  towards the ground.

17    Q.   Did you have a firearm on March 31 of

18  2021?

19    A.   I had a firearm.  Yes.

20    Q.   Did you unholster it at any time in

21  connection with the search of the suspect we've

22  been talking about?

23    A.   I don't recall.

24    Q.   Did you see any officers with

Officer Kyle Popp 10/31/2023

1   unholstered firearms?

2        A.   I don't recall.

3        Q.   Do you know a police officer named

4   Rosenbaum?

5        A.   Yes.

6        Q.   Do you recall what kind of weapon, if

7   any, he had during this incident we've been

8   talking about?

9        A.   No.

10       Q.   In your interrogatory answers, you said

11  you had no present recollection of all of the

12  facts of the incident.

13            Do you remember that or should I show

14  it to you or do you have those in front of you?

15       A.   I have that in front of me.

16       Q.   Okay.  I think it's Interrogatory

17  No. 15.

18            When you said no present recollection

19  of all of the facts, could you tell us what

20  facts you do have a present recollection of?

21       A.   Yes.  That I responded to a call for

22  service for a man with a gun in the public way

23  at the beach park area along the lakefront.

24       Q.   And am I correct that you did not know

1    whether that call for service came from someone

2    who did not leave his or her name?

3        MR. DAFFADA:  You can answer.

4        THE WITNESS:  You are correct.

5    BY MR. FLAXMAN:

6        Q.   Am I correct that you didn't have any

7    physical description of the suspect other than

8    that he was a white male between 5 feet and

9    6 feet of height?

10       A.   No.  We did not -- I don't recall the

11   specific description given.  Just a male subject

12   with a gun in his hand.

13       MR. FLAXMAN:  Okay.  Let me ask you to look

14   at Exhibit 10.

15                  (Whereupon, Exhibit No. 10 was

16                   previously marked for

17                   identification.)

18   BY MR. FLAXMAN:

19       Q.   That's an Incident Investigation

20   Report; is that right?

21       A.   Sorry.

22       Q.   It's on the screen.  Can you see it or

23   do you have it in front of you?

24       A.   Yes.  It's a little blurry on the

Officer Kyle Popp 10/31/2023

1    screen, some of the writing and stuff.

2        Q.   Does that help you?  I made it bigger.

3        A.   Yes.  That's better.

4        Q.   Okay.  Can you tell us what an Incident

5    Investigation Report is at the City of Evanston

6    Police Department?

7        A.   It is a report that is documented after

8    an incident takes place.

9        Q.   And did you ever write any of those

10   reports when you worked at the City of Evanston?

11       A.   Yes.

12       Q.   Did you try to be truthful when you

13   prepared a report?

14       A.   Yes.

15       Q.   Did you try to be accurate when you

16   prepared a report?

17       A.   Yes.

18       Q.   Did you try to be complete when you

19   prepared a report?

20       A.   Yes.

21       Q.   And am I correct that this report was

22   prepared by Officer S. Brown?

23       A.   Yes.

24       Q.   Do you know Officer S. Brown?

Officer Kyle Popp 10/31/2023

```
1        A.    Yes.
2        Q.    Do you know him to be a hard-working
3    honest police officer?
4        MR. DAFFADA:  Objection.  Form.
5             You can answer.
6        THE WITNESS:  Yes.
7    BY MR. FLAXMAN:
8        Q.    And when he wrote in the narrative on
9    Page 2, the second paragraph:  While en route,
10   dispatch advised that an unknown citizen later
11   identified as redacted reported seeing a white
12   male approximately 5 feet tall to 6 feet tall in
13   a dark coat and jeans situated just north of the
14   beach on the trail with a gun in his right hand.
15            Now does that refresh your recollection
16   about whether the information you had when you
17   responded to the scene was you were looking for
18   a white male approximately 5 feet tall to 6 feet
19   tall in a dark coat and jeans situated just
20   north of the beach?
21       A.    Yes.  If that's what was documented in
22   the call.
23       Q.    I'm not sure what you meant by that
24   qualification.  What did you mean by if that's
```

1    what's documented in the call?

2        A.   As in, if that was what was provided by

3    dispatch for like the description.

4        Q.   Do you have any reason to believe that

5    Mr. Brown was inaccurate in recording what the

6    dispatch message was?

7        A.   No.

8        Q.   Okay.  The policy, which we just looked

9    at as Exhibit 14, in Section 312.5 about

10   documentation of any search.

11            Were you familiar with a provision of

12   that nature when you worked for Evanston as a

13   police officer?

14       MR. DAFFADA:  Objection.  Asked and answered.

15            You can answer.

16       THE WITNESS:  I don't recall specifically for

17   a search.

18   BY MR. FLAXMAN:

19       Q.   Do you recall searching the suspect on

20   March 31, 2021?

21       A.   I don't recall searching.

22       Q.   Do you recall any officer searching?

23       A.   No.

24       Q.   In your Interrogatory Answers, Answer

 1    No. 16, you said that -- let me get it if I can.

 2         A.   I have it in front of me, too.

 3         Q.   I want to read something to what you

 4    said.  I don't want to get it wrong.

 5              And 16 was:  Do you contend that a

 6    reasonable police officer could have believed

 7    that it was lawful to detain Plaintiff on

 8    March 31 at the time and place specified in the

 9    Amended Complaint in this case?

10              And your answer was yes.

11              Did I read that correctly?

12         A.   Yes.

13         Q.   And then in Answer No. 17 you started

14    by saying:  Subject believed to be armed with a

15    handgun in public near a beach on the walking

16    path and park.

17              Did you believe the suspect was armed

18    with a handgun?

19         A.   Yes.

20         Q.   And why did you believe that?

21         A.   First arriving officers on scene had

22    the subject already detained.  I believed him to

23    be the subject with the handgun.

24         Q.   Any other reason why you believed the

Officer Kyle Popp 10/31/2023

```
 1    suspect to be the subject -- that was the person

 2    described as person with a handgun?

 3         A.   I'm sorry.  Can you repeat the

 4    question?

 5         Q.   All right.  Any other reason aside from

 6    what you just told us for why you believed the

 7    suspect to have been armed with a handgun in

 8    public near a beach on the walking path and

 9    park?

10         A.   The dispatch call saying a subject was

11    on the beach with a gun.

12         Q.   Anything else?

13         A.   No.

14         Q.   Did you consider the fact that the

15    dispatch call referred to a white male and the

16    suspect was an African-American male?

17         MR. DAFFADA:  Objection.  Form.

18         THE WITNESS:  I don't recall.

19    BY MR. FLAXMAN:

20         Q.   Do you recall whether or not the

21    suspect was an African-American male?

22         A.   I don't recall.

23         MR. FLAXMAN:  All right.  We have some

24    videos, I think.
```

Officer Kyle Popp 10/31/2023

 1          I'm going to play an excerpt from the
 2   Kane body camera.  It's about a minute, and I'll
 3   turn the audio down so it doesn't interfere with
 4   us.
 5          Do you see an image, the video on your
 6   screen?
 7       MR. DAFFADA:  No.
 8       THE WITNESS:  No.
 9       MR. FLAXMAN:  Oh, that's -- how about now?
10       THE WITNESS:  Yes.
11       MR. FLAXMAN:  It's going to be a minute
12   video, without sound.
13                   (Whereupon, a video was shown
14                    without audio.)
15       MR. DAFFADA:  Excuse me, Ken.  Do you know
16   whose video this is?
17       MR. FLAXMAN:  It's been marked as Exhibit 17.
18   It's the camera -- body camera of Officer Kane
19   starting at 3 minutes, 20 seconds and 16 frames
20   to 4 minutes 35 seconds and 22 frames.
21                   (Whereupon, Exhibit No. 17 was
22                    previously marked for
23                    identification.)
24       MR. FLAXMAN:  We just stopped now.

Officer Kyle Popp 10/31/2023

BY MR. FLAXMAN:

1    Q.   Are you able to identify the officer

2   who is now depicted in the image?

3    A.   No.

4    MR. FLAXMAN:  Okay.  Let's play the rest of

5   it.

6                        (Whereupon, a video was shown

7                         without audio.)

8    MR. DAFFADA:  Objection for lack of sound.

9        But okay.

10    MR. FLAXMAN:  Well, we'll note your

11   objection.

12                        (Whereupon, a video was shown

13                         without audio.)

14   BY MR. FLAXMAN:

15    Q.   Now we're stopping.  There's an

16   officer -- did you see an officer holding a

17   handgun?

18    A.   Yes.

19    Q.   Was that at the -- how would you

20   describe that position that the handgun was in?

21   Was that in that down position we talked about

22   before or something else?

23    A.   For the officer's body cam?


1    BY MR. FLAXMAN:

2        Q.   Are you able to identify the officer

3   who is now depicted in the image?

4        A.   No.

5        MR. FLAXMAN:  Okay.  Let's play the rest of

6   it.

7                        (Whereupon, a video was shown

8                         without audio.)

9        MR. DAFFADA:  Objection for lack of sound.

10           But okay.

11        MR. FLAXMAN:  Well, we'll note your

12   objection.

13                        (Whereupon, a video was shown

14                         without audio.)

15   BY MR. FLAXMAN:

16        Q.   Now we're stopping.  There's an

17   officer -- did you see an officer holding a

18   handgun?

19        A.   Yes.

20        Q.   Was that at the -- how would you

21   describe that position that the handgun was in?

22   Was that in that down position we talked about

23   before or something else?

24        A.   For the officer's body cam?

Exhibit 15
Page 31 of 41

Officer Kyle Popp 10/31/2023

1    Q.   Correct.

2    A.   His at the time was pointed down in the

3  frame when the gun was pictured on the screen.

4                    (Whereupon, a video was shown

5                     without audio.)

6  BY MR. FLAXMAN:

7    **Q.   Okay.  Am I correct that that video**

8  **ended with the suspect on the ground on his**

9  **stomach with his hands spread apart?**

10   A.   Yes.

11   **Q.   Were you present on the scene at the**

12  **time the suspect got to the ground?**

13   A.   I don't recall.

14                    (Interruption.)

15   MR. FLAXMAN:  Okay.  Let me show you No. 18,

16  which is also from Officer Kane's body camera

17  starting at 6 minutes, 26 seconds and 13 frames

18  going to 6 minutes, 45 seconds and 92 frames.

19                    (Whereupon, Exhibit No. 18 was

20                     previously marked for

21                     identification.)

22                    (Whereupon, a video was shown

23                     without audio.)

24

Officer Kyle Popp 10/31/2023

```
 1    BY MR. FLAXMAN:
 2        Q.   Are you depicted in this video, in this
 3    image that I stopped at?
 4        A.   No.
 5        Q.   Do you know who that is, the officer
 6    who has his hands on the suspect?
 7        A.   Yes.
 8        Q.   Who is it?
 9        A.   Officer Burgers.
10        Q.   Were you present when Officer Burgers
11    put his hands on the suspect?
12        A.   I don't recall.
13        Q.   Okay.
14                    (Whereupon, a video was shown
15                     without audio.)
16                    (Whereupon, Exhibit No. 19 was
17                     previously marked for
18                     identification.)
19        MR. FLAXMAN:  And 19, which is Officer
20    Kubiak, K-U-B-I-A-K, body camera starting at
21    4 minutes, 27 seconds and 4 frames to 5 minutes
22    and 9 seconds.
23                    (Whereupon, a video was shown
24                     without audio.)
```

```
 1        MR. DAFFADA:  Objection.  This is Ken's --

 2        MR. FLAXMAN:  It's the same one.  It's 18.

 3   I'm sorry.

 4           19 -- I think we did 19.  It looks like

 5   a -- let's look at 20.

 6                 (Whereupon, Exhibit No. 20 was

 7                  previously marked for

 8                  identification.)

 9                 (Whereupon, a video was shown

10                  without audio.)

11   BY MR. FLAXMAN:

12      Q.   And we stopped at -- is that you with

13   your right hand on the suspect's right hand?

14      A.   Yes.

15      Q.   Okay.  And the other officer is

16   officer -- well, is that Officer Kane -- is

17   Officer Kane searching the suspect?

18      A.   I don't know.

19      Q.   Let's see if we can watch some more.

20           And we see an officer handing Officer

21   Kane handcuffs.

22           Did you see Officer Kane search the

23   suspect before he got the handcuffs?

24      A.   I don't recall.
```

Officer Kyle Popp 10/31/2023

1    Q.   All right.  Now, is the suspect being

2    handcuffed with two sets of handcuffs?

3    A.   Yes.  It appears so.

4    Q.   And do you know why that was done?

5    A.   Generally more for comfort.

6    MR. FLAXMAN:  Okay.  Let's hit play.

7              (Whereupon, a video was shown

8              without audio.)

9    MR. FLAXMAN:  Okay.  I think that concludes

10   the video portion.

11   BY MR. FLAXMAN:

12   Q.   Did you ever come across an Evanston

13   resident named Alexander Gray?

14   A.   I don't recall.

15   Q.   Were you wearing a body camera that

16   day?  March 31 of 2021?

17   A.   I believe so.

18   Q.   Have you ever seen your body camera

19   video of the events that we've just been talking

20   about?

21   A.   No.

22   Q.   Do you know what happened to your body

23   camera video of the events of March 31, 2021?

24   A.   No.

1    Q.   Did you do anything to preserve that

2  video?

