UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALEXANDER GRAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-1931 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF EVANSTON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

An anonymous caller gave an ominous tip to the Evanston Police Department in a 911 call. A white man in a dark coat and jeans was carrying a firearm north of a beach.

Officers sprang into action, and they soon encountered Alexander Gray north of the beach, standing alone by the bike path. He was wearing an outfit that matched the description. The officers saw him holding a black object. But Gray is a black man.

The officers pulled out their handguns, and at least one officer pointed his weapon at Gray. They directed him to put up his hands, and get on the ground. He complied.

Before long, Gray was surrounded. The officers placed him in handcuffs, patted him down, and searched his pockets. They looked for a gun, and came up empty. After finding no gun, the officers let him go. When it was all said and done, Gray was detained for about seven minutes.

Gray responded by suing the City of Evanston and several police officers, alleging excessive force and an unreasonable search. He also brought a *Monell* claim against the City. After discovery, the parties filed cross motions for summary judgment. This Court denied Gray's motion for summary judgment. *See Gray v. City of Evanston*, 2024 WL 3495009 (N.D. Ill. 2024).

For the following reasons, Defendants' motion for summary judgment is hereby granted in part and denied in part.

## Background

The shores of Lake Michigan in Chicagoland are chock-full of beaches. Some beaches go on for blocks and blocks, and some beaches offer only a small oasis from urban life. The beach in question was the South Boulevard Beach, a little park nestled off of Sheridan Road in

Evanston, Illinois. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 6 (Dckt. No. 60); Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 12 (Dckt. No. 49). If you sneeze while driving, you might miss it.

It is easy to envision a beach filled with joyous beachgoers, doing what beachgoers do – making sandcastles, throwing frisbees, frolicking in the water, and so on. Going to the beach is one of the joys of summer in Chicago.

But the day in question wasn't like that at all. The incident took place in March 2021. The record confirms that the sky was overcast, with heavy gray clouds looming as far as the eye could see.

The incident took place in a green area north of the beach, right next to a bike path along a line of parked cars. The area wasn't crowded with people. In fact, by the look of things, the bike path was almost deserted.

Except for Alexander Gray.

On that wintry day in March 2021, the Evanston Police Department received an anonymous tip from a 911 caller. The tipster reported "a white male, approximately 5 feet tall to 6 feet tall, in a dark coat and jeans" carrying a handgun. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 2 (Dckt. No. 60). He was "just north of the beach on the trail." *Id.*

At the time of the call, "it was unlawful for any person to carry a firearm in a public park in Evanston." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 49).

Evanston police officers – including Defendants Marcin Kubiak, Michael Kane, Kyle Popp, Daniel Rosenbaum, and Pauline Pogorzelski – responded to the 911 call. *Id.* at ¶¶ 11, 14.

Body cam footage from several officers captured what happened next.

Officer Kubiak arrived on the scene first. *Id.* at ¶ 10; Kubiak Body Cam, at 2:33 (Dckt. No. 45).

At the time, Gray was just north of the beach. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 3 (Dckt. No. 60). He was by the trail. *See* Kubiak Body Cam, at 2:33 (Dckt. No. 45). He was standing in a grassy area by a bench and a tree. He stood between the bike path and the boulders that line the lake shore. *Id.* A line of parked cars stood on the other side of the bike path.

Gray's clothes fit the description. He was bundled up, wearing a dark parka and jeans. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 12 (Dckt. No. 49); Kane Body Cam, at 4:33 (Dckt. No. 45).

The record is mixed about whether Gray had a black object in his hand. *Compare* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 13 (Dckt. No. 49) (admitting that "Officer Kubiak *observed* [Gray] holding a black object in his hand") (emphasis added), *with id.* at ¶ 20 (disputing that [Gray] was [actually] holding *a black cell phone in his hand*") (emphasis in original).

Officer Kubiak says that he saw a black object in Gray's hand. *Id.* at ¶ 13 (citing Kubiak Dep., at 14:7-21); *see also* Kubiak Dep., at 14:22 – 15:18 (Dckt. No. 43-1). Gray says that he "probably" was holding his black cell phone in his hand. *See* Gray Dep., at 9:3-4 (Dckt. No. 40-2). But body cam footage appears to show nothing in Gray's hands. *See* Kubiak Body Cam, at 2:55 – 3:10 (Dckt. No. 45).

Gray also admits that he "had a pair of black headphones on his person" when the officers encountered him, although he doesn't say whether the headphones were in his hands. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 20 (Dckt. No. 49). By the look of things, it appears that Gray took off the headphones when he got on the ground. *See* Kubiak Body Cam, at 2:55 – 3:10 (Dckt. No. 45). It's hard to say for sure.

Putting that issue aside, Gray differed from the description by the 911 caller in another important respect. Gray is not a white man. Gray is a black man. *See* Pl.'s Ex. 3, at 1 (Dckt. No. 40-3). That said, Gray had a beard, so his face was not completely visible.

By the look of things, Gray was the only person in sight. The body cam footage does not show any other pedestrians, or any cyclists.