3    A.   No.

4    Q.   Did you do anything to destroy that

5  video?

6    A.   No.

7    Q.   And what happens to your video camera

8  at the conclusion of your shift?

9    A.   We place the body cameras in their

10  charging stations.

11    Q.   Do you know what if anything is done

12  when there's a desire to preserve the body

13  camera video?

14    A.   I know there are different time lengths

15  that each video is stored for, depending on if

16  it's an arrest or not or whatever circumstances

17  there may be.

18    Q.   Do you know what those time frames are?

19    A.   No.  I don't.

20  MR. FLAXMAN:  I think we're almost done.

21      Let's take a five-minute break, and

22  I'll reflect.  Is that okay?

23          (Whereupon, a short break was

24           taken.)

Exhibit 15
Page 36 of 41

Officer Kyle Popp 10/31/2023

```
1        MR. FLAXMAN:  This is a new exhibit which I
2   haven't yet shared.  It's from Burgers' body
3   camera starting at 1 minute, 7 seconds and
4   4 frames to 2 minutes, 27 seconds and 22 frames.
5        What I want to do is play it and then
6   ask you if it refreshes your recollection about
7   some aspects of the event.  Is that okay?  Do
8   you understand that?
9        THE WITNESS:  Yes.
10       MR. FLAXMAN:  Okay.  And I'll try to keep the
11  audio off; and if I didn't get that, I'll stop
12  it and fix it.
13                  (Whereupon, a video was shown
14                   with audio.)
15       MR. FLAXMAN:  I didn't get that.  Now, it's
16  no audio.
17                  (Whereupon, a video was shown
18                   without audio.)
19  BY MR. FLAXMAN:
20       Q.   After having seen that video, has your
21  recollection been refreshed as to whether or not
22  the suspect was searched during the incident on
23  March 31 of 2021?
24       A.   Yes.
```

Exhibit 15
Page 37 of 41

Officer Kyle Popp 10/31/2023

1    Q.   And what is your present recollection

2  about whether or not he was searched?

3    A.   Based on my observations from the

4  video, it appears that Officer Kane had

5  searched.

6    Q.   Okay.  Do you know why Officer Kane was

7  searching?

8    A.   Because the subject was believed to be

9  armed with a handgun.

10    MR. FLAXMAN:  Okay.  I have nothing further.

11    MR. DAFFADA:  All right, Ken.

12        I guess I'll talk to you in a couple of

13  hours.

14    MR. FLAXMAN:  Okay.  Signature is waived or

15  reserved?  Reserved or what's your pleasure?

16    MR. DAFFADA:  We'll waive it.

17    MR. FLAXMAN:  All right.  And I'm ordering

18  it.

19        And I'll see you later this afternoon.

20    MR. DAFFADA:  Can I get a copy, Miss Taylor?

21    MR. FLAXMAN:  I'll send you that last

22  exhibit, sir.

23        See you later.

24    MR. DAFFADA:  All right.

1  FURTHER DEPONENT SAITH NOT.

2  (Deposition concluded at 11:56 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Officer Kyle Popp 10/31/2023

```
 1   STATE OF ILLINOIS        )

 2                            )   SS:

 3   COUNTY OF C O O K        )

 4          I, Johnetta Stafford Taylor, a Certified

 5   Shorthand Reporter within and for the County of

 6   Cook County and State of Illinois, do hereby

 7   certify that heretofore, to-wit, on

 8   October 31, 2023, remotely appeared before me

 9   via Zoom videoconferencing, OFFICER KYLE POPP,

10   in a cause now pending and undetermined in the

11   U.S. District Court for the Northern District of

12   Illinois, Eastern Division, wherein ALEXANDER

13   GRAY is the Plaintiff, and CITY OF EVANSTON, et

14   al. are the Defendants.

15          I further certify that the said KYLE POPP

16   was first duly sworn to testify the truth, the

17   whole truth and nothing but the truth in the

18   cause aforesaid; that the testimony then given

19   by said witness was reported stenographically by

20   me in the presence of the said witness, and

21   afterwards reduced to typewriting by

22   Computer-Aided Transcription, and the foregoing

23   is a true and correct transcript of the

24   testimony so given by said witness as aforesaid.
```

Officer Kyle Popp 10/31/2023

```
1          I further certify that the signature to
2     the foregoing deposition was waived by counsel
3     for the respective parties.
4          I further certify that the taking of this
5     deposition was pursuant to notice and that there
6     were present at the deposition the attorneys
7     hereinbefore mentioned.
8          I further certify that I am not counsel
9     for nor in any way related to the parties to
10    this suit, nor am I in any way interested in the
11    outcome thereof.
12         IN TESTIMONY WHEREOF:  I have hereunto
13    set my verified digital signature this 6th day
14    of November 2023.
15
16
17
18
19    _____
20    COOK COUNTY, ILLINOIS
21    LIC. NO. 084-001583
22
23
24
```

**Exhibit 15**
Page 41 of 41

Daniel Rosenbaum 10/30/2023

```
1              IN THE UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4    Alexander Gray,              )
              Plaintiff,          )
5                                 )
          vs.                     ) No. 23 CV 1931
6                                 )
     City of Evanston, et al.,    )
7              Defendants.        )

8

9              The deposition of DANIEL ROSENBAUM, called

10   for examination pursuant to the Rules of Civil

11   Procedure for the United States District Courts

12   pertaining to the taking of depositions, taken

13   before Melissa C. Guandique, Certified Shorthand

14   Reporter of the State of Illinois, via Zoom

15   Videoconference, on the 30th day of October, 2023,

16   at the hour of 2:38 p.m.

17

18

19

20   Reported by:  Melissa C. Guandique, CSR

21   License No.:  084-004335

22

23

24
```

**Exhibit 16**
**Page 1 of 58**

Daniel Rosenbaum 10/30/2023

```
 1    APPEARANCES:  (ALL PARTIES APPEARING VIA ZOOM.)

 2         KENNETH FLAXMAN LAW OFFICES

 3         BY:  MR. KENNETH N. FLAXMAN

 4         200 South Michigan Avenue, Suite 201

 5         Chicago, Illinois  60604

 6         (312) 427-3200

 7         knf@kenlaw.com
                 Representing the Plaintiff;
 8

 9         LEINENWEBER, BARONI & DAFFADA

10         BY:  MR. JAMES DAFFADA

11         120 North LaSalle Street, Suite 2000

12         Chicago, Illinois 60602

13         (866) 786-3705

14         jim@ilesq.com
                 Representing the Defendants.
15

16

17

18

19

20

21

22

23

24
```

```
 1                    I N D E X

 2   WITNESS                        EXAMINATION

 3   DANIEL ROSENBAUM

 4        By Mr. Flaxman                04

 5        By Mr. Daffada                55

 6

 7

 8

 9

10

11              E X H I B I T S

12   NUMBER                        MARKED FOR ID

13   Deposition Exhibit

14        Nos. 1 - 13

15        (All exhibits previously marked by and

16        retained by Mr. Flaxman.)

17

18

19

20

21

22

23

24
```

Exhibit 16
Page 3 of 58

Daniel Rosenbaum 10/30/2023

```
 1                    (Witness sworn.)
 2                    DANIEL ROSENBAUM,
 3   called as a witness herein, having been first duly
 4   sworn, was examined and testified as follows:
 5                    EXAMINATION
 6   BY MR. FLAXMAN:
 7       Q.   Good afternoon, sir.
 8            Could state your name and spell your last
 9   name for us, please?
10       A.   My name is Daniel Rosenbaum.  Last name is
11   spelled R-o-s-e-n-b-a-u-m.
12       Q.   And how old are you?
13       A.   I am 33 years old.
14       Q.   And are you presently employed by the city
15   of Evanston?
16       A.   Yes.
17       Q.   How long have you worked for Evanston?
18       A.   Approximately nine years.
19       Q.   And what is your present position?
20       A.   I am a detective assigned to the special
21   operations group.
22       Q.   When did you become a detective?
23       A.   January 2018.
24       Q.   Was -- what was your former position?
```

1     A.   I was a police officer.

2     Q.   Was it a promotion to become a detective?

3     A.   No.

4     Q.   Did you get a pay increase as a detective?

5     A.   No.

6     Q.   Do you get different working hours as a

7  detective?

8     A.   I don't understand the question.

9     Q.   Well, did you just work the same shift

10 every day and not rotate shifts as a detective?

11     MR. DAFFADA:  Objection.  Form.  You can

12 answer.

13     MR. FLAXMAN:  Let me rephrase the question.

14 BY MR. FLAXMAN:

15     Q.   Before you became a detective, did you

16 work rotating shifts?

17     A.   Yes.

18     Q.   After becoming a detective do you still

19 work rotating shifts?

20     A.   Yes.

21     Q.   Do you get more opportunities to work

22 overtime as a detective?

23     MR. DAFFADA:  Object to form.

24     THE WITNESS:  No.

Exhibit 16
Page 5 of 58

Daniel Rosenbaum 10/30/2023

1    BY MR. FLAXMAN:

2        Q.    What is the special operations group?

3        A.    It is a unit assigned to investigate gang

4    and narcotic crime.

5        Q.    And according to your interrogatory

6    answers you went to the University of Chicago; is

7    that correct?

8        A.    Yes.

9        Q.    What did you major in?

10       A.    Psychology.

11       Q.    Are you continuing your education?

12       A.    No.

13       Q.    Do you have plans to continue your

14   education?

15       A.    Not presently, no.

16       Q.    Well, do you have plans at some time in

17   the future to continue your education?

18       A.    Not presently, no.

19       Q.    What do you mean by not presently?

20       A.    At this point in time I have no concrete

21   plans to continue my education.

22       Q.    Is this the third federal civil rights

23   lawsuit in which you've been a party?

24       A.    To the best of my knowledge, yes.

Daniel Rosenbaum 10/30/2023

1    Q.    My understanding is that one case you were

2    involved in was called Lark versus City of Evanston

3    and involved the death of a dog, is that generally

4    correct?

5    A.    Yes.

6    Q.    After you were sued in that case was

7    there, to your knowledge, an investigation by the

8    City of Evanston into the facts and circumstances

9    that gave rise to that case?

10   A.    I don't know.

11   Q.    Did you have to give a statement to the

12   City of Evanston to explain your recollection of

13   your involvement in the -- what led to that -- the

14   incident that gave rise to that case?

15   A.    I don't recall.

16   Q.    Do you recall being involved in another

17   case called Hall versus Rosenbaum?

18   A.    Yes, I believe it was Hall versus City of

19   Evanston, et al.

20   Q.    Did you have to give a statement to the

21   City of Evanston about your alleged involvement in

22   the incident giving rise to that case?

23   A.    I don't recall.

24   Q.    Okay.  And did you give a statement to the

1    City of Evanston about your alleged involvement in

2    the present lawsuit that we're here today about?

3        A.    No.

4        Q.    Could you tell us what, if anything, you

5    looked at in connection with coming to this

6    deposition today?

7        A.    Yes.

8        Q.    What did you look at?

9        A.    I reviewed video and reports.

10       Q.    Did you look at something called a CAD

11   report?

12       A.    Yes.

13       Q.    Did you -- had you ever seen a CAD report

14   before?

15       A.    Yes.

16       Q.    Do you know how the CAD reports are

17   created?

18       A.    I do not.

19       Q.    Do you know who creates them?

20       A.    I don't know.

21       Q.    When you looked at the CAD report did you

22   notice anything that appeared incorrect about your

23   involvement in the incident that is described in

24   that CAD report?

```
 1        A.   No.
 2        MR. FLAXMAN:  Let me put it up on the screen.
 3        MR. DAFFADA:  Do you have a copy of --
 4        THE WITNESS:  No.
 5        MR. FLAXMAN:  Do you have a copy?
 6        MR. DAFFADA:  I can get it.  You can keep
 7   going.
 8   BY MR. FLAXMAN:
 9        Q.   What we have on the screen now is the CAD
10   report that you looked at before the deposition; is
11   that correct?
12        A.   Yes.
13        Q.   And at the bottom it's labeled Exhibit 11
14   Page 1 of 2.
15        A.   Yes.
16        Q.   Let me ask you to look at the
17   second -- what I'm scrolling down to is
18   Exhibit 2 -- Page 2.
19             Do you see where employee I.D. 1689,
20   that's the third line, do you see it?
21        A.   Yes.
22        Q.   Okay.  Was -- is that your employee I.D.
23   number?
24        A.   Yes.
```

Daniel Rosenbaum  10/30/2023

1    Q.    And it says unit 803.

2          Was that your unit on March 31, 2021?

3    A.    Yes.

4    Q.    Were you working alone or with a partner

5    that day?

6    A.    I was working with partners.

7    Q.    Who were your partners that day?

8    A.    My partners were Detective Pogorzelski and

9    Detective Popp.

10   Q.    And I think I'd like you to spell that for

11   the court reporter, please.

12   A.    Pogorzelski, P-o-g-o-r-z-e-l-s-k-i, and

13   Popp is spelled P-o-p-p.

14   Q.    Were you in a vehicle that day?

15   A.    Yes.

16   Q.    And who was driving that vehicle when you

17   arrived at the scene?

18   A.    I don't recall.

19   Q.    If we look at the first row that has your

20   employee I.D. number it says, dispatched 3/31/21

21   14:48:38.