Officer Kubiak pulled out his weapon, and pointed it squarely at Gray. *See* Kubiak Body Cam, at 2:33 (Dckt. No. 45); *see* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 13 (Dckt. No. 49). Officer Kubiak directed Gray to put his hands up and get on the ground. *See* Kubiak Body Cam, at 2:33; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 21.

It's hard to say exactly how far away Officer Kubiak was from Gray at that point. But the line of cars helps to give some idea. Officer Kubiak walked down the bike path toward Gray, and walked along eight or nine parked cars. *See* Kubiak Body Cam, at 2:25 – 3:15 (Dckt. No. 45); *see also* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 5 (Dckt. No. 60) (agreeing that Officer Kubiak "walked slowly past about nine diagonal parking spaces before reaching plaintiff"). Those cars were parked widthwise. *See* Kubiak Body Cam, at 2:25 – 3:15.

Before Officer Kubiak started walking toward Gray, the distance between them was equal to roughly eight or nine parking spaces, measured widthwise. If an average parking space is roughly nine feet wide, then eight parking spaces is approximately 72 feet. So, as a ballpark figure, maybe Officer Kubiak was 72 feet away from Gray, give or take, when he pulled out his weapon.[1]

---

[1] This Court isn't relying on that exact distance as a basis for its decision. But the distance is helpful to set the scene, from a story-telling perspective, to give the reader a sense of what the videos show. Gray stated that the distance was equal to "nine diagonal parking spaces," adding that "plaintiff estimates it to be 45 feet." *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 5 (Dckt. No. 47). The latter

The exact distance doesn't matter. The idea is that Officer Kubiak was some distance away from Gray when he pulled out his weapon.

Officer Kane soon arrived, and sprinted toward Officer Kubiak from behind. *See* Kane Body Cam, at 4:00 (Dckt. No. 45); *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 14–15 (Dckt. No. 49). Officer Kane removed his weapon, too. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 15. He held it out with his right hand. By the look of things, he pointed it down, maybe at a 45-degree angle toward the ground, resting it on the back of his outstretched left hand. *See* Kane Body Cam, at 4:17-32; Kubiak Body Cam, at 3:21 (Dckt. No. 45).

Gray cooperated with the officers. As directed, he promptly put his hands up when Officer Kubiak directed him to do so. *Id.* at 2:34-38; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 13 (Dckt. No. 49).

Officer Kubiak asked Gray what he had in his pocket. *See* Kubiak Body Cam, at 2:46 (Dckt. No. 45). Gray responded that he was smoking a cigarette. *Id.* at 2:48. The officer once again asked what he had in his pocket, and Gray responded "I live here." *Id.* at 2:50-54.

Officer Kubiak directed Gray to get on the ground, four times. *See* Kubiak Body Cam, at 2:34 – 3:00 (Dckt. No. 45). Gray didn't resist, but he didn't get on the ground after the first directive, either. After the fourth directive, Gray calmly got on the ground. *Id.* at 3:05; Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 22 (Dckt. No. 49); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 8 (Dckt. No. 60). He appears to take the headphones off his head as he got on the ground. *See* Kubiak Body Cam, at 2:55 – 3:10 (Dckt. No. 45).

Officers Kubiak and Kane slowly walked toward Gray from a distance. *See* Kane Body Cam, at 3:59 – 4:15 (Dckt. No. 45); *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 12 (Dckt. No. 49). Officer Kubiak pointed his weapon at Gray the entire time, putting Gray in the crosshairs.

When the officers approached Gray, they could see black headphones on the ground in front of him. *See* Kane Body Cam, at 4:30-34 (Dckt. No. 45); *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 13 (Dckt. No. 49).

Officer Kubiak told Gray: "Do what we tell you and you won't get hurt." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 22 (Dckt. No. 49).

Moments later, a swarm of officers appeared. Officers Popp, Rosenbaum, and Pogorzelski arrived on the scene. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 17 (Dckt. No. 49). They surrounded Gray as he was on the ground. Gray commented: "holy shit." *See* Kubiak Body Cam, at 3:26-28 (Dckt. No. 45).

---

number cannot be right. Nine parking spaces occupy more space than 45 feet. That's only five feet per parking space. That might work for a Vespa, but not a car. As an aside, an ordinance in Evanston requires each parking space to be at least eight and a half feet wide. *See* Evanston Mun. Code tit. 6, ch. 16, § 2-4 (2024). Eight and a half feet per parking space, times eight parking spaces, is 68 feet (and it's even larger if there were nine parking spaces, as the parties agreed).

One of the officers asked Gray if he had a gun. Gray responded: "nothing, nothing." *Id.* at 3:33-36.

Officers Kane and Popp handcuffed Gray. *See* Kane Body Cam, at 4:30 – 5:30 (Dckt. No. 45); *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 25 (Dckt. No. 49).

Officer Pogorzelski explained to Gray that the police had received a call about a man in the park with a handgun in his right hand. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 26 (Dckt. No. 49). She acknowledged that maybe someone "mistook" his headphones. *See* Kubiak Body Cam, at 4:03-12 (Dckt. No. 45).

Gray responded: "they totally mistook me." *Id.* at 4:12. He explained that he "was just on a phone call." *Id.* at 4:12-19.