22         Do you see that?

23   A.    Yes.

24   Q.    And then the next line shows en route at

Daniel Rosenbaum 10/30/2023

1  14:48:38; is that correct?

2      A.   I'm sorry, are you asking if I see that?

3      Q.   Right.

4      A.   Yes, I see that.

5      Q.   And then the next line says arrived

6  3/31/21 at 14:48:38; is that correct?

7      A.   Yes, I see that.

8      Q.   And were you dispatched -- when you were

9  dispatched to that call were you already at the

10  scene of the call?

11     A.   I don't recall.

12     Q.   When you got to the call what is the first

13  thing you did?

14     MR. DAFFADA:  Objection.  Foundation.  You can

15  answer.

16     THE WITNESS:  I don't recall.

17  BY MR. FLAXMAN:

18     Q.   Okay.  Before you got to the scene of the

19  call what -- do you recall what you heard from the

20  dispatcher?

21     A.   I recall being told via police radio that

22  there was an individual armed with a handgun.

23     Q.   Do you recall whether there was a

24  description of the race of the person armed with

Daniel Rosenbaum 10/30/2023

1    the handgun?

2        A.   No.

3        Q.   Do you recall if you were told what the

4    height was of the person armed with a handgun?

5        A.   I don't recall, no.

6        Q.   Do you recall if you were told the sex of

7    the person armed with a handgun?

8        A.   I recall it being a male.

9        Q.   Let me show you what has previously been

10   marked as Exhibit 10.

11           Do you see that on your screen or do you

12   have a copy in front of you?

13       A.   I have a copy.

14       Q.   Do you have Exhibit 10 in front of you?

15       A.   I do.

16       Q.   Could you tell us what this is?

17       A.   This is an exhibit -- Exhibit 10 is an

18   Evanston Police Department incident report.

19       Q.   Is this an official form of the Evanston

20   Police Department?

21       A.   Yes.

22       Q.   And have you ever filled out a form like

23   this?

24       A.   Yes.

1    Q.   When you filled out the form did you try

2  to be accurate?

3    A.   Yes.

4    Q.   Did you try to be complete?

5    A.   Yes.

6    Q.   Do you know who wrote this report?

7    A.   I don't know.

8    Q.   Well, do you see at the bottom, like, the

9  third row from the bottom it says Brown, coma, S

10  Patrol 1719.

11    A.   Yes, I see that.

12    Q.   Do you know who Officer Brown is?

13    A.   Yes.

14    Q.   And who is Officer Brown?

15    A.   He is a police officer in Evanston.

16    Q.   When is the last time you saw him at work?

17    A.   I don't know.

18    Q.   Have you ever seen him at work?

19    A.   Yes.

20    Q.   Do you know if he is deployed in the

21  military at the present time?

22    A.   That is my understanding, yes.

23    Q.   Okay.  Did Officer Brown have a reputation

24  for writing accurate police reports?

```
 1        A.   I don't know.

 2        Q.   Well, let's look at Page 2 of this report.

 3             Do you know Officer Kane, K-a-n-e?

 4        A.   Yes.

 5        Q.   Do you know -- do you know Officer Popp,

 6   P-o-p-p?

 7        A.   Yes.

 8        Q.   If we look at Exhibit 11, which I think

 9   you have -- I think you have it in front of you?

10        A.   Yes.

11        Q.   Do you see Officer Kane's I.D. number on

12   that report Exhibit 11?

13        A.   I don't know.

14        Q.   What do you mean by you don't know?

15        A.   I don't know Officer Kane's I.D. number.

16        Q.   Let's go back to Exhibit 10.

17             Do you see where it says Kane M.

18   parenthesis, 1695?

19        A.   Yes.

20        Q.   And where it says Rosenbaum D. 1689, is

21   that your I.D. number; is that right?

22        A.   Yes.

23        Q.   Okay.  Can you see 1695 on Exhibit 11?

24        A.   Yes.
```

Daniel Rosenbaum 10/30/2023

1    Q.   And that shows that he was dispatched; is

2  that right?

3    A.   Where are you -- are we looking at the

4  same thing, sir?

5    Q.   Exhibit 11 for the entry for Unit 275

6  3/31/21 at 14:39:24, does that show officer 1695

7  dispatched?

8    A.   Yes.

9    Q.   Does it show when 1695 arrived at the

10  scene?

11    A.   I don't see an entry for 1695 arriving on

12  scene.

13    Q.   Do you see an entry for 1682 on

14  Exhibit 11?

15    A.   I do not, no.

16    Q.   Okay.  Is there -- do you know an officer

17  named Basner, B-a-s-n-e-r?

18    A.   Yes.

19    Q.   Do you see an entry for employee I.D.

20  Number 1525 on Exhibit 11?

21    A.   Yes.

22    Q.   Could you -- and is that for 3/31/21 at

23  14:40 p.m. dispatched?

24    A.   Yes.

Daniel Rosenbaum 10/30/2023

 1      Q.   Does it show when 1525 arrived, if at all,
 2  at the scene?
 3      A.   I don't see an entry, no.
 4      Q.   Okay.  Officer Pogorzelski, he was riding
 5  with you that day, is that what you said before?
 6      A.   Yes, to my -- to the best of my
 7  recollection.
 8      Q.   Okay.  And according to Exhibit 10 his
 9  employee I.D. number is 1697, do you see that?
10      A.   Yes.
11      Q.   Do you see 1697 on Exhibit 11?
12      A.   I do not, no.
13      Q.   All right.  Let me show you another
14  exhibit.
15           Do you see in front of the screen
16  Exhibit 1?
17      A.   Yes.
18      Q.   Is that a picture of you?
19      A.   Yes.
20      Q.   Does that show the equipment you were
21  wearing on March 31, '21?
22      A.   I don't know.
23      Q.   Okay.  Were you wearing a star on
24  March 31, 2021?

1    A.   I believe so, yes.

2    Q.   If you look at Exhibit 1, do you see the

3 number 1, which is the highest number, it's on your

4 left shoulder, close to your left shoulder?

5    A.   Yes.

6    Q.   Is that a star?

7    A.   Yes.

8    Q.   Okay.  And tell us what number 2 is?

9    A.   Number 2 appears to be the microphone

10 piece of a radio.

11    Q.   Is number 3 part of a vest?

12    A.   Number 3 is centered on the Velcro portion

13 of the ballistic vest.

14    Q.   And is ballistic vest also known as a

15 bulletproof vest?

16    A.   Yes.

17    Q.   What is number 4?

18    A.   The number 4 is superimposed on the

19 buttstock of the carbine.

20    Q.   Tell us what a carbine is?

21    A.   A carbine is an adjustable stock or short

22 end rifle.

23    Q.   Do you recall if you had a rifle on

24 March 31, 2021, during the incident giving rise to

Daniel Rosenbaum 10/30/2023

1    this lawsuit?

2        A.   Yes.

3        Q.   Did you do special training in connection

4    with carrying a rifle?

5        A.   Yes.

6        Q.   What is number 5?

7        A.   Number 5 is superimposed on a body-worn

8    camera.

9        Q.   Was your body-worn camera working on

10   March 31, 2021?

11       A.   I don't recall.

12       Q.   Do you know, what, if anything, happened

13   to the video of the incident on March 31, 2021,

14   that gives rise to this case?

15       A.   I don't know.

16       Q.   Did you -- what did you do at the end of

17   your tour of duty on March 31, 2021, with your

18   body-worn camera?

19       MR. DAFFADA:  Objection.  Form.

20       THE WITNESS:  I don't recall.

21   BY MR. FLAXMAN:

22       Q.   What do you usually do with your body-worn

23   camera at the end of your shift?

24       MR. DAFFADA:  What period of time, Ken?

Exhibit 16
Page 18 of 58

 1   Objection.

 2   BY MR. FLAXMAN:

 3       Q.    In March of 2021, what did you usually do

 4   with your body-worn camera at the end of your

 5   shift?

 6       A.    I would dock the camera in our body-worn

 7   camera docks.

 8       Q.    And would anybody download the video and

 9   audio off of the body worn cameras, if you know,

10   back in March of 2021?

11       A.    I don't know.

12       Q.    Have you made any efforts to find the

13   video from the body-worn camera you were wearing,

14   if any, on March 31, 2021?

15       A.    No.

16       Q.    Could you tell us what number 6 -- what

17   the item on which the number 6 is superimposed in

18   Exhibit 1?

19       A.    That appears to be an ammunition magazine

20   for a handgun.

21       Q.    Did you have a handgun that day?

22       A.    Yes.

23       Q.    And is your handgun at the bottom left of

24   the picture where the number 10 superimposed?

1      A.   Yes.

2      Q.   What kind of handgun did you have?

3      A.   I had a semi-automatic Glock handgun.

4      Q.   Is number 7 more ammunition for that

5  Glock?

6      A.   Yes.

7      Q.   And could you tell us what the object is

8  on which the number 8 is superimposed?

9      A.   That appears to be a flashlight.

10      Q.   Is there something to the right of the

11  flashlight that you're wearing in this picture?

12      A.   I don't know.

13      Q.   Okay.  Do you see the number 9 on the

14  picture?

15      A.   Yes.

16      Q.   When you wear -- is this your full

17  equipment that you wear when you work as an

18  Evanston police officer?

19      MR. DAFFADA:  Objection.  Form.  You can

20  answer.

21      THE WITNESS:  No.  There is also items on my

22  duty belt that are not visible in this picture.

23  BY MR. FLAXMAN:

24      Q.   Is there anything that you wear on

Exhibit 16
Page 20 of 58

Daniel Rosenbaum  10/30/2023

1   your -- to the right of the number 8 that you

2   generally wear in your tour of duty as an Evanston

3   police officer?

4        A.   I don't know.

5        Q.   Do you see the number 9?

6        A.   Yes.

7        Q.   And could you tell us what that is

8   superimposed on?

9        A.   That is a tourniquet.

10       Q.   And why do you carry a tourniquet?

11       A.   A tourniquet is an effective medical

12   intervention for arterial hemorrhage from an

13   extremity, like an arm or a leg.

14       Q.   In the years that you have worked for

15   Evanston, have you ever had an occasion to use a

16   tourniquet?

17       A.   Yes.

18       Q.   How many times?

19       A.   Once.

20       MR. DAFFADA:  Could we take a break for a

21   second.  I need to tell someone to quiet down.

22       MR. FLAXMAN:  Fine.

23                     (Recess taken.)

24       MR. DAFFADA:  Sorry about that.  We're good.

Daniel Rosenbaum 10/30/2023

BY MR. FLAXMAN:

1    Q.   Go back to Exhibit 1, do you see the
2    number 11 on the bottom right?
3
4    A.   Yes.
5    Q.   Is that superimposed on top of a glove?
6    A.   Yes.
7    Q.   Do you recall why you were wearing gloves
8    back in March 31, 2021?
9    A.   I do not recall.
10   Q.   Number 12, could you tell us what that is
11   superimposed on?
12   A.   Yes, that's a keychain.
13   Q.   And are those your personal keys on the
14   keychain?
15   A.   No.
16   Q.   What are those keys to?
17   A.   Those are various keys to the police
18   department, police vehicle, office door, et cetera.
19   Q.   Do you recall what type of vehicle you
20   were in on March 31, 2021?
21   A.   No.
22   Q.   What other police equipment did you have
23   that day, March 31, 2021?
24   A.   I had handcuffs and a Taser.

Daniel Rosenbaum  10/30/2023

1       Q.   When you got out of your car -- when you

2   arrived at the scene on March 31st, 2021, did you

3   make a decision to take your rifle with you?

4       MR. DAFFADA:  Objection.  Form.  You can

5   answer, if you know.

6       THE WITNESS:  I do not recall.

7   BY MR. FLAXMAN:

8       Q.   When you -- when you're driving in a

9   police vehicle back in March of 2021, are you

10  wearing all this equipment when sitting down or is

11  it sitting next to you or stored somewhere or

12  something else?

13      MR. DAFFADA:  Objection.  Form.  You can

14  answer.

15      THE WITNESS:  I don't remember -- no, I don't

16  recall.

17  BY MR. FLAXMAN:

18      Q.   Is it possible to sit in a vehicle and

19  wear the carbine in the way it's shown in

20  Exhibit 1?

21      A.   Yes, it's possible.

22      Q.   Is that because -- is it your practice to

23  wear the carbine as it's shown in Exhibit 1 while

24  you're in a police vehicle?

Daniel Rosenbaum 10/30/2023

1      A.   No.

2      Q.   Is it your custom when you're on duty back

3   in March of 2021 to always take your carbine with

4   you when you get out of the police vehicle?

5      A.   No.

6      Q.   And could you tell us, generally, when it

7   is that you take your rifle with you?

8      A.   Yes.

9      Q.   Would you tell us, please?

10      A.   I would retrieve my patrol rifle in

11   circumstances where I anticipated a potential to

12   encounter an armed individual, specifically armed

13   with a firearm.

14      Q.   Do you recall what, if anything -- what,

15   if any, information you received on March 31, 2021,

16   about a person suspected to be having -- carrying a

17   firearm at around 2:48 p.m. that day?

18      A.   I recall responding to a dispatched call

19   of a man with a gun.

20      Q.   Is that why you took the rifle with you

21   when you got out of the car?