Officers Kane and Popp patted Gray down. *See* Kane Body Cam, at 4:30 – 5:30 (Dckt. No. 45); *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 49). As they rolled Gray over (onto his back), Officer Pogorzelski apologized if there was a "misunderstanding." *See* Kane Body Cam, at 5:28-31.

They reached into Gray's jacket pockets, too. *See* Kane Body Cam, at 5:37 – 6:02 (Dckt. No. 45); *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 49). The officers removed several items from Gray's coat pocket, including his black cellphone, a set of keys, a black glove or two, and a surgical mask.[2] *See* Kane Body Cam, at 5:37 – 6:02.

Officers Kane and Popp helped Gray get back on his feet. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 28 (Dckt. No. 49). Gray reiterated that he was simply on a phone call, taking a smoke break. *See* Kane Body Cam, at 5:56 – 6:04 (Dckt. No. 45).

Officer Pogorzelski asked if the officers could open Gray's jacket. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 28 (Dckt. No. 49). She said: "Do you mind if we open your jacket just to make sure there's nothing?" *See* Kane Body Cam, at 6:10-15 (Dckt. No. 45).

Gray responded mid-sentence, giving his consent. He gave them the green light: "of course – no problem." *Id.*

An officer – who appears to be Officer Burgers, a non-defendant – then opened and searched Gray's jacket. *Id.* at 6:15-45; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 49); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 13 (Dckt. No. 60).

---

[2] The location of Gray's cellphone might be a question of fact. At deposition, Gray testified that he "probably" had his cell phone in his hands. *See* Gray Dep., at 9:3-4 (Dckt. No. 40-2). But in his summary judgment filings, Gray disputed the fact that he held a cell phone. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 20 (Dckt. No. 49). Based on the body cam footage, this Court can't help but wonder if the phone was in his pocket. The footage isn't perfect, but the phone isn't visible on the ground when the officers approached him. *See* Kane Body Cam, at 4:30-34 (Dckt. No. 45). Also, it looks like the officers removed the phone from his pocket during the search on the ground. *Id.* at 5:37 – 6:02. Either way, the exact location of the phone does not control the outcome of this motion.

5

The ensuing search of the pockets didn't take long. Maybe 10 or 15 seconds. *See* Kane Body Cam, at 6:31-43 (Dckt. No. 45). The officer probably spent more time unzipping Gray's jacket than he did searching inside of it. *Id.* at 6:16-45.

After the officer finished unzipping Gray's parka, he opened up the sides of Gray's jackets, briefly scanning both sides. *Id.* at 6:30-40. He also lightly poked into a few interior pockets, peeking inside but not digging deeply. *Id.* at 6:30-38. Officer Pogorzelski also briefly lifted up one side of Gray's jacket and touched near his waistband. *Id.* at 6:38-45.

The officers found no gun, and let Gray go. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 29 (Dckt. No. 49).

Officer Kubiak explained to another officer: "He was standing right here. . . . I didn't see anybody else." *See* Kubiak Body Cam, at 5:12-18 (Dckt. No. 45).

Officer Pogorzelski once again apologized, and thanked Gray for his "cooperation." *See* Kane Body Cam, at 6:54 – 7:10 (Dckt. No. 45); Kubiak Body Cam, at 5:50 – 6:06 (Dckt. No. 45). She repeated that someone had called 911 and had said that someone was standing by the trail, holding a gun. *See* Kane Body Cam, at 6:54 – 7:10. Officer Pogorzelski wondered aloud if the caller had "vision problems." *Id.*

All in all, the interaction didn't take much time. About seven minutes passed between when Officer Kubiak arrived on the scene and when the officers released Gray. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 30 (Dckt. No. 49).

Later, after the search of Gray, an officer walked south to the beach area. He saw two people on the beach wearing dark coats. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 17–18 (Dckt. No. 60). But they were in a different spot than the location of the person with the would-be gun. The 911 caller claimed that a gunman was "just north of the beach on the trail." *Id.* at ¶ 2. And here, the two beachgoers in dark coats weren't on the trail north of the beach (like Gray was) – they were on the beach itself.

The City of Evanston has a use of force policy, called "Policy 300." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 31 (Dckt. No. 49). The policy requires officers to "use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose." *See* Defs.' Ex. 10, at 2 (Dckt. No. 43-5).

Gray filed suit against the officers and the City of Evanston, bringing three claims.

First, Gray brings an excessive-force claim. Gray alleges that Officer Kubiak used excessive force when he pointed his firearm at Gray. Gray alleges also that Officer Kane used excessive force by unholstering his weapon. *See* Pl.'s Mem. in Supp. of Pl.'s Mtn. for Summ. J., at 2 (Dckt. No. 32).

6

Second, Gray alleges that Officers Kane, Kubiak, Popp, Rosenbaum, and Pogorzelski conducted an unlawful search. *Id.*

Third, Gray brings a *Monell* claim against the City of Evanston, claiming that its "written policies for the use of force and search and seizure authorize unlawful police conduct." *Id.* at 3.