22      A.   Yes.

23      Q.   On -- do you recall whether or not you

24   pointed your rifle at any person on March 31, 2021,

Exhibit 16
Page 24 of 58

 1    when you arrived at the scene of the incident

 2    giving rise to this lawsuit?

 3        A.   I don't recall.

 4        Q.   Do you recall whether or not you fired

 5    your rifle at any time on March 31, 2021?

 6        A.   I did not fire my rifle.

 7             Could I go back to the question about the

 8    pointing a rifle?

 9        Q.   Sure.

10        A.   The more I think about it, my recollection

11    is that I did not point my rifle at any individual

12    that day.

13        Q.   Did you ever disconnect your rifle from

14    your vest?

15        MR. DAFFADA:  Objection.  Form.

16        MR. FLAXMAN:  Let me rephrase the question.

17    BY MR. FLAXMAN:

18        Q.   To get that rifle that is shown in

19    Exhibit 1 into your arm so that you can use it,

20    what would you have to do?

21        A.   I would have had to remove it from a

22    secured rifle rack inside the police vehicle.

23        Q.   When you're wearing it as shown in

24    Exhibit 1, what holds the rifle onto your vest?

Daniel Rosenbaum 10/30/2023

1     A.     There is a sling holder that is worn over

2 the shoulder.

3     Q.     Did you ever remove the sling from your

4 shoulder on March 31st, 2021?

5     A.     I don't recall.

6     Q.     Now, are you familiar with the use of

7 force policy of the City of Evanston?

8     A.     Yes.

9     Q.     How did you learn about that policy?

10     A.     I don't recall.

11     Q.     Did you receive formal training in that

12 policy?

13     A.     Yes.

14     Q.     When is the last time you looked at that

15 policy?

16     A.     On today's date.

17     Q.     And is that the same policy that I'm about

18 to show you, which is marked Exhibit 8, the eight

19 page policy?

20     A.     I don't know.

21     Q.     Okay.  Were you trained at the City of

22 Evanston about whether or not pointing a firearm at

23 a suspect is the use of deadly force?

24     MR. DAFFADA:  Objection.  Form.  You can

 1   answer.

 2       THE WITNESS:  I don't recall.

 3   BY MR. FLAXMAN:

 4       Q.   Okay.  As you sit here today, is it your

 5   understanding that pointing a firearm at a suspect

 6   is the use of deadly force?

 7       A.   No.

 8       Q.   And could you tell us how you came to that

 9   conclusion?

10       A.   I'm sorry, I don't understand the

11   question.

12       Q.   Well, okay.  I think you told us that your

13   understanding is that pointing a firearm at a

14   suspect is not the use of deadly force; is that

15   correct?

16       A.   Yes.

17       Q.   And did you learn that at the University

18   of Chicago?

19       MR. DAFFADA:  Objection.  Argumentative.  You

20   can answer.

21       THE WITNESS:  No.  I did not learn that at the

22   University of Chicago.

23   BY MR. FLAXMAN:

24       Q.   Did you attend a police academy?

Daniel Rosenbaum  10/30/2023

1     A.   Yes.

2     Q.   Which police academy did you attend?

3     A.   The Cook County Sheriff's Police Academy.

4     Q.   And were you instructed at the Cook County

5   Sheriff's Police Academy about the use of force?

6     A.   Yes.

7     Q.   Were you instructed at the Cook County

8   Sheriff's Police Academy about the use of deadly

9   force?

10     A.   Yes.

11     Q.   Do you recall any instruction about

12   whether or not pointing a firearm at a suspect is

13   the use of deadly force?

14     A.   I don't recall specifically.

15     Q.   Did you receive any in-service training at

16   the Evanston Police Department about the use of

17   force?

18     A.   Yes.

19     Q.   Do you recall any in-service training at

20   the Evanston Police Department about the use of

21   deadly force?

22     A.   Yes.

23     Q.   Do you recall any in-service training at

24   the City of Evanston about whether or not pointing

Exhibit 16
Page 28 of 58

Daniel Rosenbaum 10/30/2023

1    a firearm at a suspect is the use of deadly force?

2        A.   I don't recall specifically, no.

3        Q.   In addition to the Cook County Sheriff's

4    Police Academy and in-service training at the

5    Evanston Police Department, have you received any

6    other training in police procedure while you've

7    worked as an Evanston Police Officer?

8        A.   Yes.

9        Q.   Could you tell us what that training

10   consisted of?

11       A.   I don't recall every -- the entirety of

12   the training classes I've attended as a police

13   officer.

14       Q.   Well, have those training classes been at

15   the FBI school?

16       A.   Yes, I have attended an FBI class.

17       Q.   And did that FBI class cover the use of

18   deadly force?

19       A.   Yes.

20       Q.   Is there anything at that FBI class about

21   whether or not pointing a firearm at a suspect is

22   the use of deadly force?

23       A.   I don't recall.

24       Q.   Do you recall any other schools, other

Daniel Rosenbaum  10/30/2023

1  than the FBI school, that you have attended while

2  working as an Evanston police officer?

3      A.   Yes.

4      Q.   And could you tell us what those were?

5      A.   I have attended a 40-hour basic narcotics

6  investigator class.

7      Q.   Anything else?

8      A.   I've attended a 40-hour lead homicide

9  investigator class.

10      Q.   Anything else?

11      A.   I've attended an eight-hour patrol stops

12  class.

13      Q.   When was the patrol stops class?

14      A.   I don't recall.

15      Q.   Did the -- who provided that patrol stops

16  class?

17      A.   I don't recall.

18      Q.   Was it -- did you leave the City of

19  Evanston to attend that class?

20      A.   Yes.

21      Q.   Do you remember where you were?

22      A.   I don't recall.

23      Q.   Okay.  At that patrol stops class was

24  there any instruction about conducting searches of

 1    suspects?

 2         A.    No.

 3         Q.    Okay.  Could you tell us what you learned

 4    at the patrol stops class?

 5         A.    To the best of my recollection the class

 6    centered on higher risk traffic stops.

 7         Q.    If we go back to the use of force policy,

 8    300.2, there is a reference to the reasonableness

 9    of the use of force must be judged from the

10    perspective of a reasonable officer on the scene.

11              Do you see that?

12         A.    Yes, I do.

13         Q.    What was your perspective on the scene on

14    March 31st, 2021, when you responded to the police

15    call that underlies this case?

16         A.    I don't recall specifically.

17         Q.    Is there anything you could look at that

18    would refresh your recollection?

19         A.    Yes.

20         Q.    And what's that?

21         A.    That would be the body-worn camera video

22    of the incident.

23         Q.    Did you look -- when is the last time you

24    looked at those body worn cameras?

1      MR. DAFFADA:  Objection.  Form.  You can

2   answer.

3      THE WITNESS:  I don't recall exactly.

4   BY MR. FLAXMAN:

5      Q.   Did you look at any body-worn camera

6   videos today?

7      A.   Yes.

8      Q.   How many did you look at?

9      A.   Just one.

10     Q.   And when -- how many hours before this

11  deposition did you look at that body-worn camera

12  video?

13     A.   Approximately an hour and a half.

14     Q.   After looking at that body-worn camera

15  video -- well, do you recall whose body-worn camera

16  it was that recorded that video?

17     A.   Yes.

18     Q.   And whose was it?

19     A.   Officer Kubiak.

20     Q.   Does that show Officer Kubiak with a

21  handgun being pointed at a suspect?

22     A.   The portion of the video that I reviewed

23  did not show that, no.

24     Q.   After looking at Officer Kubiak's video

Exhibit 16
Page 32 of 58

1   did you recall what your perspective of the scene

2   was on March 31st, 2021?

3       A.   Yes, that video refreshed my recollection.

4       Q.   And after viewing that video what was your

5   recollection of what your perspective of the scene

6   was on March 31st, 2021, and the incident giving

7   rise to this lawsuit?

8       A.   I believe there were several police

9   officers speaking with an individual in the 500

10  block of Sheridan Square.

11      Q.   Did that -- that individual -- did you see

12  him -- was that a male?

13      A.   I don't know.

14      Q.   Did you see that person commit any

15  criminal offenses?

16      MR. DAFFADA:  Objection.  Form.  You can

17  answer.

18      THE WITNESS:  No, I did not.

19  BY MR. FLAXMAN:

20      Q.   Have spoken to Officer Kubiak about the

21  incident giving rise to this lawsuit?

22      A.   No.

23      Q.   Have you spoken to any police officer

24  about the incident giving rise to this lawsuit?

Daniel Rosenbaum  10/30/2023

```
 1        A.   I don't recall.
 2        Q.   In -- the use of force policy,
 3   Section 300.2.1 is entitled Duty to Intercede, do
 4   you see that?
 5        A.   Yes.
 6        Q.   Is it your understanding that if you see a
 7   police officer using unreasonable force, you should
 8   intercede to prevent the use of that unreasonable
 9   force?
10        A.   Yes.
11        Q.   Is there a similar duty when you see an
12   officer conducting what appears to be an
13   unreasonable search that you should intercede to
14   prevent that unreasonable search?
15        MR. DAFFADA:  Objection.  Form.
16        THE WITNESS:  I don't know.
17   BY MR. FLAXMAN:
18        Q.   Well, did you see police officers search a
19   suspect on March 31st, 2021, at about -- shortly
20   before 3:00 p.m.?
21        A.   I don't recall.
22        Q.   Let me ask you to look at Exhibit 12.
23             There is an officer standing up, do you
24   see that?
```

Daniel Rosenbaum 10/30/2023

```
 1        A.    Yes.

 2        Q.    Do you know who that is?

 3        A.    Yes.

 4        Q.    Could you tell us his name?

 5        A.    That is Officer Kane.

 6        Q.    There is an officer at the bottom left of

 7   that picture.

 8              Do you know who that is?

 9        A.    Yes.

10        Q.    Who is that?

11        A.    That is Detective Popp.

12        Q.    And if we look at Exhibit 13 we see Popp,

13   Kane, and on the right we see another officer.

14              Can you identify who that is?

15        A.    Yes.

16        Q.    Who is that?

17        A.    That is Detective Pogorzelski.

18        Q.    Does she still work for the City of

19   Evanston?

20        A.    No.

21        Q.    Do you know where she is employed?

22        A.    Yes.

23        Q.    Where is she employed?

24        A.    She is employed by the Federal Bureau of
```

Daniel Rosenbaum 10/30/2023

```
 1    Investigations.
 2         Q.   Could you tell us what -- well, could you
 3    tell us what's happening to the suspect in this
 4    image?
 5         MR. DAFFADA:  Objection.  Foundation.
 6         MR. FLAXMAN:  You can answer the question.
 7         THE WITNESS:  I don't know.
 8    BY MR. FLAXMAN:
 9         Q.   Did you see what is depicted in this area
10    when you were at the scene on March 31, 2021?
11         A.   I don't recall.
12         Q.   Is there anything you can look at that
13    would refresh your recollection about whether or
14    not you saw what is depicted in this image on
15    March 31st, 2021?
16         A.   Yes.
17         Q.   What is it that would refresh your
18    recollection or might refresh your recollection?
19         A.   A body-worn camera video depicting this.
20         Q.   Okay.
21         THE WITNESS:  Could I take a break?
22         MR. FLAXMAN:  Sure.  At any time you can take a
23    break.  How much time do you want?
24         THE WITNESS:  Five minutes is fine.
```

Daniel Rosenbaum 10/30/2023

```
 1        MR. FLAXMAN:  That's fine.  See you in five

 2   minutes.

 3                        (Recess taken.)

 4   BY MR. FLAXMAN:

 5        Q.   Let's me ask you to look at your screen.

 6             Do you see an image that is labeled as

 7   Exhibit 2?

 8        A.   I do, yes.

 9        Q.   Does that show your back, among other

10   things?

11        A.   I believe so, yes.

12        Q.   Could you tell us what is on the back of

13   your belt?

14        A.   Could you point to it with the cursor,

15   please?

16        Q.   There is one here and one there.

17        A.   So where you have the cursor right now is

18   like a pocket for a notepad or pens and stuff.

19        Q.   On the left part of your body as shown in

20   this picture?

21        A.   Yes.

22        Q.   And what is on -- more towards the middle

23   right of your body, what is that?

24        A.   That is medical equipment.
```

Daniel Rosenbaum 10/30/2023

1      Q.   Does this image depict you holding your
2  rifle?
3      A.   Yes.
4      Q.   And about -- do you see the suspect on the
5  ground?
6      A.   Yes.
7      Q.   Do you recall ever seeing that suspect
8  engaged in any criminal act on the day that this
9  image was taken?
10     A.   I don't recall.
11     Q.   Do you recall the race of that suspect?
12     A.   No.
13     Q.   Why did you have your carbine in your
14  hands?
15     A.   I was responding to an emergency call of
16  an armed individual.
17     Q.   Let me ask a better question, perhaps.
18          At the instant depicted in this image
19  that's been marked Exhibit 2, why did you have your
20  carbine in your hands?
21     A.   I was providing security for the officers
22  placing that individual into detention.
23     Q.   And how far away from the suspect were you
24  in this image?