After discovery, the parties filed cross motions for summary judgment. *See* Pl.'s Mtn. for Summ. J. (Dckt. No. 30); Defs.' Mtn. for Summ. J. (Dckt. No. 38). This Court denied Gray's motion for summary judgment. *See generally Gray*, 2024 WL 3495009.

The ruling at hand focuses on Defendants' motion for summary judgment.

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

**I.  Claims Against the Officers**

Gray brings two claims against the officers – an excessive-force claim, and an unreasonable-search claim. The officers raise a variety of defenses, including qualified immunity.

Qualified immunity is "an immunity from suit rather than a mere defense to liability," meaning that "it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). So, the Court will start with the issue of qualified immunity. If qualified immunity applies, then the officers are immune from suit entirely.

7

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome qualified immunity, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818).

"[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). So, this Court will start with the second prong.

The plaintiff bears the burden of defining the right and showing that it was clearly established. *See Pryor v. Corrigan*, 124 F.4th 475, 488 (7th Cir. 2024); *see also Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017) ("Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once the defendants raise it.").

A plaintiff must "show[] that there is a case 'on point or closely analogous' that allows [the Court] to conclude that a reasonable government employee would or should know that her conduct is unlawful." *See Sebesta v. Davis*, 878 F.3d 226, 234 (7th Cir. 2017) (quoting *Boyd v. Owen*, 481 F.3d 520, 527 (7th Cir. 2007)).

This Court will address the excessive-force claim, and then the unlawful-search claim.

### A. Excessive Force

The Fourth Amendment prohibits "unreasonable searches and seizures." *See* U.S. Const. amend. IV. The use of force, standing alone, is not enough to give rise to a claim. After all, the Fourth Amendment prohibits *unreasonable* searches and seizures.

The right to make an investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 22–27 (1968)). The reasonableness of the force requires a balance between the intrusion on the Fourth Amendment right (on the one hand) and the government interests (on the other). *Id.*; *see also United States v. Place*, 462 U.S. 696, 703 (1983).

An objective-reasonableness standard applies when evaluating whether an officer used excessive force during an investigatory stop. *Graham*, 490 U.S. at 388. The test is objective, so the motives or intent of the officers are irrelevant. *See al-Kidd*, 563 U.S. at 736.

The reasonableness of the conduct depends on the facts known to the officers at the time of the incident. *See Burton v. City of Zion*, 901 F.3d 772, 780 (7th Cir. 2018) ("When evaluating the reasonableness of a police officer's use of force, the key question is what the officer knew at the time.") (internal quotation marks omitted); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) ("A court must make [the objective-reasonableness] determination from the

8

perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."); *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013) ("The reasonableness of the force used depends on the totality of the facts and circumstances known to the officer at the time the force is applied.").

The test requires "careful attention to the facts and circumstances of each particular case." *See Graham*, 490 U.S. at 396. A court must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

When evaluating the objective reasonableness of the conduct, context matters. After all, "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* It's a lot easier to declare that an officer acted unreasonably after the fact, with the luxury of time, without adrenaline rushing through your veins, while sipping coffee in the comfort of chambers with classical music softly playing in the background.

Gray contends that Officers Kubiak and Kane used excessive force when restraining him. *See* Pl.'s Mem. in Resp. to Defs.' Mtn. for Summ. J., at 3 (Dckt. No. 54). Gray points out that Officer Kubiak pointed his gun at him, and Officer Kane drew his firearm, in connection with the seizure. *Id.* He thinks that Officer Kubiak's verbal threat – "do what we tell you, and you won't get hurt" – was excessive force, too. *Id.*

As a starting point, Gray is right that the officers used force. Pointing a gun at someone is a show of force. *See, e.g.*, *Lopez v. Sheriff of Cook County*, 993 F.3d 981, 991 (7th Cir. 2021) ("Putting a gun to someone's head is no doubt a use of force."); *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009) (noting that "gun pointing" is a "use[] of force" that has been held unreasonable under certain circumstances); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 773–74 (7th Cir. 2000); *McDonald v. Haskins*, 966 F.2d 292, 294–95 (7th Cir. 1992). People feel coerced when looking at the wrong end of a gun.

Drawing a weapon in connection with a stop seems like a use of force, too. *See Bishop v. Bosquez*, 782 F. App'x 482, 487 (7th Cir. 2019) (considering whether drawing a gun was a reasonable use of force); *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005) (describing "the drawing of weapons and other measures of force"); *see also Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 925 (E.D. Wis. 1999) (considering whether "draw[ing] a gun" was a reasonable use of force during an investigatory stop). It's a display of soft power, with the possibility of hard power to follow.

But "pointing a gun during a valid investigatory stop . . . is not *per se* unreasonable." *See Williams v. Seltzner*, 2024 WL 127020, at *8 (W.D. Wis. 2024) (citing *Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989)); *see also Baird*, 576 F.3d at 346 ("[W]hile police are not entitled to point their guns at citizens when there is no hint of danger, they are allowed to do so when there *is* reason to fear danger.") (emphasis in original).