Daniel Rosenbaum 10/30/2023

```
 1        A.   I don't know.

 2        Q.   Were you ten feet away?

 3        A.   I don't know.

 4        Q.   Were you close enough to hear what, if

 5   anything, he was saying?

 6        A.   I don't know.

 7        Q.   Were you -- did you have your finger on

 8   the trigger of your rifle?

 9        A.   No.

10        Q.   Did you have -- is there a safety on that

11   rifle?

12        A.   Yes.

13        Q.   Was the safety on or off at that point in

14   time that is shown in Exhibit 2?

15        A.   The safety was engaged.

16        Q.   What does engaged mean?

17        A.   The weapon was safe.

18        Q.   What would you have had to do to make the

19   weapon usable to fire a bullet at that point in

20   time?

21        A.   I would have had to flip the safety

22   selector to the fire position.

23        Q.   And how long would that have taken you to

24   do?
```

Daniel Rosenbaum  10/30/2023

```
 1        A.   I don't know.
 2        Q.   Well, would it have taken ten minutes?
 3        A.   No.
 4        Q.   Would it have taken a second or two?
 5        A.   I don't know, depends on the
 6   circumstances.
 7        Q.   Could you tell us, if you can, why you
 8   were using your rifle at this point in time that is
 9   shown in Exhibit 2 rather than your handgun?
10        A.   Based upon the nature of the call I was
11   responding to I anticipated encountering an armed
12   individual.
13        Q.   Well, there is an officer to your right
14   where the cursor is now, do you know who that is?
15        A.   Yes.
16        Q.   Who is that?
17        A.   I believe that's Officer Kubiak.
18        Q.   And was he pointing a handgun at the
19   suspect at the point in time shown in Exhibit 2?
20        A.   I don't know.
21        Q.   Okay.  After looking at this image do you
22   have a recollection about whether or not the
23   suspect was being searched?
24        A.   Based on this image, no.
```

Daniel Rosenbaum 10/30/2023

```
1        Q.    Let me ask you to look at Exhibit 3.
2              Are you depicted in this image?
3        A.    Yes.
4        Q.    Is that you with part of the word Police
5    in the back of your jacket?
6        A.    Yes.
7        Q.    Are you depicted in Exhibit 4?
8        A.    Yes.
9        Q.    And is that you in the middle holding a
10   rifle that's pointed almost straight down?
11       MR. DAFFADA:  Could you blow it up, Ken?  It's
12   hard to see on the screen.
13       MR. FLAXMAN:  Let's look at Exhibit 5.  It's
14   the same thing.  I've enlarged it.
15   BY MR. FLAXMAN:
16       Q.    Is that you in about the middle of the
17   screen wearing a hat holding a rifle that is
18   pointed almost straight down?
19       A.    Yes, I believe so.
20       Q.    And Exhibit 5 is the same image, but it's
21   cropped somewhat.
22       MR. DAFFADA:  Objection.  Form.  You can answer
23   if there is a question.
24
```

Daniel Rosenbaum 10/30/2023

```
 1    BY MR. FLAXMAN:
 2        Q.   Does Exhibit 5 show you again holding your
 3    rifle pointing almost straight down?
 4        A.   I believe so, yes.
 5        Q.   Exhibit 6 is that you wearing the hat
 6    holding the rifle?
 7        A.   Yes, that appears to be me.
 8        Q.   All the way in the left there is an
 9    officer, do you know who that is?
10        A.   Yes.
11        Q.   Who is that?
12        A.   That appears to be Officer Wozniak.
13        Q.   And to the right of Officer Wozniak there
14    is another officer.
15             Do you know who that appears to be?
16        A.   Yes.
17        Q.   Who is that?
18        A.   Officer Bergers (phonetic).
19        Q.   Look at Exhibit 7, is that you holding the
20    rifle?
21        A.   Yes, that appears to be me.
22        Q.   I will make it bigger for you.
23             Is the rifle pointed straight down as it
24    was in the previous exhibits?
```

```
 1          A.   Yes, it appears to be.

 2          Q.   Let me go back to -- I'm going to ask you

 3    to look at Exhibit 5 and then again at Exhibit 7.

 4               Is the angle of the rifle the same in

 5    Exhibit 5 and Exhibit 7?

 6          A.   Yes, it appears to be.

 7          Q.   Okay.  Is it your recollection that you

 8    never pointed your rifle at the suspect?

 9          A.   Yes.

10          Q.   At any time did you see anything that

11    caused you to believe that the suspect was a threat

12    to anyone?

13          A.   I don't recall.

14          Q.   Is there anything that you could look at

15    that would refresh your recollection as to whether

16    or not you perceived the suspect as a threat to

17    anyone?

18          A.   Yes.

19          Q.   And what is that?

20          A.   Either a report of the incident or

21    body-worn camera video of the incident.

22          Q.   What would you be looking for in the

23    body-worn camera video of the incident as to

24    whether or not the suspect presented a threat to
```

Daniel Rosenbaum  10/30/2023

1    anyone?

2        MR. DAFFADA:  Objection.  Form.  Calls for

3    speculation.  Go ahead.

4        THE WITNESS:  I don't know.

5    BY MR. FLAXMAN:

6        Q.   Do you recall what it was you saw the

7    suspect do, if anything, on March 31st of 2021?

8        A.   No, I don't recall.

9        Q.   Did the suspect appear to be under the

10   influence of drugs?

11       A.   I don't recall.

12       Q.   Is there anything you could look at that

13   would refresh your recollection about whether or

14   not he appeared to be under the influence of drugs?

15       A.   I don't know.

16       Q.   Before you said looking at a report might

17   refresh your recollection.

18           Is that the report that I -- I showed you

19   a report before, which I'm looking for, which

20   doesn't seem to be here anymore.

21           This is Exhibit 10, the incident

22   investigation report, which we looked at before; is

23   that correct?

24       A.   Yes.

Daniel Rosenbaum 10/30/2023

1    Q.   Is there any report, other than this one,

2  that could refresh your -- that might refresh your

3  recollection as to whether or not you perceived the

4  suspect to be a threat?

5    A.   I don't know.

6    Q.   Have you ever seen a report other than

7  this one about the incident of March 31, 2021

8  shortly before 3:00 p.m.?

9    A.   No, not to my knowledge.

10   Q.   I think you have a copy of this report in

11  front of you; is that right?

12   A.   Yes, sir.

13   Q.   Would you read it through and see if

14  anything in there refreshes your recollection about

15  anything you saw that could have caused you to

16  believe that the suspect was a threat?

17   A.   Okay.  I've reviewed the report.

18   Q.   After having reviewed the report is your

19  recollection refreshed as to whether or not you saw

20  anything that caused you to believe that the

21  suspect was a threat?

22   A.   Yes.

23   Q.   And what is that?

24   A.   The suspect matched the description of a

1    911 call of a person with a gun.

2        Q.   And could you tell us what your

3    recollection is of what that description was?

4        MR. DAFFADA:  Objection.  Form.  He indicated

5    it came from this report.

6        THE WITNESS:  The description was a white male,

7    approximately five feet tall to six feet tall in a

8    dark coat and jeans, situated just north of the

9    beach on the trail.

10   BY MR. FLAXMAN:

11       Q.   Now, do you understand that 80 percent of

12   the male adult population is between five feet tall

13   and six feet tall?

14       MR. DAFFADA:  Objection.  Argumentative.  You

15   can answer.

16       THE WITNESS:  I don't know.

17   BY MR. FLAXMAN:

18       Q.   And what was it that caused you to believe

19   that the suspect was a white male?

20       MR. DAFFADA:  Objection.  There is no

21   foundation for that.

22       THE WITNESS:  Could you repeat the question?

23   BY MR. FLAXMAN:

24       Q.   Well, you told us that the suspect matched

 1    the description that appears in Exhibit 10, the

 2    report.

 3          What was it that made it -- that caused

 4    you to believe that the suspect was a white male?

 5    A.    I don't know.

 6    Q.    Now, when you -- in Exhibit 5 when you're

 7    holding the rifle, is that deploying the rifle?

 8    MR. DAFFADA:  Objection.  Form.  You can

 9    answer, if you understand.

10    THE WITNESS:  Yes.

11    BY MR. FLAXMAN:

12    Q.    At the time you deployed the rifle on

13    March 31st, 2021, did you anticipate an armed

14    encounter with the suspect that we see in the

15    picture laying on the ground with his arms

16    stretched out?

17    A.    Yes.

18    Q.    Why is that?

19    A.    We were responding to an emergency call of

20    a man armed with handgun.

21    Q.    And did you ever see the suspect with a

22    handgun?

23    A.    Not to my recollection, no.

24    Q.    When you were deploying the rifle as shown

1   in Exhibit 5, did you expect the need for accurate

2   and effective fire at long range?

3       MR. DAFFADA:  Objection.  Calls for

4   speculation.  You can answer.

5       THE WITNESS:  I don't know.

6   BY MR. FLAXMAN:

7       Q.   Do you understand that the rules of the

8   Evanston Police Department require that you expect

9   the need for accurate and effective fire at long

10  range before you deploy a patrol rifle?

11      A.   That is not my understanding, no.

12      Q.   Now, that -- the weapon, the rifle, the

13  carbine, that was a patrol rifle; is that right?

14      MR. DAFFADA:  Objection.  Form.

15      THE WITNESS:  Yes.

16  BY MR. FLAXMAN:

17      Q.   And back in March 31, 2021, at the time

18  you deployed your patrol rifle, did you expect the

19  need to meet or exceed the suspect's fire power?

20      A.   I don't know.

21      Q.   Well, don't you have to know or believe

22  that there is a need to meet or exceed a suspect's

23  fire power before you deploy a patrol rifle?

24      A.   That is a consideration.

Daniel Rosenbaum 10/30/2023

1      Q.   Is another consideration whether there is

2   a need to fire on a barricaded person?

3      MR. DAFFADA:  Objection.  Form.  Relevance.

4      THE WITNESS:  That is my understanding, yes.

5   BY MR. FLAXMAN:

6      Q.   At the time you deployed your firearm, the

7   rifle, on March 31st, 2021, did you perceive a need

8   to fire on a barricaded person?

9      A.   I don't know.

10      Q.   Was there a hostage present on

11   March 31st, 2021, when you deployed your rifle?

12      A.   Not to my recollection, no.

13      Q.   Did you see the suspect wearing body

14   armor?

15      A.   Not to my recollection, no.

16      Q.   Were there any supervisors on the scene on

17   March 31st, 2021?

18      A.   I don't recall.

19      Q.   Do you recall anyone instructing you to

20   deploy the rifle?

21      A.   I don't recall.

22      Q.   And in your interrogatory answers you

23   refer to low ready.

24           Could you tell us what low ready means?

1        A.    Low ready is a -- the positioning of the

2    rifle with the barrel pointed down.

3        Q.    And what does index down position mean?

4        A.    That's a similar position in which the

5    rifle is pointed down, finger off the trigger,

6    weapon safe.

7        Q.    Did you have to write a To From memo after

8    you received -- after you learned you were being

9    sued in this case?

10        MR. DAFFADA:  Objection.  Form.

11        THE WITNESS:  No, not to my recollection.

12    BY MR. FLAXMAN:

13        Q.    As you sit here today is it your belief

14    that your use of the rifle on March 31st, 2021, at

15    the incident giving rise to this case was

16    consistent with the written policies of the City of

17    Evanston?

18        A.    Yes.

19        Q.    I showed you Exhibit 10, the incident

20    investigation report.  It has some redactions.

21            Have you ever seen that report without

22    redactions?

23        A.    I don't recall.

24        Q.    Have you attended any in-service training

Exhibit 16
Page 50 of 58

Daniel Rosenbaum 10/30/2023

 1   at the City of Evanston about sensitivity to racial

 2   issues as a police officer?

 3        A.   Yes.

 4        Q.   How many?

 5        A.   I don't recall.

 6        Q.   Why did you decide to become a police

 7   officer?

 8        A.   I wanted to help people.

 9        Q.   When did you first want to become a police

10   officer?

11        A.   I became interested in the career in

12   college.

13        Q.   What did you do at the University of

14   Chicago Crime Lab?

15        A.   I -- you're asking what I did at the

16   University of Chicago Crime Lab?

17             I was -- when I was employed there I was a

18   research specialist --

19        MR. FLAXMAN:  The video is frozen.

20             (Whereupon there was an internet

21             disruption.)

22        THE WITNESS:  I said that I was employed as a

23   research specialist and afterwards --

24

Exhibit 16
Page 51 of 58

Daniel Rosenbaum 10/30/2023

```
 1              (Whereupon there was an internet
 2              disruption.)
 3         THE WITNESS:  I was asked what I did at the
 4    University of Chicago Crime Lab when I was employed
 5    there, I was employed as a research specialist, and
 6    then I did some consulting work afterwards.
 7    BY MR. FLAXMAN:
 8         Q.   Going back to the incident with the
 9    suspect, did he appear to be under the influence of
10    drugs?
11         A.   I don't know.
12         Q.   Did you notice anything unusual about his
13    mental state?
14         A.   I don't recall.
15         Q.   Did you see him do anything that was
16    non-compliant with any of the police instructions?
17         A.   I don't recall.
18         Q.   Did you see the suspect resist any police
19    officer?
20         A.   I don't recall.
21         Q.   Did you see any officers conduct a
22    protective pat down search of the suspect?
23         A.   I don't recall.
24         Q.   Is there anything you could look at that
```

Daniel Rosenbaum 10/30/2023

1    would refresh your recollection?