9

To overcome qualified immunity, Gray needs to demonstrate that the use of force was objectively unreasonable (*i.e.*, that his constitutional rights were violated), and that the use of force violated clearly established law. *See Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) ("In order to establish an excessive force claim under § 1983, plaintiffs must demonstrate that a state actor's use of force was 'objectively unreasonable' under the circumstances."); *see also al-Kidd*, 563 U.S. at 735 (quoting *Harlow*, 457 U.S. at 818).

The parties spend most of their briefs debating whether displaying the weapons amounted to a constitutional violation. That's part of the equation, but it's not enough. Gray also must demonstrate that the conduct violated a clearly established constitutional right.

Invoking broad constitutional principles writ large is not enough. The clearly established constitutional right must be "defined with specificity." *See Smith v. Finkley*, 10 F.4th 725, 742 (7th Cir. 2021). The Supreme Court has "'repeatedly told courts . . . not to define clearly established law at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quoting *al-Kidd*, 563 U.S. at 742).

In particular, "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

In a nutshell, a district court must "analyze whether precedent squarely governs the facts at issue, mindful [to] . . . not define clearly established law at too high a level of generality." *See Finkley*, 10 F.4th at 742 (citation omitted).

Gray does not define the clearly established constitutional right with any level of specificity. In fact, a reader is left wondering what that right is, except the right to be free from excessive force.

Gray seems to argue that the officers had no basis to believe that Gray was holding a weapon. *See* Pl.'s Mem. in Resp. to Defs.' Mtn. for Summ. J., at 5–9 (Dckt. No. 54). He points out that the 911 caller spoke about a white man, but Gray is a black man. Also, Gray takes issue with the location, suggesting that he wasn't where the caller spotted the gunman.[3]

---

[3] Gray submitted a demonstrative showing the location of the incident, based on Google Maps (which is fair game). *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 6 (Dckt. No. 47); Pl.'s Mem. in Resp. to Defs.' Mtn. for Summ. J., at 7–8 (Dckt. No. 54); *see also* South Boulevard Beach, Google Maps, https://maps.app.goo.gl/ZcX22aUD8qckJmdx5. The point seems to be that Gray wasn't where the 911 caller said the alleged gunman was. The 911 caller said that the gunman was "just north of the beach," but according to Gray's map, he was outside his residence – 325 feet away (to the north). That map doesn't get Gray very far. He selected a spot on the map, and marked it as the "start point north of beach." But by the look of things, he put that starting point in the *middle* of the beach, not "just north of the beach" (as the 911 caller said). The middle of the beach doesn't really matter, because the caller said that the gunman was north of the beach, not on the northern *half* of the beach. If the question is whether Gray was "just north of the beach," then there is no doubt about it. He was just north of the beach, as the

10

Even so, Gray does not frame the alleged constitutional right and pin it down. Is it a right not to be seized, when the person doesn't look like the suspect? Is it a right to be free from the use of force, when the police misidentify the person? Or, maybe a right to be free from the use of force when the police get the person's race wrong? Or maybe it's a right to be free from a seizure when the police stop the person in the wrong location? Or something else?

Whatever the right is, the right goes unspoken. Gray does not define a clearly established constitutional right with any degree of specificity. That's his burden, and he didn't carry it. So he did not overcome the hurdle of qualified immunity.

Instead, Gray goes down a few rabbit holes, and explores issues that do not move things forward.

For example, Gray points out that a verbal command from an officer while holding an unholstered handgun constitutes a seizure. *See* Pl.'s Mem. in Resp. to Defs.' Mtn. for Summ. J., at 10 (Dckt. No. 54); *Torres v. Madrid*, 592 U.S. 306 (2021). That's true, but it doesn't get Gray very far. Pointing out that a seizure took place tells you nothing about whether the seizure was unreasonable and violated a clearly established right.

Gray also cites cases about the failure to intervene. A police officer is subject to liability for not stepping in when another officer is violating a plaintiff's rights. *See, e.g.*, *Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). That's true, but beside the point. A failure to intervene comes into play only if a plaintiff establishes a violation of a clearly established constitutional right in the first place.

Gray has not carried the burden of demonstrating that the conduct violated a clearly established constitutional right. So the officers are entitled to qualified immunity. The Court grants summary judgment to Officers Kane and Kubiak on the excessive-force claim.

### B. Unlawful Search

Gray fares better on the next claim. He brings an unreasonable-search claim against Officers Kane, Kubiak, Popp, Rosenbaum, and Pogorzelski.

The claim is about the search of Gray's pockets. But the claim has some fuzziness. The officers searched Gray's pockets twice. Gray does not make it clear whether he is challenging the first search, or the second search, or both.