2        A.    Yes, perhaps some of the body camera from

3    the scene.

4        Q.    Did you ever think on March 31st of 2021,

5    that the suspect at the incident giving rise to

6    this lawsuit was attempting to flee?

7        A.    I don't know.

8        Q.    Did you ever believe that the suspect had

9    committed a felony involving serious bodily injury

10   or death?

11       A.    I don't know.

12       Q.    Well, what do you mean by I don't know?

13             You either believe it or you don't believe

14   it?

15       A.    I don't recall.

16       Q.    Did you ever believe that the suspect was

17   attempting to flee?

18       A.    I don't recall.

19       Q.    Did you ever believe that the suspect had

20   a weapon?

21       A.    Yes.

22       Q.    Why?

23       A.    Per the information given via police

24   dispatch on the call that I responded to.

Daniel Rosenbaum 10/30/2023

1    Q.    Possessing a weapon in a public place was

2    a crime back in March 31st, 2021; is that correct?

3    A.    It can be, yes.

4    Q.    And did you believe that the suspect who

5    was laying on the ground while you held your rifle

6    had committed a crime?

7    A.    Yes.

8    Q.    Did you believe you had a reasonable basis

9    to believe that the suspect who was laying on the

10   ground when you held your rifle had committed a

11   crime?

12   MR. DAFFADA:  Objection.  Asked and answered.

13   You can answer.

14   THE WITNESS:  I'm sorry, could you repeat that?

15   That was -- I don't understand the question.

16   BY MR. FLAXMAN:

17   Q.    You told us that you believe that the

18   suspect had committed a crime.

19        My next question is did you believe you

20   had a reasonable basis to believe that the suspect

21   had committed a crime?

22   A.    Yes.

23   Q.    And why is that?

24   A.    I responded to an emergency call of a man

Daniel Rosenbaum 10/30/2023

```
 1   armed with a handgun.
 2       Q.   Why did you believe that the suspect was
 3   that man?
 4       A.   He matched the description as given by
 5   police dispatch.
 6       Q.   Any other reason that you believe that the
 7   suspect had committed a crime other than what
 8   you've told us?
 9       A.   Not to my recollection.
10       MR. FLAXMAN:  I have nothing further.
11       MR. DAFFADA:  All right.
12       MR. FLAXMAN:  Do you have any questions?
13       MR. DAFFADA:  I have a couple questions.
14                    EXAMINATION
15   BY MR. DAFFADA:
16       Q.   Your recollection of the events on
17   March 31st, 2021, do you have an independent
18   recollection of any independent recollection of
19   what happened that day without being refreshed?
20       A.   No.
21       Q.   What we've talked about today, what you've
22   testified about, was that based on having reviewed
23   the videos and these reports and reading the
24   complaint?
```

Exhibit 16
Page 55 of 58

Daniel Rosenbaum  10/30/2023

```
1    A.    Yes.

2    MR. DAFFADA:  No further questions.

3    MR. FLAXMAN:  Signature?

4    MR. DAFFADA:  Waived.

5                 (Deposition concluded at

6                 4:09 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Exhibit 16
Page 56 of 58

```
 1   STATE OF ILLINOIS   )

 2                       )  SS:

 3   COUNTY OF C O O K   )

 4            I, MELISSA C. GUANDIQUE, an Officer of the

 5   Court, do hereby certify that heretofore, to-wit,

 6   on the 30th day of October, 2023, appeared via Zoom

 7   Videoconference, DANIEL ROSENBAUM, in a cause now

 8   pending and undetermined in the Circuit Court of

 9   Cook County, Illinois, wherein Alexander Gray is

10   the Plaintiff, and City of Evanston, et al., are

11   the Defendants.

12            I further certify that the said witness

13   was first duly sworn to testify the truth, the

14   whole truth and nothing but the truth in the cause

15   aforesaid; that the testimony then given by said

16   witness was reported stenographically by me in the

17   presence of the said witness, and afterwards

18   reduced to typewriting by Computer-Aided

19   Transcription, and the foregoing is a true and

20   correct transcript of the testimony so given by

21   said witness as aforesaid.