The first search took place while Gray was laying on the ground, handcuffed. *See* Kane Body Cam, at 5:37 – 6:02 (Dckt. No. 45). The officers removed a cell phone, a set of keys, a black glove or two, and a surgical face mask. *Id.* The second search took place when Gray got

---

body cam footage shows. The shoreline shows boulders, not sand, with the sandy beach to the south. In any event, the exact location is neither here nor there. Gray was in the vicinity of the spot where the alleged gunman was. And more importantly, Gray has not pointed to a clearly established constitutional right to be free from the use of force based on a geographical mix-up.

back on his feet, and the officers unzipped his jacket. *Id.* at 6:10-45. By the look of things, the officers poked around, but did not remove anything during the second search. *Id.*

At times, Gray seems to address the search that took place while he was on the ground. *See* Pl.'s Mem. in Resp. to Defs.' Mtn. for Summ. J., at 12 (Dckt. No. 54) ("[Officers] Popp and Kane searched [Gray]'s pockets."); Kane Body Cam, at 5:37 – 6:02 (Dckt. No. 45) (showing Officer Kane searching Gray's exterior pocket while Gray is on the ground).

At other times, Gray seems to discuss the search that took place while he was standing. *See* Pl.'s Mem. in Resp. to Defs.' Mtn. for Summ. J., at 12–13 (Dckt. No. 54) (discussing the search that ensued after Officer Pogorzelski asked him, "Do you mind if we open your jacket?"); Kane Body Cam, at 6:10-45 (Dckt. No. 45) (showing officers searching Gray's interior jacket pockets after opening his jacket while Gray is standing).

The Court will read Gray's filings broadly, and will assume that Gray is challenging both searches.

Even then, the claim about the second search has an aura of mystery, too. The primary officer who conducted the search inside Gray's jacket appears to be Officer Burgers. *See* Kane Body Cam, at 6:10-45 (Dckt. No. 45); Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 49); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 13 (Dckt. No. 60). But Officer Burgers is not a defendant. Gray appears to primarily challenge Officer Pogorzelski's actions: lifting up one side of his jacket and briefly touching near his waistband. *See* Kane Body Cam, at 6:38-45.

With those clarifications in mind, the Court returns to the issue of qualified immunity. Once again, the issue involves the existence of a clearly established constitutional right.

That issue suffers from neglect. In his brief, Gray devotes almost no attention to defining the clearly established constitutional right. He offers barely a morsel, invoking the general rule about *Terry* stops. The analysis spans only two sentences.

"Defendants agree that a *Terry* protective pat down search is limited to 'an outer search of a suspect's clothing.' . . . Nor do defendants dispute that the law is clearly established that a *Terry* stop is limited to 'a pat down.'" *See* Pl.'s Mem. in Resp. to Defs.' Mtn. for Summ. J., at 12–13 (Dckt. No. 54).

Gray did not make much of an effort to pin down the right with specificity, as required to overcome an assertion of qualified immunity. The argument is so skeletal that it comes close to the line of not carrying his burden. *See Archer*, 870 F.3d at 613 ("[T]he plaintiff has the burden of defeating [qualified immunity] once the defendants raise it. To do so, the plaintiff must show (1) that the defendant violated a constitutional right . . . and (2) that the right was clearly established at the time of the alleged violation . . . . A failure to show either is fatal for the plaintiff's case . . . .") (citations omitted); *Findlay v. Lendermon*, 722 F.3d 895, 899–900 (7th Cir. 2013) ("In reaching this conclusion, we do not suggest that no 'plainly excessive' argument could ever be made from the facts as Findlay presents them. But the burden to make this

12

showing rests squarely on Findlay. He has not done so and therefore cannot prevail."). If Gray carried his burden across the line, he slumped across it and made it by an inch, tops.

Gray basically says that police officers cannot search pockets during a *Terry* stop. That's not correct. Or at the very least, that's not *entirely* correct. There's a lot more to it.

The case law offers a more nuanced set of boundaries when it comes to searching pockets during *Terry* stops. Gray glossed over the nuances. Even so, the Court agrees that the rules about searching pockets during a *Terry* stop are clearly established.[4]

Police officers can stop someone if they have reasonable suspicion that the person has committed, is committing, or is about to commit a crime. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). Reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *See United States v. Cortez*, 449 U.S. 411, 417 (1981).

In other words, "[t]o make an investigatory stop, an officer needs only some reasonable suspicion supported by articulable facts that criminal activity is afoot." *See United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002) (citing *Terry*, 392 U.S. at 30). But once an officer has reasonable suspicion, "even without probable cause, [an officer] may conduct an investigatory stop, limited in scope and executed through the least restrictive means reasonable." *Id.*

Stopping a person is one thing. Frisking that person is another.

"The power to conduct a *Terry* stop does not automatically give police the power to frisk the subject for weapons." *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013). The legitimacy of a frisk is a "separate inquiry." *Id.*

The Fourth Amendment permits a frisk "only if a police officer can 'point to specific and articulable facts' indicating 'that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous.'" *United States v. Howell*, 958 F.3d 589, 598 (7th Cir. 2020) (quoting *Terry*, 392 U.S. at 21, 24–25).

A frisk is "a limited pat down of the suspect's outer clothing to search for weapons." *Id.* "An officer is not justified in conducting a general exploratory search for evidence under the guise of a stop-and-frisk." *United States v. Brown*, 188 F.3d 860, 866 (7th Cir. 1999). A frisk must "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29.

*Terry* entitles an officer to pat down a jacket and feel for a lump in the person's pocket. *See Minnesota v. Dickerson*, 508 U.S. 366, 379 (1993). "An officer encountering a small, hard

---

[4] The parties do not address probable cause. Gray does not argue that the police lacked probable cause for a search. On the flipside, Defendants do not argue that they had probable cause to search Gray's pockets.