22            I further certify that the signature to

23   the foregoing deposition was waived by counsel for

24   the respective parties.
```

1           I further certify that the taking of this

2    deposition was pursuant to Notice, and that there

3    were present at the deposition the attorneys

4    hereinbefore mentioned.

5           I further certify that I am not counsel

6    for nor in any way related to the parties to this

7    suit, nor am I in any way interested in the outcome

8    thereof.

9           IN TESTIMONY WHEREOF:  I have hereunto set

10   my digital signature this 8th day of November,

11   2023.

12

13

14

15   _____

16        ILLINOIS CERTIFIED SHORTHAND REPORTER

17

18

19

20

21

22

23

24

**Evanston Police Department**
Policy Manual

# Use of Force

## 300.1 PURPOSE AND SCOPE
This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this department is expected to use these guidelines to make such decisions in a professional, impartial, and reasonable manner.

In addition to those methods, techniques, and tools set forth below, the guidelines for the reasonable application of force contained in this policy shall apply to all policies addressing the potential use of force, including but not limited to the Control Devices and Techniques and Conducted Energy Device policies.

### 300.1.1 DEFINITIONS
Definitions related to this policy include:

**Deadly force** - Force reasonably anticipated and intended to create a substantial likelihood of causing death or very serious injury.

**Feasible** - Reasonably capable of being done or carried out under the circumstances to successfully achieve the arrest or lawful objective without increasing risk to the officer or another person.

**Force** - The application of physical techniques or tactics, chemical agents, or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed, or restrained.

**Imminent** - Ready to take place; impending. Note that imminent does not mean immediate or instantaneous.

**Totality of the circumstances** - All facts and circumstances known to the officer at the time, taken as a whole, including the conduct of the officer and the subject leading up to the use of force.

## 300.2 POLICY
The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Officers are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties.

Officers must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties.

The Department recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting officers with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation, and a careful balancing of all interests.

Copyright Lexipol, LLC 2023/10/17, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 17**
**Page 1 of 14**

Evanston Police Department
Policy Manual

*Use of Force*

___

### 300.2.1  DUTY TO INTERCEDE AND REPORT

Any officer present and observing another law enforcement officer or a member using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force.

Any officer who observes another law enforcement officer or a member use force that is potentially beyond that which is objectively reasonable under the circumstances should report these observations to a supervisor as soon as feasible.

Officers shall submit a written report within five days of the incident (720 ILCS 5/7-16).

### 300.2.2  PERSPECTIVE

When observing or reporting force used by a law enforcement officer, each officer should take into account the totality of the circumstances and the possibility that other law enforcement officers may have additional information regarding the threat posed by the subject.

### 300.3  USE OF FORCE

Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain, and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons, or methods provided by this department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

### 300.3.1  USE OF FORCE TO EFFECT AN ARREST

An officer may use any force which he/she reasonably believes to be necessary, under the totality of the circumstances, to effect an arrest, or to be necessary to defend him/herself or another from bodily harm while making an arrest (720 ILCS 5/7-5).

___

Copyright Lexipol, LLC 2023/10/17, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 17**
**Page 2 of 14**

# Evanston Police Department
Policy Manual

*Use of Force*

---

### 300.3.2 FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE
When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. These factors include but are not limited to:

    (a)    Immediacy and severity of the threat to officers or others.

    (b)    The conduct of the individual being confronted, as reasonably perceived by the officer at the time.

    (c)    Officer/subject factors (e.g., age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).

    (d)    The effects of suspected drug or alcohol use.

    (e)    The individual's mental state or capacity.

    (f)    The individual's ability to understand and comply with officer commands.

    (g)    Proximity of weapons or dangerous improvised devices.

    (h)    The degree to which the individual has been effectively restrained and his/her ability to resist despite being restrained.

    (i)    The availability of other reasonable and feasible options and their possible effectiveness.

    (j)    Seriousness of the suspected offense or reason for contact with the individual.

    (k)    Training and experience of the officer.

    (l)    Potential for injury to officers, suspects, and others.

    (m)    Whether the individual appears to be resisting, attempting to evade arrest by flight, or is attacking the officer.

    (n)    The risk and reasonably foreseeable consequences of escape.

    (o)    The apparent need for immediate control of the individual or a prompt resolution of the situation.

    (p)    Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

    (q)    Prior contacts with the individual or awareness of any propensity for violence.

    (r)    Any other exigent circumstances.

### 300.3.3 PAIN COMPLIANCE TECHNIQUES
Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:

    (a)    The degree to which the application of the technique may be controlled given the level of resistance.

---

Copyright Lexipol, LLC 2023/10/17, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 17**
**Page 3 of 14**

Evanston Police Department

Policy Manual

*Use of Force*

---

(b)    Whether the individual can comply with the direction or orders of the officer.

(c)    Whether the individual has been given sufficient opportunity to comply.

The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.

### 300.3.4   USE OF FORCE TO SEIZE EVIDENCE

In general, officers may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. However, officers are discouraged from using force solely to prevent a person from swallowing evidence or contraband. In the instance when force is used, officers should not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted. Officers are encouraged to use techniques and methods taught by the Evanston Police Department for this specific purpose.

### 300.3.5   RESPIRATORY RESTRAINTS

A member shall not apply direct pressure to the throat, windpipe, or airway of a person with the intent to reduce or prevent the intake of air (chokehold) unless deadly force is justified (720 ILCS 5/7-5.5). A member shall not use a chokehold or any lesser contact with the throat or neck area of another in order to prevent the destruction of evidence by ingestion (720 ILCS 5/7-5.5). If a respiratory restraint is applied, it is subject to the same guidelines and requirements as a carotid control hold.

### 300.3.6   ALTERNATIVE TACTICS - DE-ESCALATION

When circumstances reasonably permit, officers should use non-violent strategies and techniques to decrease the intensity of a situation, improve decision-making, improve communication, reduce the need for force, and increase voluntary compliance (e.g., summoning additional resources, formulating a plan, attempting verbal persuasion).

### 300.4   DEADLY FORCE APPLICATIONS

When reasonable, the officer shall, prior to the use of deadly force, make efforts to identify him/herself as a peace officer and to warn that deadly force may be used.

Use of deadly force is justified in the following circumstances involving imminent threat or imminent risk:

(a)    An officer may use deadly force to protect him/herself or others from what he/she reasonably believes is an imminent threat of death or serious bodily injury.

(b)    An officer may use deadly force to stop a fleeing subject when the officer has probable cause to believe that the individual has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and (720 ILCS 5/7-5):

1.    The officer reasonably believes that there is an imminent risk of serious bodily injury or death to any other person (except to the subject him/herself) if the individual is not immediately apprehended.

---

Copyright Lexipol, LLC 2023/10/17, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 17**
**Page 4 of 14**

Use of Force - 4
*App. 305 of 326*

Evanston Police Department

Policy Manual

*Use of Force*

---

2.    Under such circumstances, a verbal warning should precede the use of deadly force, where feasible.

Imminent does not mean immediate or instantaneous. An imminent danger may exist even if the suspect is not at that very moment pointing a weapon at someone. For example, an imminent danger may exist if an officer reasonably believes that the individual has a weapon or is attempting to access one and intends to immediately use it against the officer or another person. An imminent danger may also exist if the individual is capable of causing serious bodily injury or death without a weapon, and the officer believes the individual intends to immediately do so (720 ILCS 5/7-5).

300.4.1  MOVING VEHICLES
Shots fired at or from a moving vehicle involve additional considerations and risks, and are rarely effective.

When feasible, officers should take reasonable steps to move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants.

An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the imminent threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.

Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.

**300.5  REPORTING THE USE OF FORCE**
Any use of force by a member of this department shall be documented promptly, completely, and accurately in an appropriate report, depending on the nature of the incident. The officer should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances.

To collect data for purposes of training, resource allocation, analysis, and related purposes, the Department may require the completion of additional report forms, as specified in department policy, procedure, or law. See the Report Preparation Policy for additional circumstances that may require documentation.

300.5.1  NOTIFICATIONS TO SUPERVISORS
Supervisory notification shall be made as soon as practicable following the application of force in any of the following circumstances:

(a)    The application caused a visible injury.

(b)    The application would lead a reasonable officer to conclude that the individual may have experienced more than momentary discomfort.

(c)    The individual subjected to the force complained of injury or continuing pain.

(d)    The individual indicates intent to pursue litigation.

(e)    Any application of the conducted energy device or control device.

(f)    Any application of a restraint device other than handcuffs, shackles, or belly chains.

---

Copyright Lexipol, LLC 2023/10/17, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 17**
**Page 5 of 14**

Evanston Police Department

Policy Manual

*Use of Force*

___

     (g)    The individual subjected to the force was rendered unconscious.

     (h)    An individual was struck or kicked.

     (i)    An individual alleges unreasonable force was used or that any of the above has occurred.

## 300.6 MEDICAL CONSIDERATIONS

Once it is reasonably safe to do so, medical assistance shall be obtained for any person who exhibits signs of physical distress, has sustained visible injury, expresses a complaint of injury or continuing pain, or was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until the individual can be medically assessed. Individuals should not be placed on their stomachs for an extended period, as this could impair their ability to breathe (720 ILCS 5/7-15).

Based upon the officer's initial assessment of the nature and extent of the individual's injuries, medical assistance may consist of examination by an emergency medical services provider or medical personnel at a hospital or jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.

The on-scene supervisor or, if the on-scene supervisor is not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

Individuals who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics, and imperviousness to pain, or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away.

See the Medical Aid and Response Policy for additional guidelines.

## 300.7 SUPERVISOR RESPONSIBILITIES

A supervisor should respond to a reported application of force resulting in visible injury, if reasonably available. When a supervisor is able to respond to an incident in which there has been a reported application of force, the supervisor is expected to:

     (a)    Obtain the basic facts from the involved officers. Absent an allegation of misconduct or excessive force, this will be considered a routine contact in the normal course of duties.

     (b)    Ensure that any injured parties are examined and treated.

Copyright Lexipol, LLC 2023/10/17, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 17**
**Page 6 of 14**

Use of Force - 6
*App. 307 of 326*

# Evanston Police Department
Policy Manual

*Use of Force*

    (c)    When possible, separately obtain a recorded interview with the individual upon whom force was applied. If this interview is conducted without the individual having voluntarily waived his/her *Miranda* rights, the following shall apply:

        1.    The content of the interview should not be summarized or included in any related criminal charges.

        2.    The fact that a recorded interview was conducted should be documented in a property or other report.

        3.    The recording of the interview should be distinctly marked for retention until all potential for civil litigation has expired.

    (d)    Once any initial medical assessment has been completed or first aid has been rendered, ensure that photographs have been taken of any areas involving visible injury or complaint of pain, as well as overall photographs of uninjured areas.

        1.    These photographs should be retained until all potential for civil litigation has expired.

    (e)    Identify any witnesses not already included in related reports.

    (f)    Check the immediate vicinity for evidence, including video evidence. Search for and review all pertinent department video (station, in-car, body-worn camera, etc.)

    (g)    Review and approve all related reports.

    (h)    Determine if there is any indication that the individual may pursue civil litigation.

        1.    If there is an indication of potential civil litigation, the supervisor should complete and route a notification of a potential claim through the appropriate channels.

    (i)    Evaluate the circumstances surrounding the incident and initiate an administrative investigation if there is a question of policy noncompliance or if for any reason further investigation may be appropriate.

    (j)    Make notification to the Office of Professional Standards via email or telephone, providing the basic information for them to begin documentation and tracking of the investigation.

    (k)    Make proper notification through the chain of command if the use of force results in serious physical or death.

In the event that a supervisor is unable to respond to the scene of an incident involving the reported application of force, the supervisor is still expected to complete as many of the above items as circumstances permit.

In an effort to mitigate and also ensure that a  use of force complies with policy, a supervisor should be proactive in responding to calls and incidents where the chance of a use of force is elevated. The purpose of this response includes, but is not limited to, de-escalation, timely investigation, and requesting necessary assistance. Calls where a chance of use of force is elevated include, but is not limited to, calls involving weapons, in progress domestics, disturbances, and calls where known factors would reasonably lead a supervisor to believe the chance of a use of force is elevate.

Copyright Lexipol, LLC 2023/10/17, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 17**
**Page 7 of 14**

# Evanston Police Department
Policy Manual

## *Use of Force*

---

### 300.7.1  COMMANDER RESPONSIBILITY
The Commander shall review each use of force by any personnel within his/her command to ensure compliance with this policy and to address any training issues.

### 300.8  POLICY TRAINING
All personnel authorized to carry lethal and less-lethal weapons shall be issued copies of and receive instruction regarding this policy before being authorized to carry an weapon.

Policy instruction will be documented in the officer's training and evaluation manual.

Officers will receive periodic training on this policy and demonstrate their knowledge and understanding.

Subject to available resources, officers should receive periodic training on:

(a)  Guidelines regarding vulnerable populations, including but not limited to children, elderly, pregnant persons, and individuals with physical, mental, or intellectual disabilities.

(b)  De-escalation tactics, including alternatives to force.

(c)  Officers will receive training on the use of force at least yearly.

### 300.8.1  ADDITIONAL TRAINING REQUIREMENTS
At a minimum, officers shall receive training every calendar year in the use of force.

### 300.9  USE OF FORCE ANALYSIS
At least annually, the Office of Professional Standards should prepare an analysis report on use of force incidents. The report should be submitted to the Chief of Police. The report should not contain the names of officers, suspects or case numbers, and should include:

(a)  The identification of any trends in the use of force by members.

(b)  Training needs recommendations.

(c)  Equipment needs recommendations.

(d)  Policy revision recommendations.

### 300.10  STRESS/TRAUMATIC INCIDENTS
See attachment: SOP 300-1 Traumatic Stress Incidents.pdf

### 300.11  ANTI-RETALIATION
Retaliation against individuals who report or cooperate with use of force investigations is prohibited.

Evanston Police Department Policy Manual: 1004.3 RETALIATION PROHIBITED

Evanston Police Department Policy Manual: 1004.4 COMPLAINTS OF RETALIATION

---

Copyright Lexipol, LLC 2023/10/17, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 17**
**Page 8 of 14**

# Attachments

Copyright Lexipol, LLC 2023/10/17, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 17**
**Page 9 of 14**

Attachment

**SOP 300-1 Traumatic Stress Incidents.pdf**

Copyright Lexipol, LLC 2023/10/17, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 17**
**Page 10 of 14**

# DEPARTMENTAL GENERAL ORDER

| CITY OF EVANSTON, ILLINOIS | | | POLICE MANUAL | | |
|---|---|---|---|---|---|
| **Subject:** Stress/ Traumatic Incidents | **LEXIPOL 300-1** | **Rev. Jan 18, 2020** | **Effective Date With LEXIPOL** | **Page** 1 | **Of** 4 |
| **Index As: Employee Assistance Services, Remove from Duty, Traumatic Incidents** | | | **Prepared By Demitrous Cook Chief of Police** | | |

POLICY:     The Department recognizes that members, by virtue of their profession, may encounter situations that require them to take a police action which can result in emotional and psychological trauma. It is the policy of the Department to provide professional counseling service to its members to assist them in coping with the impact of any such traumatic incidents as well as providing services for other personal and emotional situations that may impact them. Member may receive voluntary assistance or member may be mandatorily referred.

I.     DEFINITIONS

    A.     A traumatic incident is any action by any member (sworn or civilian) that results in a death or serious physical injury or any police incident or action (on or off duty) which may result in emotional and psychological anguish. A traumatic incident includes, but is not limited to, the following: police shooting incidents which result in injury or death; situations in which officers are fired upon; police vehicle accidents involving death or serious personal injury; extremely violent scenes; etc.

    B.     Stress refers to any mentally or emotionally disruptive influence or distress to a member, on duty or off.

    C.     Serious Physical Injury: Injury that creates a substantial risk of death, may cause serious permanent disfigurement, may result in long-term or permanent loss or impairment of the function of any bodily member or organ, or may result in prolonged hospitalization.

II.     EMPLOYEE ASSISTANCE SERVICES

    A.     The Department has services on a contractual basis with a private referral counseling service.

    B.     The service provides services for a wide range of traumatic incidents and personal issues as well as consultation for a member's fitness for duty.

III.     INITIATING SERVICES

    A.     Any member of the Department, or an immediate family member, may contact the

**Exhibit 17**
**Page 11 of 14**

*App. 312 of 326*

**City of Evanston, Illinois**

| Subject:    Stress/ Traumatic Incidents | LEXIPOL 300-1 | Rev. Jan 18, 2020 | Effective Date With LEXIPOL | Page    Of    2        4 |
|---|---|---|---|---|

service for information or for a counseling appointment.

B.     All command and supervisory personnel have the authority and the responsibility to recommend the program to members under their supervision, when appropriate.

C.     Command staff members may require a member under their command to contact the service and to attend counseling sessions when there is reason to believe a traumatic or stress-related problem exists which currently is interfering, or may in the future interfere, with the member's job performance. The command staff member will initiate the appropriate referral and forward it through the chain of command to the Chief.

IV.     <u>REMOVAL FROM DUTY</u>

A.     Any Department member (sworn or nonsworn, full or part-time) whose actions or use of force results in a death or serious physical injury will be removed from line duty assignment pending an administrative review. The administrative review will consist of three parts.

1.     Medical Examination/Drug Screening