13

object may have reasonable suspicion to believe that object is a weapon[.]" *United States v. Ford*, 872 F.3d 412, 417 (7th Cir. 2017) (citations omitted).

But during a *Terry* stop, when "the incriminating character of the object [in the pocket is] not immediately apparent to [the officer]," any further search is "constitutionally invalid." *Dickerson*, 508 U.S. at 379. In other words, the Supreme Court has clearly established a constitutional right against any "further search of [a] pocket" when the initial frisk does not reveal any object whose "incriminating character" is "immediately apparent." *Id.* That search would not be "authorized by *Terry* or by any other exception to the warrant requirement." *Id.*

But weapons are a different story. Police officers have greater latitude when they feel an object during a protective pat-down, and have reason to believe that the object is a weapon.

The restriction that "the incriminating character of the object [must be] immediately apparent" to justify further frisking "does not apply until the officer concludes that the object at issue is not a weapon." *United States v. Richardson*, 657 F.3d 521, 524 (7th Cir. 2011). After all, a frisk in a *Terry* stop is justified only by concerns for officer safety, and the purpose of the frisk is to search for weapons. *See Howell*, 958 F.3d at 598.

But once an officer concludes that the object is not a weapon, that officer "cannot go beyond a protective pat-down to manipulate an object concealed in a pocket unless 'the incriminating character of the object [is] immediately apparent.'" *Id.* (quoting *Dickerson*, 508 U.S. at 378–79). So, any further manipulation of an object is beyond the constitutional pale. *See United States v. Rivers*, 121 F.3d 1043, 1046 (7th Cir. 1997) ("[I]n *Dickerson*, the seizure was constitutionally invalid because the officer continued to manipulate the lump in the defendant's pocket to determine its nature even after concluding it was not a weapon.").

At bottom, when a "protective search [has] establish[ed] that the suspect is unarmed," *see United States v. Kenerson*, 585 F.3d 389, 393 (7th Cir. 2009), the suspect has a clearly established constitutional right not to be searched beyond a protective pat-down unless "the incriminating character of the object [is] immediately apparent." *See Dickerson*, 508 U.S. at 379.

Here, if the officers felt a hard lump or object in Gray's pocket during the protective pat-down, they may have had a reasonable suspicion to believe that object was a handgun. *See Richardson*, 657 F.3d at 524 ("Courts, including ours, have concluded that an officer who encounters a small, hard object during a pat-down may have reasonable suspicion to believe the object is a weapon."); *see also United States v. Brown*, 188 F.3d 860, 865–66 (7th Cir. 1999). And with reasonable suspicion of a weapon, the officers would be free to search that pocket. *See Richardson*, 657 F.3d at 523–24.

But if the officers had determined that Gray was unarmed during the initial pat-down, then Gray enjoyed a clearly established right to be free from any search of his pockets beyond the protective pat-down. *See Dickerson*, 508 U.S. at 379.

14

Gray didn't do much to establish the existence of a clearly established constitutional right. He put his toe in the water, in a sea of *Terry* case law, and not much else. Even so, this Court concludes that Gray had a clearly established constitutional right when it came to a search of his pockets during a *Terry* stop.

The question, then, is whether Gray presented sufficient evidence to support a verdict in his favor that the officers violated his rights. The Court concludes that he did.

The record reveals a genuine issue of material fact. A reasonable jury could conclude that the officers did not have a legitimate basis to search Gray's pockets. That is, a reasonable jury could conclude that the officers did not have a basis for believing that the objects in Gray's pockets – including his keys, his phone, a surgical mask, and a glove or two – felt like a weapon when they patted him down. *See* Kane Body Cam, at 5:37 – 6:02 (Dckt. No. 45).

On the other hand, a reasonable jury might see things the other way, literally and figuratively. A reasonable jury could conclude that those particular objects did provide the officers with a basis to believe that Gray had a weapon. After all, the Seventh Circuit has held that "[a]n officer encountering a small, hard object *may* have reasonable suspicion to believe that object is a weapon[.]" *Ford*, 872 F.3d at 417 (emphasis added) (citations omitted). On a pat-down, a phone might feel like a weapon. A phone is a small, hard object.

Maybe the officers reasonably believed that one of the objects in Gray's pocket felt like a weapon. Maybe they didn't. That's a question of fact. A jury will need to decide whether the officers had a reasonable belief about the presence of a weapon.

In a similar vein, the issue of consent presents another genuine issue of material fact. After he got back on his feet, Gray verbally gave the officers permission to look inside his jacket. Whether the officers exceeded the scope of that consent is a question of fact.

One possible reading is that Gray gave the officers consent to look inside the jacket, but not poke around. Another possible reading is that Gray gave the officers consent to open his jacket and look inside his pockets. Both interpretations are reasonable, so a jury needs to pick which one is right.

In sum, Gray has a legal and factual basis to contend that the officers violated a clearly established constitutional right during the search of his pockets. So the claim can get to a jury.