Physically injured members will not return to line duty assignment until a medical exam determines that the member is physically fit for such duty. Injured and uninjured members may be subject to mandatory drug screening as set forth in City policy, Department policy, or labor union agreement.

2.     Psychological Examination

The member will not return to line duty assignment until an emotional stability and psychological fitness examination determines that the member is emotionally and psychologically fit for such duty. The exam will be conducted and assessed by the City's or Department's employee assistance programs or other qualified professional with experience treating law enforcement personnel involved in traumatic/stressful incidents.

3.     Preliminary Investigation and Procedural Review

The member will not return to line duty assignment until authorized by the Chief of Police following a preliminary investigation and procedural review of the incident.

B.     A thorough investigation and procedural review of the incident will be conducted as directed by Department and City policy and procedures and/or as directed in writing

**Exhibit 17**
**Page 12 of 14**

**City of Evanston, Illinois**

| Subject: Stress/ Traumatic Incidents | LEXIPOL 300-1 | Rev. Jan 18, 2020 | Effective Date With LEXIPOL | Page Of |
|---|---|---|---|---|
| | | | | 3     4 |

by the Chief of Police.

C.  During the administrative review and investigation following removal from line duty assignment, the Chief of Police will determine and authorize the member's job status, such as temporary assignment to a staff or support position, administrative leave, or other status.

D.  For the good of an employee or the Department, and when authorized by the Chief of Police, the removal-from-duty policy may be applied to actions that result in less serious physical injury, to actions that result in emotional trauma, and to personnel who witness such actions or the aftermath of such actions.

E.  In addition to other required or necessary notifications, on-duty supervisors will consult with command level personnel to determine the applicability of this policy as soon as possible following such actions.

V.  TRAUMATIC INCIDENT -- PROCEDURE

A.  The ranking member on the scene (or informed of a situation) will assure that the ranking on-duty supervisor is promptly notified.

B.  The on-duty supervisor will take steps to insure for the proper care of the member. If there are obvious symptoms of traumatic stress, the member will be taken to the hospital for evaluation. The on-duty supervisor will assign a support person to the affected member to assist the member during the initial time after the incident.

C.  The on-duty supervisor will immediately notify the appropriate command level members and the Chief. If the incident involves a criminal investigation, the Deputy Chief of Investigative Services will be notified.

D.  The member will complete all investigative and procedural requirements relating to the incident if the member is physically and psychologically able.

E.  The member will be referred to the appropriate counseling/debriefing services as soon as possible after the event. After the member receives such services, the Chief of Police will determine the member's status.

F.  The Northern Illinois Critical Incident Stress Management Team provides assistance to emergency personnel coping with stressful experiences. The Command member in charge may authorize the call-out of this service.

Exhibit 17
Page 13 of 14

*App. 314 of 326*

**City of Evanston, Illinois**

| Subject: Stress/<br>Traumatic Incidents | LEXIPOL 300-1 | Rev.<br>Jan 18, 2020 | Effective Date With LEXIPOL | Page<br>4 | Of<br>4 |
|---|---|---|---|---|---|

VI. <u>SUPERVISOR'S RESPONSIBILITY</u>

    A. The procedures contained in this order do not abrogate the responsibility of supervisors to counsel members.

    B. This program will not be used as a substitute for normal disciplinary processes or to delay the normal disciplinary processes.

**Exhibit 17**
Page 14 of 14

*App. 315 of 326*

# Evanston Police Department
Policy Manual

# Search and Seizure

## 312.1  PURPOSE AND SCOPE
Both the federal and state Constitutions provide every individual with the right to be free from unreasonable searches and seizures. This policy provides general guidelines for Evanston Police Department personnel to consider when dealing with search and seizure issues.

## 312.2  POLICY
It is the policy of the Evanston Police Department to respect the fundamental privacy rights of individuals. Members of this department will conduct searches in strict observance of the constitutional rights of persons being searched. All seizures by this department will comply with relevant federal and state law governing the seizure of persons and property.

The Department will provide relevant and current training to officers as guidance for the application of current law, local community standards and prosecutorial considerations regarding specific search and seizure situations, as appropriate.

## 312.3  SEARCHES
The U.S. Constitution generally provides that a valid search warrant is required in order for a search to be permissible. There are, however, several exceptions that permit a warrantless search.

Examples of law enforcement activities that are exceptions to the general warrant requirement include, but are not limited to, searches pursuant to the following:

- Valid consent
- Incident to a lawful arrest
- Legitimate community caretaking interests
- Vehicle searches under certain circumstances
- Exigent circumstances

Certain other activities are recognized by federal and state courts and by certain statutes as legitimate law enforcement activities that also do not require a warrant. Such activities may include seizure and examination of abandoned property, and observations of activities and property located on open public areas.

Because case law regarding search and seizure is constantly changing and subject to interpretation by the courts, each member of this department is expected to act in each situation according to current training and his/her familiarity with the subject's clearly established rights as determined by case law.

Whenever practicable,members are encouraged to contact a supervisor to resolve questions regarding search and seizure issues prior to electing a course of action.

Copyright Lexipol, LLC 2023/12/19, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 18**
**Page 1 of 11**

Evanston Police Department
Policy Manual

*Search and Seizure*

For information relative to searches during street stops and temporary detentions, place see Policy 419 of this manual.

## 312.4   SEARCH PROTOCOL

Although conditions will vary and officer safety and other exigencies must be considered in every search situation, the following guidelines should be followed whenever circumstances permit:

(a)   Members of this department will strive to conduct searches with dignity and courtesy.

(b)   Officers should explain to the person being searched the reason for the search and how the search will be conducted.

(c)   Searches should be carried out with due regard and respect for private property interests and in a manner that minimizes damage.

(d)   In order to minimize the need for forcible entry, an attempt should be made to obtain keys, combinations or access codes when a search of locked property is anticipated, unless such an attempt would compromise an active investigation.

(e)   When the person to be searched is of the opposite sex as the searching officer, a reasonable effort should be made to summon an officer of the same sex as the subject to conduct the search. When it is not practicable to summon an officer of the same sex as the subject, the following guidelines should be followed:

(a)   Another officer or a supervisor should witness the search.

(b)   The officer should not search areas of the body covered by tight-fitting clothing, sheer clothing or clothing that could not reasonably conceal a weapon.

(c)   If possible, conduct the search so that it can be documented on camera.

For further information on searches:  See attachment: SOP 312-1 1.20.21.pdf

## 312.5   DOCUMENTATION

Officers are responsible to document any search and to ensure that any required reports are sufficient including, at minimum, documentation of the following:

• Reason for the search

• Any efforts used to minimize the intrusiveness of any search (e.g., asking for consent or keys)

• What, if any, injuries or damage occurred

• All steps taken to secure property

• The results of the search, including a description of any property or contraband seized

• If the person searched is the opposite sex, any efforts to summon an officer of the same sex as the person being searched and the identification of any witness officer

Supervisors shall review reports to ensure the reports are accurate, that actions are properly documented and that current legal requirements and department policy have been met.

Copyright Lexipol, LLC 2023/12/19, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 18
Page 2 of 11**

# Evanston Police Department

Policy Manual

## Search and Seizure

Copyright Lexipol, LLC 2023/12/19, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 18**
**Page 3 of 11**

# Attachments

Copyright Lexipol, LLC 2023/12/19, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 18**
**Page 4 of 11**

Attachment

**SOP 312-1 1.20.21.pdf**

Copyright Lexipol, LLC 2023/12/19, All Rights Reserved.
Published with permission by Evanston Police Department

**Exhibit 18**
**Page 5 of 11**

SOP 312-1 1.20.21.pdf - 5
*App. 320 of 326*

# STANDARD OPERATING PROCEDURE

| CITY OF EVANSTON, ILLINOIS | | | POLICE MANUAL | | |
|---|---|---|---|---|---|
| Subject: Searches | Number 312-1 | Rev. Jan 20, 2021 | Effective Date With Lexipol | Page 1 | Of 6 |
| Index As:          Searches; Consent Searches, Search Warrants, Emergency Searches, Search Incident to Arrest, Search to Affect Arrest,  Conducting Searches | | | Prepared For Demitrous Cook Chief of Police | | |

POLICY:  It is the policy of the Evanston Police Department to respect the fundamental privacy rights of individuals.  Members of this department will conduct searches in strict observance of the constitutional rights of persons being searched.  All seizures by this department will comply with relevant federal and state law governing the seizure of persons and property.

## I.    CONSENT SEARCHES

### A.    Granting Consent

Consent is a statement to an officer giving permission to search. The person granting consent must be the person being searched, or the registered owner or person in apparent control of a vehicle; or by a person who owns the premises or is in apparent control of the premises. The consent must be voluntary. The court will consider the totality of the circumstances to determine if the consent was voluntarily given. Police cannot use the consent of a co-occupant to make entry in order to search for evidence to be used against the opposing occupant who is present and objects to the entry (SCOTUS Randolph v. Georgia). Once consent is refused or withdrawn, the search must be terminated immediately.

### B.    Scope of  Consent Search

A person has the right to refuse to give consent to search. A person giving consent may limit the scope or duration of the search. The consent may be withdrawn at any time during the search. If the consent is revoked, the search must cease. Officers are not required to notify the consenting person of these rights prior to requesting consent unless the person inquires, and then the officer must answer truthfully.

### C.    Consent  Search Waiver Form

Where possible, officers should have the consenting person sign a Consent to Search form prior to initiating a consent search. If written consent is not available, officers should document exactly what the consenting person said, and note any witnesses or any audio/video recording.

**Exhibit 18**
Page 6 of 11

*App. 321 of 326*

| Subject: Searches | Number | Rev. Mar. | Effective Date | Page | Of |
|---|---|---|---|---|---|
| | SOP 312-1 | 21, 2017 | March 21, 2017 | 2 | 6 |

## II.   SEARCH WARRANTS

A search warrant is a court order directing a law enforcement officer to search a designated person, place or vehicle for particularly described it ems that are subject to seizure.  The law s regarding the issuance and execution of search warrants are set out in Illinois Revised Statute. Search warrants must have prior approval given by States Attorney's Office.

### A.   Searches of Premises

A police supervisor will be notified any time a member intends to execute a search warrant of a premise.  The member obtaining the warrant will obtain permission from his/her immediate supervisor (whether on-duty or not). A bureau or divisional supervisor belonging to the member executing the warrant will be responsible for and accompany the member on the execution of the search w arrant. Prior to executing the w arrant, the member's supervisor will conduct a pre-search warrant briefing and understand the plan of the mission. The supervisor may seek assistance from other divisions and bureaus. A uniformed police officer will be present if there is reason to believe that forcible entry may be required. The Chief of Police will be informed prior to and after the w arrant is executed by the supervisor in charge of the w arrant service.

### B.   Time Limitations

Search warrants must be executed within certain time frames.  If a warrant is not executed, it must be marked "not executed" and returned to the clerk of the issuing court.

After executing a warrant, the officer must without unnecessary delay, return the w arrant with a written inventory of the items seized.

## III.   EMERGENCY SEARCHES

Officers may conduct a warrantless emergency search w here there is probable cause to search and an emergency (exigent circumstances) exists which denies the officer the time and opportunity to obtain a search w arrant. In the event an officer seizes any evidence, the officer must prepare the appropriate inventory forms.

**Exhibit 18**
Page 7 of 11

| Subject: Searches | Number | Rev. Mar. | Effective Date | Page | Of |
|---|---|---|---|---|---|
| | SOP 312-1 | 21, 2017 | March 21, 2017 | 3 | 6 |

A.    <u>Vehicles</u>

If an officer has probable cause to search a motor vehicle that is lawfully stopped in a public place, then the officer may conduct a full search of the vehicle without a search warrant.

The search could be conducted where the vehicle is stopped or moved to a different facility for searching. The scope of the search is the same as could be authorized by a search w arrant, generally only limited by the size of the item being sought.

If an officer's probable cause focuses on the vehicle and not on a particular container, then the entire vehicle, including containers, can be searched if the containers could conceal the evidence.

If an officer' s probable cause to search goes to a particular container which is within a vehicle, then the officer may search the vehicle for the specific container and may conduct a warrantless search of the container for the evidence. The vehicle would need to be lawfully stopped in a public place.

B.    <u>Residences or Other Premises</u>

Generally a residence or other premises is not going to be searched without a search warrant or consent. It is possible to search a house if there is probable cause and exigent circumstances. If officers have probable cause and an emergency, the officer could make a warrantless search. The better option which should be exercised by officers in the event there is probable cause and a true emergency is to make a warrantless emergency entry, secure the premises, eliminate the emergency and conduct the search when the search warrant arrives.

C.    <u>Persons</u>

A warrantless search of a person can be conducted if the officer has probable cause to search and an emergency. Very often the same facts which create probable cause to search also provide probable cause to arrest. An officer has the option of searching based on probable cause plus an emergency or making an arrest and then searching the person incident to the arrest.

**Exhibit 18**
Page 8 of 11

*App. 323 of 326*

| Subject: Searches | Number | Rev. Mar. | Effective Date | Page | Of |
|---|---|---|---|---|---|
| | SOP 312-1 | 21, 2017 | March 21, 2017 | 4 | 6 |

D. <u>Crime Scene Searches</u>

There is no search warrant necessary to conduct an investigation of an incident which occurred in a public place. In an obviously private area (house, office, etc.), officer's should at least get consent from a person that has control over the premise to conduct an investigation. In instances of serious crimes such as murder, especially where there is reason to believe that the offender is someone who would have a right in that property, then a search warrant should be obtained. It is permissible for the officer to make a cursory search, or walk through of the crime scene to look for persons who may need medical assistance or who may pose a threat to the officer. Any evidence in plain view during the search for victims/offenders can be seized. Officer's may secure the premise until the search warrant is obtained. The officer should be as careful as possible to avoid contamination of the crime scene. The officer should be able to document exactly where he/she walked and what he/she touched.

IV. <u>SEARCH INCIDENT TO ARREST</u>

A. <u>Persons Under Arrest</u>

On making a full custody arrest, an officer may conduct a full search of the arrestee and the area within the arrestee's immediate control.

Generally, the area within immediate control is considered that area within the arrestee's reach. If the arrestee is permitted to move from room to room or is given access to particular areas, such as a drawer or closet, then the area that can be searched incident to arrest is expanded.

B. <u>Motor Vehicles</u>

Officers may conduct a search incident to arrest in order to protect themselves from any weapons the arrestee might grab and to seize any crime-related evidence that the arrestee might try to destroy. Once the arrestee has been lawfully arrested and taken into custody, officers may search the vehicle if the officer has a reasonable belief that evidence related to the offense of arrest may be inside the vehicle. Officers should document in their report that the search was conducted in search of evidence related to the offense. (e.g. Arrest for narcotics; I entered the arrestees vehicle looking for drugs or crime-related evidence associated with drug use or sales.)

**Exhibit 18**
Page 9 of 11

**City of Evanston, Illinois**

| Subject:  Searches | Number<br><br>SOP 312-1 | Rev.<br>Mar.<br>21, 2017 | Effective Date<br><br>March 21, 2017 | Page | Of |
|---|---|---|---|---|---|
| | | | | 5 | 6 |

## I.   SEARCHES TO AFFECT ARREST

Often an officer will have to enter a residence or premise to affect an arrest.

### A.   Arrestee's Residence

Consent: Entry may be made by requesting consent to enter from a person who has the apparent authority to give consent. The officer may then arrest with a warrant or without a warrant if such authority exists.

Exigent Circumstances: An officer may make a warrantless entry into the arrestee's residence to affect an arrest when there is an emergency, which justifies immediate action. (Such as fresh pursuit, a person's immediate safety or a heinous crime that occurred which would necessitate the immediate apprehension of the subject for risk of flight by the subject or public safety.) Officers will not make entry into a wanted person's residence for city ordinance violations without specific supervisory approval.

Warrant Arrest : A police officer can enter the residence of the w anted subject by consent, exigent circumstances or if there is a reasonable belief that the w anted subject is within his/her residence this may include forced entry if necessary, however officers should knock and announce their presence and purpose prior to entry into any residence unless officer safety would be  jeopardized.

### C.   Third Person' s Residence

Consent: An officer may enter a third person's residence with the consent from a person who has the apparent authority to give consent to affect an arrest of a person who does not live there.

Exigent Circumstances: An officer could make a warrantless entry into a third person' s residence to arrest someone who does not live there if there is authority to arrest  and there is an emergency.

### D.   Other Premises

To enter a non-residential premise to make an arrest, entry can be made if the property is generally open to the public. If the property is not open to the public, the officer should have consent, exigent circumstances or have an arrest w arrant for the w anted person and reasonable belief that the w anted person is on the premise. If the property belongs to a third party person and there is an expectation of privacy, a search w arrant should be obtained unless consent is given

**Exhibit 18**
**Page 10 of 11**

**City of Evanston, Illinois**

| Subject:  Searches | Number<br><br>SOP 312-1 | Rev.<br>Mar.<br>21, 2017 | Effective Date<br><br>March 21, 2017 | Page | Of |
|---|---|---|---|---|---|
| | | | | 6 | 6 |

## I.     CONDUCTING SEARCHES

### A.     Control of the  Search

When more than one officer is involved, the officer executing the search must be indicated. This officer is responsible for seeing that the search is properly executed, and that any evidence seized is properly maintained. A supervisor will be present in any non-consent search of a residence.

### B.     Seized Items

The area or person to be searched must be searched thoroughly. If evidence is located, the officer in charge will be notified and that officer will collect the evidence. The officer in charge will prepare  the appropriate inventory forms for all property seized.

### E.     Detention of Persons  Present

An officer directing a search of a premise not generally open to the public, or of a vehicle other than a common carrier, may detain persons present for such time as is reasonably necessary to execute the search.

1.     Officers may frisk persons present if they feel safety requires it.

2.     If the items listed on a search w arrant are not found on the premises or vehicle, the officers may then search any person present at the time of the officer's entry to the extent reasonably necessary to find property described in the w arrant which could be concealed upon the  person.

### F.     Concluding the  Search

At the conclusion of the search the officer in charge is responsible for making sure that the property that has been searched is secure or that the person in control of the property has had an opportunity to secure the property.   In the event the  officers  caused  any  damage  to  the property while conducting the search, a supervisor must be notified and a record made of  the  damage.

**Exhibit 18**
**Page 11 of 11**