### II.   The *Monell* Claim

Gray also brings a *Monell* claim against the City of Evanston. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Gray takes issue with Evanston's policy about the use of force. "Evanston's use of force policy does not expressly forbid the threat of deadly force to compel compliance with a police order." *See* Pl.'s Mem. in Supp. of Mtn. for Summ. J., at 9 (Dckt. No. 39). He also complains

15

that officers aren't "trained to know that pointing a firearm at a suspect is the use of deadly force." *Id.*

A *Monell* claim requires a plaintiff to prove three elements: "[a] policy or custom, municipal fault, and 'moving force' causation." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 676 (7th Cir. 2022). In the case at hand, the first element is the place to start, and the place to end.

A municipality can have liability under section 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *See Monell*, 436 U.S. at 691. The Seventh Circuit "interpret[s] that language as creating three bases for municipal liability: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *See Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019).

When challenging a municipal policy, "as a threshold matter[,] plaintiffs must demonstrate that the policy at issue violates their constitutional rights." *Hall v. City of Chicago*, 953 F.3d 945, 950–51 (7th Cir. 2020) (citing *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010)).

And beyond that, a plaintiff must also show "an action pursuant to [that] municipal policy." *Id.* at 950. When an officer violates a constitutional right, but not under a city policy, a municipality is "*not* vicariously liable for the torts of its employees or agents." *See Bohanon*, 46 F.4th at 675 (citing *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020)). In other words, the municipality can be held liable only for its own constitutional violations. *See Monell*, 436 U.S. at 690–91.

Evanston has a policy about the use of force, called "Policy 300." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 31 (Dckt. No. 49). The policy requires officers to "use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose." *See* Defs.' Ex. 10, at 2 (Dckt. No. 43-5).

It's hard to argue with that.

First, Gray takes issue with the fact that the policy "does not expressly forbid the threat of deadly force to compel compliance with a police order." *See* Pl.'s Mem. in Supp. of Mtn. for Summ. J., at 9 (Dckt. No. 39).

True, the policy does not prohibit the threat of the use of deadly force. But the Constitution does not require such a prohibition, either. The Fourth Amendment does not forbid the use of deadly force as a blanket matter, let alone forbid a threat to use deadly force. Sometimes police officers have to use force, including deadly force. Officers carry weapons as part of their official duties, and for good reason.

"When addressing the use of deadly force, the court considers whether a reasonable officer in the circumstances would have probable cause to believe that the suspect poses an immediate threat to the safety of the officers or others." *See Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018). So, for example, "[i]f the suspect threatens the officer with a weapon, deadly force may be used." *Id.*

Evanston's use-of-force policy reiterates that standard. Policy 300 reads: "An officer may use deadly force to protect him/herself or others from what he/she reasonably believes is an imminent threat of death or serious bodily injury." *See* Defs.' Ex. 10, at 4 (Dckt. No. 43-5).

If anything, Evanston's use-of-force policy accurately reflected the current state of the law. No reasonable jury could find that the policy violated Gray's constitutional rights.

And again, even if the policy inspired the actions of the officers, Gray would not have a *Monell* claim. The officers did not use excessive force with they pointed their weapons at Gray. They had a reasonable basis to believe that Gray was holding a gun in a park, in violation of a local ordinance. There was no underlying constitutional violation, so there is no *Monell* claim.[5]

Second, Gray takes issue with the training. He believes that officers aren't "trained to know that pointing a firearm at a suspect is the use of deadly force." *See* Pl.'s Mem. in Supp. of Mtn. for Summ. J., at 9 (Dckt. No. 39).

That's not exactly right. Pointing a firearm at someone is not the *use* of deadly force.

True, pointing a gun can lead to the use of deadly force. And pointing a gun at someone can be an *excessive* use of force, too.

For example, if an individual presents no danger, pointing a gun at that individual to effectuate a seizure is unreasonable and violates the Fourth Amendment. *See Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 773–74 (7th Cir. 2000); *McDonald v. Haskins*, 966 F.2d 292, 294–95 (7th Cir. 1992). After all, pointing a gun *threatens* the use of deadly force. If a suspect does not himself threaten the use of deadly force, there is no need for an officer to threaten the use of deadly force, too.

But pointing a gun is not the *use* of deadly force. Gray points to no case or statute suggesting that merely pointing a gun at someone amounts to the *use* of deadly force.

It's hard to know what training Gray has in mind. Any police officer knows that pointing a gun at someone creates the possibility of the use of deadly force. That's the whole point.

In sum, no reasonable jury could find that Evanston's use-of-force policy violated Gray's constitutional rights. That conclusion forecloses Gray's *Monell* claim based on the use-of-force policy.

---

[5] Gray only argues for *Monell* liability on the excessive-force claim. He does not argue that his unlawful-search claim gives rise to *Monell* liability.

**Conclusion**

Defendants' motion for summary judgment is granted in part and denied in part. The Court grants the motion for summary judgment about the use of excessive force. The Court denies the motion for summary judgment about the reasonableness of the search. The Court grants the motion for summary judgment on the *Monell* claim.

Date: March 7, 2025

Steven C. Seeger
United States District Judge